**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RALPH HOLMES, DANIEL BAXTER, GEORGE CHILDRESS, HANNIBAL EASON, CURTIS FOSTER, CURTIS HALTERMAN, BILLY JOHNSON, WENDELL LANCASTER, DANIEL LORD, AARON WINFERT, and JASON WRIGHT, on behalf of themselves and all others similarly situated,<br><br>   Plaintiffs,<br><br>   v.<br><br>SALVADOR A. GODINEZ, Acting Director of Illinois Department of Corrections; and L. RACHEL MCKINZIE, Americans with Disabilities Act Coordinator, Illinois Department of Corrections,<br><br>   Defendants. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT** |

**CLASS ACTION COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

## I.  PRELIMINARY STATEMENT

1.  Plaintiffs are deaf and hard of hearing prisoners who are in the custody of the Illinois Department of Corrections (the "Department" or "IDOC"). While in IDOC custody, Plaintiffs have been denied the assistance they need to effectively communicate and participate in IDOC programs and services, in violation of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, the Religious Land Use and Institutionalized Persons Act, and the Eighth and Fourteenth Amendments to the Constitution of the United States. Plaintiffs seek to represent a class consisting of all prisoners who are deaf or hard of hearing and who are or will be confined in Illinois' prisons.

2.  As a result of the Department's failure to provide the assistance required by prisoners who are deaf or hard of hearing to effectively communicate, Plaintiffs have been

1

excluded from a variety of programs and activities offered by the Department, have been punished as a result of their disabilities, and have otherwise suffered injury.

3.     Among the injuries suffered by Plaintiffs as a result of the Department's failure to provide the assistance required for effective communication, Plaintiffs are unable to adequately: maintain contact with loved ones; benefit from educational opportunities (including academic classes, vocational training, and other programs) offered to prisoners; discuss their medical care because they can not communicate effectively with doctors, nurses, and other medical personnel; communicate with their counselors; participate in religious services; or access telephone and television services. Because the Department has failed to provide them adequate assistance, Plaintiffs are forced to serve their time largely isolated from, and are unable to effectively communicate with, other human beings. Plaintiffs have even missed meals and visitors because they could not hear announcements that they should leave their cells.

4.     The Department also has improperly disciplined Plaintiffs because of their disabilities. For example, Plaintiffs have been disciplined for not following orders which they could not hear. Plaintiffs have also been unable to defend themselves in hearings or proceeding stemming from disciplinary charges brought against them, because they could not effectively communicate with hearing officers and investigators.

5.     The Department's failure to properly account for Plaintiffs' disabilities also has jeopardized Plaintiffs' safety. For example, the Department has not made auditory safety alerts accessible to Plaintiffs, including such vital warnings as fire alarms, warning shots, and orders to lie down to avoid being shot. In addition, on a daily basis, the Department's failure to provide Plaintiffs the assistance they need means that Plaintiffs are forced to rely on other prisoners, placing them in constant danger of exploitation by those prisoners.

6.      The Department's failure to account for Plaintiffs' disabilities also has resulted in denying Plaintiffs access to an adequate grievance process for their complaints as to the manner in which they have been treated.  The Department conducts the grievance process without providing Plaintiffs with needed auxiliary aids and services as required by the ADA.

7.      Because the Department's systematic failure to provide deaf or hard of hearing prisoners the assistance they require improperly infringes upon the rights of all deaf or hard of hearing prisoners in IDOC custody, Plaintiffs seek class-wide declaratory and injunctive relief requiring the Defendants to provide the assistance necessary for prisoners who are deaf or hard of hearing to adequately participate in programs and services and to enjoy equal rights as hearing prisoners while incarcerated, and enjoining Defendants from denying equal rights to deaf or hard of hearing prisoners as a result of their disabilities, or punishing them because of their disabilities.

## II.     JURISDICTION

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because: (1) this action arises under the Constitution and laws of the United States, pursuant to 28 U.S.C. § 1343(a)(3); (2) this action seeks to redress the deprivation, under color of state law, of Plaintiffs' civil rights, pursuant to 29 U.S.C. § 794a and 42 U.S.C. § 2000e-16; (3) Plaintiffs allege that they have been aggrieved by an act or failure to act by a recipient of Federal assistance under 29 U.S.C. § 794, pursuant to 42 U.S.C. § 12133; (4) Plaintiffs allege discrimination on the basis of disability in violation of 42 U.S.C. § 12132, it is brought in part pursuant to 42 U.S.C. § 1983; and (5) Plaintiffs allege that Defendants deprived them of their rights, privileges, or immunities secured by the Constitution and Federal laws.

9.      This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

3

10.     This Court has jurisdiction to grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

## III.  VENUE

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because some Plaintiffs reside at Stateville Correctional Center ("Stateville"), which is located in this district; the principal place of business of L. Rachel McKinzie is located in this district; and a substantial number of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

## IV.  PARTIES

### A.  Plaintiffs

12.     Named Plaintiffs Ralph Holmes, Daniel Baxter, George Childress, Hannibal Eason, Curtis Foster, Curtis Halterman, Billy Johnson, Wendell Lancaster, Daniel Lord, Aaron Winfert and Jason Wright, (collectively, "Plaintiffs") are individuals with a hearing disability currently incarcerated at facilities under IDOC's custody and control.

13.     Ralph Holmes is a 41-year-old man incarcerated at Dixon Correctional Center ("Dixon").  He became deaf as a teenager due to a car accident.  He does not know American Sign Language ("ASL").  Mr. Holmes requires access to text information for all communications as well as development of sign language skills for rehabilitation purposes.

14.     Daniel Baxter is a 57-year-old man who has been incarcerated at Big Muddy River Correctional Center ("Big Muddy River") since 2007.  He has been hard of hearing since 2006, stemming from complications of a medical condition.  Mr. Baxter knows some sign language, but requires development of his sign language skills for rehabilitative purposes.  He requires hearing aids and to talk face-to-face in a quiet environment for effective communication.

15.     George Childress is a 60-year-old man incarcerated at Dixon.  He is deaf in both ears and uses a hearing aid in his left ear.  He uses ASL and writing to communicate.  He requires an ASL interpreter for effective communication.

16.     Hannibal Eason is a 28-year-old man currently incarcerated at Stateville Correctional Center ("Stateville").  He is partially deaf in both ears as a result of contracting meningitis at thirteen months of age.  In order to properly understand his surroundings, he needs to wear a hearing aid in both ears.  He now wears a hearing aid in only one ear.

17.     Curtis Foster is a 46-year-old man incarcerated at Stateville.  Mr. Foster was born with deafness in one ear and minimal hearing in the other.  Mr. Foster has been in prison since 1998.  He spent his first five years at Menard Correctional Center ("Menard") and was transferred to Stateville in 2003.  Mr. Foster relies on ASL to communicate and requires an ASL interpreter to communicate with people who do not know ASL.

18.     Curtis Halterman is a 40-year-old man incarcerated at Jacksonville Correctional Center ("Jacksonville").  Mr. Halterman lost his hearing in a car accident.  He has significant hearing loss in his left ear and relies on residual hearing in his right ear (assisted by a hearing aid in his left ear), lip-reading, and writing.  He communicates effectively by talking face-to-face with individuals in quiet environments.  Mr. Halterman has been in IDOC custody since February 1994, beginning at Menard.  He was transferred in 1996 to Western Illinois Correctional Center ("Western Illinois") and, in 2001, to Logan Correctional Center ("Logan").  He was subsequently transferred to Illinois River Correctional Center ("Illinois River") before being transferred to Jacksonville in 2007.

19.     Billy Johnson is a 28-year-old man incarcerated at Menard.  He was born deaf in both ears.  He grew up using sign language and is fluent in ASL.  He is able to communicate with persons who do not know ASL with the aid of an ASL interpreter.

20.     Wendell Lancaster is a 37-year-old man incarcerated at Dixon.  He has been deaf in both ears since birth.  He relies on ASL to communicate and requires an ASL interpreter to allow him to communicate effectively with persons who do not know ASL.

21.     Daniel Lord is a 44-year-old man incarcerated at Dixon.  He has been deaf since the age of three.  ASL is Mr. Lord's native language and he relies on it to communicate.  He requires an ASL interpreter to allow him to communicate effectively with persons who do not know ASL.  He was previously incarcerated at Joliet Correctional Center ("Joliet").

22.     Aaron Winfert is a 31-year-old man incarcerated at Menard.  He has been deaf in his left ear and hard of hearing in his right ear since early childhood.  His primary language is ASL.  He is able to communicate with persons who do not know ASL with the use of a hearing aid and/or an ASL interpreter.

23.     Jason Wright is a 32-year-old man incarcerated at the Graham Correctional Center ("Graham").  He was born deaf and communicates through ASL.  He requires an ASL interpreter for effective communication.

**B.      Defendants**

24.     Salvador A. Godinez is the Acting Director of IDOC and is responsible for the day-to-day operations of IDOC.  Mr. Godinez is sued in his official capacity.

25.     L. Rachel McKinzie is IDOC's Chief Legal Officer and ADA Coordinator, and is responsible for the administration of the ADA within IDOC.  Ms. McKinzie is sued in her official capacity.

26.     At all relevant times, Defendants were acting under color of state law, pursuant to their authority as officials, agents, contractors, or employees of the State of Illinois; within the scope of their employment as representatives of public entities, as defined in 42 U.S.C. § 12131(1); and as representatives of a "department, agency, special purpose district, or other instrumentality of a State" under 29 U.S.C. § 794(b).

## V.     DEFENDANTS' RESPONSIBILITIES TO DEAF OR HARD OF HEARING INMATES

### A.     IDOC's Responsibilities Under the U. S. Constitution

27.     Under the Fourteenth Amendment of the United States Constitution, "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

28.     Under the Eighth Amendment of the United States Constitution, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

29.     Pursuant to the Eighth and Fourteenth Amendments, Defendants are prohibited from denying deaf or hard of hearing prisoners basic rights and services, including rights and services offered to hearing inmates, in a manner that results in cruel or unusual punishment or that deprives Plaintiffs of their rights to equal protection of the laws by discriminating against Plaintiffs in the application of Federal laws or the laws of the state of Illinois.

### B.     Defendants' Responsibilities Under the Americans with Disabilities Act ("ADA")

30.     On July 12, 1990, Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with

7

disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

31.    Defendants are public entities, as departments, agencies, special purpose districts, or other instrumentalities of the State of Illinois, as defined in 42 U.S.C. § 12131(1).

32.    Plaintiffs are qualified individuals with a disability within the meaning of Title II of the ADA, 42 U.S.C. § 12131(2), and have a right not to be subjected to discrimination on the basis of their disability by Defendants. 42 U.S.C. § 12132.

33.    Individuals in the custody of IDOC such as Plaintiffs are wholly dependent on IDOC for medical, dental, educational, mental health, and religious services, among other services. Individuals in the custody of IDOC are also dependent on IDOC and prison staff for all of their basic daily needs, including food, exercise, and safety.

34.    Under the ADA, 42 U.S.C. § 12132, and 28 C.F.R. § 35.130(a), IDOC must ensure that individuals in its custody are not, on the basis of disability, excluded from participation in or denied the benefits of its services, programs, or activities

35.    The U.S. Department of Justice ("DOJ") regulation implementing Title II of the ADA requires the provision of effective communication as part of its nondiscrimination mandate. 28 C.F.R. 35.160.

36.    The DOJ regulation requires that "[a] public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a).

37.     The DOJ regulation further provides that, to ensure effective communication, "a public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity." 28 C.F.R. § 35.160(b)(1).

38.     To comply with the ADA, IDOC must provide equal access to and effective communication for its programs and services, as set forth in 28 C.F.R. § 35.149 and § 35.160(a). This includes the provision without surcharge of appropriate "auxiliary aids and services" to deaf or hard of hearing prisoners. 28 C.F.R. § 35.130(f) and §35.160.

39.     "Auxiliary aids and services" include: "(1) Qualified interpreters, note-takers, transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, or other effective methods of making aurally delivered materials available to individuals with hearing impairments; . . . (3) Acquisition or modification of equipment or devices; and (4) Other similar services and actions." 28 C.F.R. § 35.104.

40.     The type of auxiliary aid or service necessary to ensure effective communication for persons who are deaf or hard of hearing varies in accordance with the individual's amount of hearing loss and the length and complexity of the communication involved. ADA Title II Technical Assistance Manual, Section II-7.1000.

41.     In determining what type of auxiliary aid and service is necessary, "a public entity shall give primary consideration to the requests of the individual with disabilities." 28 C.F.R. § 160(b)(2).

42.    Many individuals who were deaf at birth or who lost their hearing before acquiring language, including some of the Plaintiffs herein, are not fluent or functionally literate in English – written or spoken – because their native language is American Sign Language ("ASL"), not English.  Those individuals are often unable to communicate effectively with people who are not fluent in ASL without the aid of an interpreter to facilitate communication. ADA Title II Technical Assistance Manual, Section II-7.1100.

43.    The ADA regulations include "qualified interpreters" in the list of appropriate auxiliary aids and services, and define the term "qualified interpreter" to mean "an interpreter who is able to interpret effectively, accurately, and impartially both receptively and expressively, using any necessary specialized vocabulary." 28 C.F.R. § 35.104.[1]

44.    For individuals who are deaf or hard of hearing but do not know ASL, like some of the Plaintiffs, auxiliary aids and services other than qualified sign language interpreters are required to effectively communicate.

45.    For example, individuals who lose their hearing later in life may not be familiar with sign language and may communicate effectively through written English.  ADA Title II Technical Assistance Manual, Section II-7.1100.  For these individuals, use of a word processor with a videotext display may provide effective communication in transactions that are long or

---

[1] The Illinois Interpreter for the Deaf Licensure Act of 2007, 225 ILCS Part 443, requires that all sign language interpreters seeking to work as interpreters in Illinois be licensed by the Illinois Deaf and Hard of Hearing Commission ("IDHHC").  Pursuant to 68 Ill.Admin.Code Part 1515, the IDHHC issues four distinct licenses indicating different proficiency levels for different types of interpreting.  68 Ill.Admin.Code § 1515.90(d-f).  Illinois state law requirements mandate that interpreters must hold a "Master" or "Advanced Proficiency" level license to provide interpreting services for Plaintiffs seeking access to programs and services within IDOC, with the exception that interpreters holding an "Intermediate Proficiency" level license are permitted to interpret educational classes provided within the IDOC.

complex, and computer-assisted simultaneous transcription may be necessary for communicating in real-time, such as during educational, disciplinary, or religious proceedings. *Id.*

46.     There are also numerous different means by which deaf or hard of hearing individuals telecommunicate.  The most common form of assistive communications device for deaf or hard of hearing individuals is the teletypewriter ("TTY"), also known as a telecommunication device for the deaf ("TDD").  A TTY is a telephone equipped with a keyboard and a display screen, used by individuals who have hearing or speech impairments.  A TTY allows individuals to send and receive typed messages using a keyboard attached to a telephone line.

47.     TTY units are not the only type of telecommunications device for deaf or hard of hearing individuals.  Certain individuals prefer to use a technology known as Voice Carry-Over relay service ("VCO") when placing phone calls.  VCO is for individuals who can speak clearly, yet have hearing loss significant enough to prevent them from hearing through a standard telephone.

48.     For deaf or hard of hearing individuals who are fluent in ASL but lacking in their ability to understand a spoken language, videophones and free or low-cost internet-based video links such as Skype are more effective than TTYs, because they allow deaf or hard of hearing individuals to communicate with one another directly in ASL, without having to translate every statement into written English.  Increasingly, videophones are the only effective means for deaf individuals to telecommunicate with other deaf individuals because TTYs are almost obsolete.

49.     By contrast, hard of hearing inmates who are able to understand sounds that are sufficiently loud may prefer the use of an amplified telephone.  Amplified telephones operate identically to normal telephones but are equipped to amplify sound by up to 50 decibels above

11

normal levels, and also to amplify specific tones which are particularly difficult for hard of hearing individuals to perceive.

50.　Under the ADA, the Department must individually assess each deaf or hard of hearing prisoner to determine what assistance they require to effectively communicate, and must provide such assistance.

### C.　IDOC's Responsibilities Under the Rehabilitation Act

51.　The purpose of the Rehabilitation Act is to ensure that no "qualified individual with a disability in the United States . . . shall, solely by reason of [ ] disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

52.　Plaintiffs are qualified individuals with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(2), and have a right not to be subjected to discrimination on the basis of their disability. 29 U.S.C. § 794(a).

53.　Defendants receive Federal financial assistance within the meaning of 29 U.S.C. § 794(a).

54.　Defendants, as departments, agencies, and/or instrumentalities of IDOC, are "program[s] or activit[ies]" within the meaning of 29 U.S.C. § 794(b)(1)(A)-(B) and/or (b)(2)(B) and were and are required to comply with the Rehabilitation Act.

55.　The DOJ regulation implementing the Rehabilitation Act clarifies the requirements for Federal financial recipients, including correctional facilities, stating that "[a] recipient that employs fifteen or more persons shall provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude the persons in the program receiving federal financial assistance." 28 C.F.R. § 42.503(f).

12

56.     Appropriate auxiliary aids include, but are not limited to, "brailled and taped material, qualified interpreters, readers, and telephonic devices."  28 C.F.R. § 42.503(f).

57.     The Rehabilitation Act and the regulations implementing it prohibit Defendants from denying Plaintiffs, on the basis of their disabilities, the same access to services, benefits, activities, programs, and privileges as the access provided to hearing individuals, including with respect to reception and classification programs, orientation programs, educational and vocational programs, employment/work programs, counseling services, healthcare services, religious services, telephones, televisions, library services, disciplinary proceedings, awareness and safety measures, grievances, and pre-release programs.

58.     The Rehabilitation Act and the regulations implementing it also prohibit Defendants from discriminatorily impairing Plaintiffs' ability to communicate effectively with medical personnel, prison staff, other inmates and individuals outside of prison or excluding Plaintiffs from educational, vocational, and religious services and prison-wide announcements, including by failing to provide appropriate auxiliary aids and services for individuals with hearing disabilities.

## VI.     IDOC'S FAILURE OF ITS RESPONSIBILITIES TO DEAF AND HARD OF HEARING INMATES AND DENIAL OF RIGHTS TO THOSE INMATES

59.     From the day prisoners enter the IDOC system, when they are to participate in an orientation session, to the day prisoners leave the system, after completing a pre-release program, prisoners are required to participate in various programs and activities, and are to be afforded the option of participating in many other programs and activities.  Most if not all of the mandatory and optional programs require that the prisoner be able to communicate effectively.  Hearing prisoners can fully participate in these programs and activities.  Because Defendants do not take

13

proper steps to address Plaintiffs' hearing disabilities and prevent them from communicating effectively, Plaintiffs are denied meaningful and adequate participation in these programs.

60.     IDOC's written policy statements and manuals require IDOC to provide prisoners with disabilities the assistance they need to fully participate in prison programs and activities. Despite these written policy statements and manuals, the _actual_ policy and practice of the Department is _not_ to provide deaf or hard of hearing inmates the assistance required by law and by its own manuals and written policies.

61.     IDOC, in fact, has established a _de facto_ policy of not providing deaf or hard of hearing inmates with access to, and effective communication for, programs and services within the Department.

62.     As is set forth in the following sections, deaf or hard of hearing prisoners are routinely denied any assistance at all, are left to fend for themselves, and are not provided the means and opportunity to effectively communicate, resulting in IDOC either formally or effectively excluding, or preventing the adequate participation of, deaf or hard of hearing inmates in many of the programs and activities available to prisoners who can hear.

**A.      Reception and Classification**

63.     When prisoners first enter the IDOC system, they are evaluated to determine a number of facts relevant to their incarceration, including: whether they have any special needs; whether they are in need of protection from, or are a danger to, other prisoners or staff; their physical and mental health; their educational level; their religion; and their gang affiliation (if any).  The results of this evaluation determine a prisoner's security classification and, thus, the prison at which the inmate will be housed, and the privileges the inmate will have. These

evaluations include oral question-and-answer sessions with the prisoner and various professional correctional and medical staff.

64.     Each of the named Plaintiffs, and all deaf or hard of hearing prisoners, have been through the reception and classification process.

65.     IDOC has failed to provide deaf or hard of hearing inmates, including Plaintiffs, with the assistance they needed to effectively communicate during the reception and classification process.  IDOC has failed to provide any means of effective communication to prisoners who are deaf or hard of hearing during this intake and evaluation process.  Prisoners are not properly identified as deaf or hard of hearing during the process.  The Defendants do not make a proper assessment of the assistance that deaf or hard of hearing inmates require for effective communication and do not keep records on which prisoners are deaf or hard of hearing.

66.     As a result, deaf or hard of hearing prisoners do not have their mental or physical health care needs properly identified, are regularly given improper security classifications, and do not receive the types of programming opportunities available to hearing prisoners.

**B.     Orientation**

67.     After prisoners complete the initial reception and classification process, they are transferred to one of IDOC's' 27 prisons.  Upon arrival at their assigned prison, prisoners are usually required to participate in an orientation program.  During this program, they are provided a copy of the written Orientation Manual which contains the written rules and regulations applicable to that particular prison.  These written materials are usually supplemented by an oral presentation (which may include a one-on-one conversation with a counselor, a group session, or a film).  This orientation process is repeated every time prisoners are transferred from one prison to another.

68.     IDOC has failed to provide deaf or hard of hearing prisoners with any adequate communication assistance during the orientation process.  Deaf or hard of hearing inmates therefore are denied an adequate understanding of the rules and procedures explained to hearing prisoners during orientation, are at risk of violating rules they do not know about or fully understand, and are unable to take advantage of programs, activities, and other opportunities that they do not know exist.

69.     Each of the named Plaintiffs, and all deaf or hard of hearing prisoners, have gone through this orientation process at least once, and most have been through this process several times.

70.     IDOC has failed to provide deaf or hard of hearing inmates, including Plaintiffs, with the assistance they needed to effectively communicate during the orientation process.

71.     For example, upon arrival at Menard, Messrs. Winfert and Johnson were given a copy of the Orientation Manual before being escorted to their cells.  Neither individual is fluent in written English, and neither was provided an interpreter to explain the Orientation Manual. As a consequence, neither individual could understand the information contained in the Orientation Manual and could not obtain the benefits of that information.  Other deaf or hard of hearing inmates have had similar experiences.

### C.     Educational and Vocational Programs

72.     Every prison operated by the Department provides some educational or vocational programming.

73.     Pursuant to 730 ILCS 5/3-6-3(a)(4), some prisoners are eligible to earn "good time" (*i.e.*, reduce the time they spend in prison) by participating in and completing certain educational, vocational, or substance abuse treatment programs.  For example, under 730 ILCS

5/3-6-3)(a)(4.1), some inmates are eligible to receive 60 days of "Earned Good Conduct Credit" if they pass the high school-level Test of General Educational Development ("GED").

74.     All such programs include an oral component.

75.     IDOC has failed to provide effective communication to deaf or hard of hearing prisoners who seek to participate in educational and vocational programs.  As a result, deaf or hard of hearing prisoners are not able to adequately participate in these programs, or participate in them to the same extent as hearing prisoners.  This not only deprives deaf or hard of hearing inmates of the experiences inherent to these programs but also results in deaf or hard of hearing prisoners spending more time in prison, due to their inability to earn good time.

76.     Plaintiffs Lancaster, Foster, Lord, Holmes, and Halterman, for example, have all attempted to take educational or vocational courses at one or more prisons and have requested assistance so that they could understand and participate in the oral portions of the course.  None of these individuals has been provided with the assistance required for effective communication.

**D.     Employment/Work Programs**

77.     IDOC provides employment and/or work programs for its inmates but has failed to provide deaf or hard of hearing inmates the opportunity to adequately participate in those programs, including by denying or limiting their work opportunities as a result of their hearing disabilities.

78.     For example, Messrs. Childress, Wright, Baxter, and Winfert have each applied for employment opportunities but have been repeatedly rejected despite having past experience and/or appropriate physical qualifications for the positions in question.

79.     Mr. Foster has been told that he cannot take advantage of employment opportunities until he completes certain prerequisites with respect to his obtaining a GED. However, because Mr. Foster is effectively prohibited from meeting these prerequisites by virtue

of the fact that IDOC does not provide him with an interpreter, he is prevented from obtaining the work opportunities enjoyed by hearing inmates.

80.     IDOC's practice of denying work opportunities to deaf or hard of hearing inmates deprives them of the benefits other inmates derive from those opportunities and has resulted in harm to Plaintiffs.

**E.     Counselors**

81.     Every prisoner is assigned a counselor. The counselor is supposed to be the person to whom prisoners turn for a wide variety of assistance.  Among many other services, when prisoners feel that they have been wrongfully denied access to some service or program, or otherwise have a complaint, they are required to try to resolve the problem with their counselor. Only if they are unable to resolve the problem with their counselor are they permitted to use the formal grievance system.  20 Ill. Admin. Code §504.810(a).

82.     The Department has failed to provide prisoners who are deaf or hard of hearing with the assistance they require for effective communication with the counselors.  Consequently, deaf or hard of hearing inmates, including Plaintiffs, are unable to effectively communicate with their assigned counselors.

83.     For example, rather than utilize interpreters and/or other means of effective communication, IDOC counselors frequently attempt to communicate with deaf or hard of hearing inmates through written notes.  Because  inmates who are deaf or hard of hearing often have a limited command of written English, and because of the inherent limitations in communicating solely through written notes (including that such communications are slow and tedious), writing notes is generally not an effective means of communication.

84.     Other counselors attempt to communicate in spoken language, on the assumption that deaf or hard of hearing inmates can lip-read.  However, because only some inmates with

hearing disabilities know how to read lips, and because even those individuals can read lips only in certain circumstances, such communications also are frequently ineffective. Often, deaf or hard of hearing inmates require hearing aids and/or an ASL interpreter to communicate effectively with their counselors, yet IDOC denies such inmates those methods of communication.

85.     As a result of IDOC's failure to provide prisoners who are deaf or hard of hearing with the means to effectively communicate with their counselors, deaf or hard of hearing prisoners are not able to obtain assistance, resolve concerns and problems, or otherwise make use of the counselors' services adequately, or to the same extent as hearing prisoners.

**F.     Medical, Mental Health, and Rehabilitative Services**

86.     IDOC provides medical services for prisoners' mental and physical health needs, as well as counseling, psychiatric, psychological, drug treatment, and drug rehabilitation services.

87.     IDOC has failed to provide deaf or hard of hearing prisoners with the assistance they require for effective communication with healthcare personnel. Consequently, deaf or hard of hearing inmates, including Plaintiffs, are not able to effectively communicate with these personnel.

88.     The following are examples of the harm suffered by Plaintiffs because they have been denied the right to communicate effectively with healthcare personnel:

a.  In 1991, Mr. Baxter had a stroke which left him partially paralyzed. He also has cirrhosis of the liver and bipolar disorder. All of these medical conditions require close monitoring, which in turn requires frequent communication between Mr. Baxter and medical personnel. However, Mr. Baxter has never been provided with the assistance he needs to communicate effectively with

medical personnel. He has therefore been unable to discuss what he believes are serious side-effects of certain medicines he is taking for his various medical conditions.

b. Mr. Childress has diabetes, and thus must closely monitor his blood sugar levels. This requires that he communicate with his doctors and other medical personnel, so that he can report any instances where he feels dizzy or otherwise has effects from either too high or too low blood sugar. Medical personnel must be able to effectively communicate with Mr. Childress so that he knows whether his blood sugar levels are within the acceptable range. However, the Defendants have failed to provide Mr. Childress with the assistance he needs to effectively communicate with medical personnel. As a result, he has had repeated episodes where his diabetes was uncontrolled, and at least one occasion where he went into a diabetic coma as a result of insufficient blood sugar.

c. Mr. Lancaster has desired to participate in a substance abuse program. Mr. Lancaster is required to attend such a program as part of his court-mandated program in connection with visitation and custody of his children. He would obtain good time credits by participating in such a program. Mr. Lancaster has not been able to participate in such a program as the Department has not provided the assistance he needs for effective communication.

d. Mr. Foster would benefit from the Alcoholics Anonymous program that is offered by Stateville to hearing inmates. Mr. Foster has attempted to attend and participate in this program. However, no interpreters are provided for the

20

program's meetings and events, denying Mr. Foster the opportunity to adequately participate in and benefit from the program.

e.  IDOC also routinely handcuffs deaf or hard of hearing inmates during the administration of medical services. This practice prevents deaf or hard of hearing prisoners who communicate through sign language from communicating effectively with medical staff.

89.  As a result of the failure of IDOC to provide deaf and hard of hearing prisoners with the means to effectively communicate with healthcare personnel, prisoners who are deaf or hard of hearing are not able to understand the treatment they are receiving; cannot bring problems to the attention of the relevant personnel; cannot participate in programs designed to improve their health; and do not receive the same quality of medical care and mental health treatment as hearing prisoners. This also causes deaf or hard of hearing inmates to spend more time in prison because they have been unfairly denied the ability to participate in rehabilitative programs and, as a result, have been unable to obtain good time.

**G.    Religious Services**

90.  All prisoners are entitled to practice their religion in prison. The Department hires one or more chaplains at most prisons to provide religious services, and most prisons also rely on one or more volunteers to provide additional religious services for prisoners.

91.  The Department has failed to provide deaf or hard of hearing prisoners who are seeking to participate in religious services with the assistance they require for effective communication with chaplains or religious volunteers. Consequently, many deaf or hard of hearing prisoners have been denied the right to effectively practice their respective religions.

92.   As a result of IDOC's failure to provide the assistance necessary to participate in religious services, deaf or hard of hearing prisoners are not able to practice their religion to the

same extent as other prisoners, and their practice of their respective religions is substantially burdened.

93.     Messrs. Winfert, Johnson, Lancaster, Lord, Foster, and Halterman are among the prisoners who have all attempted to access religious services in various prisons and have been denied the right to effectively practice their respective religions.

94.     The following are examples of the harm Plaintiffs have suffered as a result of not being able to effectively practice their respective religions:

    a.  Dixon provides a special religious service for prisoners who are deaf or hard of hearing.  However, this is a "generic" religious service, not tailored to the particular religious beliefs and practices of each individual prisoner.  Messrs. Lancaster and Lord have been prevented from practicing their own chosen religions, as they can attend only the special service for prisoners who are deaf or hard of hearing, rather than the services for their chosen religion.  Further, the times for these services are not made known to prisoners who are deaf or hard of hearing in advance and, on at least one occasion, have simply been orally announced.

    b.  Plaintiffs housed at prisons other than Dixon do not even have access to a generic service designed for prisoners who are deaf or hard of hearing.

    c.  Mr. Foster was simply told that there was no interpreter available for religious services at Stateville.  Mr. Foster attends religious services at Stateville, but is not provided with any communication assistance, and thus does not know what is being said during the services.

d.   Mr. Halterman cannot hear the services he attends at Jacksonville because he is not provided with communication assistance.  The services are too noisy for him to understand by relying on his hearing aids alone.

**H.    Telephone Calls**

95.    Prisoners are generally permitted to make collect telephone calls to their family and friends, unless that right has been revoked for disciplinary reasons.  *See*, *e.g.*, 20 Ill. Admin. Code §525.150.

96.    The Department has failed to provide deaf or hard of hearing prisoners with the assistance they require for effective communication with their family, friends, or legal counsel, either by telephone or other comparable means.  Consequently, deaf or hard of hearing prisoners, including Plaintiffs, have been unable to make telephone calls to the same extent as other prisoners or otherwise communicate effectively with those outside of prison.  The Department does not provide prisoners with the option of using videophones, which would allow deaf or hard of hearing individuals whose native language is ASL to make telephone calls in their true language.

97.    In the absence of videophones, Messrs. Johnson and Winfert require use of a TTY device to effectively communicate by telephone.  While Menard has a TTY device, prisoners are limited to using it on Tuesday or Wednesday mornings, twice a month, and arrangements for the call must be made in advance.  If the party being called is not available, the TTY call is often not rescheduled.  In contrast, other prisoners in general population at Menard are able to use a telephone to make collect calls on a daily basis whenever they are on the yard, and at various other times, without making an appointment in advance.  They can keep calling until they reach their party.

98.    Similarly, Mr. Foster must make a special request, in advance, to use the TTY device at Stateville.  When he makes the request, he often has to wait several days for approval. On several occasions, he has been told that he cannot make a long distance call on the TTY (which is required to reach many of the people he wants to call).  On many occasions, no employee has been available who knows how to operate the TTY device, and his call has been denied (even if approved in advance). In contrast, other prisoners in general population at Stateville have a phone available every day from 9:00 a.m. to 7:00 p.m., which they can use to make long distance calls, without any advance appointment or approval.

99.     A central feature of the TTY is the keyboard through which the deaf or hard of hearing individual types the words he or she wishes to express.  If the speaker's hands are restricted in some way, typing on the keypad can be difficult.

100.    IDOC at times handcuffs deaf or hard of hearing inmates even while the inmates are attempting to use the TTY, thereby substantially restricting the inmate's ability to effectively communicate with the outside world.

101.    As a result of IDOC's failure to provide assistance necessary for effective communication by telephone (or similar means), deaf or hard of hearing prisoners are not able to maintain contact with their family, friends, and legal counsel adequately, or to the same extent as other prisoners.

**I.    Television**

102.    IDOC generally provides inmates with some access to television, whether in communal rooms or individual cells.

103.    For inmates with a hearing disability, it may be difficult or impossible to hear the sounds emanating from the television without either turning the volume to an extremely high level or using headphones.

24

104.    It is therefore common for hard of hearing inmates to request headphones so that they may perceive sounds from the television without turning the volume so high as to annoy fellow inmates.

105.    For deaf inmates unable to hear any sound, it is common to request closed-captioning for television programs.

106.    As a matter of standard practice, the Department does not provide prisoners who are deaf or hard of hearing with the assistance they require to access television in a manner equal to their hearing peers.

107.    Mr. Winfert, for example, has a television set within his cell at Menard.  He can hear sound effects from the television by turning the volume extremely high.  Because he worries that turning the volume up will annoy his fellow inmates, Mr. Winfert has requested headphones for his television.  His request was denied.

108.    Mr. Baxter, Mr. Lancaster, and others have each requested that IDOC ensure that the closed-captioning feature is turned on for all television programming at Dixon, but their requests were denied.

109.    As a result of IDOC's failure to provide assistance necessary to access television, deaf or hard of hearing prisoners are unable to enjoy the information and entertainment derived from television adequately, or to the same extent as other prisoners.

**J.    Library Assistance**

110.    The prison library is a source of both entertainment and information for inmates in IDOC custody.

111.    The assistance of library personnel is often essential for an inmate to satisfactorily navigate the library's content.

112.    Without the aid of a qualified sign language interpreter or other auxiliary aids, deaf or hard of hearing inmates are unable to communicate effectively with library personnel and are thereby denied equal access to the library's content.

113.    As a matter of standard practice, the Department does not provide deaf or hard of hearing prisoners with the assistance they require for effective communication with library personnel.  As a result, deaf or hard of hearing prisoners, including Plaintiffs, are not able to participate in library services adequately, or to the same extent as other prisoners.

**K.      Disciplinary Proceedings**

114.    IDOC disciplines inmates in connection with violations of prison rules and regulations and sometimes conducts hearings to adjudicate such violations.

115.    To effectively participate in the disciplinary process, deaf or hard of hearing inmates require the assistance of sign language interpreters and/or other means of effective communication.  Without a means of effective communication, deaf or hard of hearing inmates are unable to understand fully the nature of the charges against them and cannot accurately communicate the factual circumstances of any incidents that may have occurred.

116.    IDOC has failed to provide deaf or hard of hearing inmates with adequate access to sign language interpreters or to other methods of effective communication in connection with its disciplinary proceedings and, as a result, has caused harm to deaf and hard of hearing inmates, including Plaintiffs.

117.    For example, because of his diabetes, Mr. Childress receives an orange, peanut butter, and bread each night.  On one occasion, the warden saw the food and accused Mr. Childress of stealing it.  Due to his disability, Mr. Childress was unable to effectively communicate the circumstances of his possession of the food, and the warden took the food and

26

gave Mr. Childress a ticket. As punishment, Mr. Childress was deprived of his commissary privileges for 15 days.

118. Mr. Foster has similarly not been provided with an effective means of communication for his disciplinary proceedings. He requires the aid of an interpreter to participate in disciplinary proceedings, but IDOC has refused to provide him with an interpreter for discipline-related hearings and interviews. As a consequence, Mr. Foster has been unable to understand the charges against him, to effectively participate in his disciplinary proceedings, and to articulate a defense to the charges against him.

119. IDOC also routinely handcuffs deaf or hard of hearing inmates during disciplinary hearings, preventing them from communicating through sign language. They are thus unable to effectively communicate the factual circumstances of their behavior and to defend themselves from the charges against them.

120. As a result of IDOC's failure to provide the assistance required for effective communication with disciplinary personnel, deaf or hard of hearing prisoners are not able to participate in disciplinary proceedings adequately, or to the same extent as other prisoners.

### L. Awareness and Safety Measures

121. IDOC is responsible for the safety and well-being of the inmates in its custody. Due to their inability to perceive sounds, such as prison alarms or instructions from guards, as well as the inability of guards and other inmates to recognize and interact with deaf or hard of hearing inmates, deaf or hard of hearing inmates are uniquely susceptible to the dangers posed by prison life. Therefore, deaf or hard of hearing inmates require assistance in order to provide them with safety and protection that is adequate and equal to that enjoyed by hearing inmates.

122. IDOC has failed to implement awareness and safety measures for deaf or hard of hearing inmates that are adequate or equal to those enjoyed by hearing inmates. For example,

IDOC has failed to implement adequate and equal safety measures for deaf or hard of hearing inmates with respect to three issues: (i) visual notification systems; (ii) identification and housing; and (iii) untrained personnel and use of hearing inmates to interpret.

### 1.    Visual Notification Systems

123.    IDOC is responsible for ensuring that deaf and hard of hearing individuals in its custody can understand the numerous life-event announcements and safety alerts made in each correctional facility every day, such as fires, meals, visitors, medical treatment, and open cell doors.  IDOC employs auditory means to notify prisoners of these events and has denied requests from deaf and hard of hearing prisoners, including Plaintiffs, to employ a visual alarm system that would allow them to receive the these announcements and alerts.

124.    This policy endangers the health and safety of deaf or hard of hearing inmates and has caused them to miss meals, visitors, medical treatment (such as daily medication), showers, and other activities and further caused them to be unaware of dangerous and potentially dangerous events, such as open cell doors and fires.

125.    Inmates who are deaf or hard of hearing are also uniquely and particularly vulnerable to shoot to kill policies.  When prison officials issue an auditory order that all inmates lie on the ground in the yard, deaf or hard of hearing inmates cannot hear the order, thereby subjecting them to the risk of being shot and killed for perceived disobedience.  This danger creates ongoing mental anxiety for deaf or hard of hearing inmates.

### 2.    Identification and Housing

126.    Without a means of distinguishing deaf or hard of hearing inmates from hearing inmates, IDOC personnel and other inmates mistake such inmates for hearing inmates, resulting in confusion, conflict, and mistreatment of deaf or hard of hearing inmates.

127.   For example, guards sometimes mistake an inmate's inability to hear an instruction for disobedience, and hearing inmates sometimes mistake the use of sign language as a rude or inflammatory gesture.  A lack of proper identification therefore endangers the health and safety of deaf or hard of hearing inmates, placing them uniquely at risk for disciplinary issues and violence from fellow inmates.

128.   Moreover, many prisoners who are deaf or hard of hearing and who use ASL need to be around others who also are fluent in ASL.  For these prisoners, the feeling of isolation brought about by being unable to communicate with others in ASL or other means has a damaging psychological impact.  Thus, for at least some deaf and hard of hearing prisoners, it may be beneficial to their health and safety to be grouped together, rather than to isolate them among populations composed solely of hearing inmates.  IDOC has failed to address these health and safety issues.

129.   IDOC often does not house deaf or hard of hearing inmates with each other, instead housing them entirely with hearing inmates.  IDOC refuses to transfer deaf or hard of hearing inmates to other facilities where there are a greater number of deaf or hard of hearing inmates.

### 3.    Untrained Personnel/Use of Other Inmates to Interpret

130.   It is difficult for deaf or hard of hearing inmates to interact with prison personnel who are not trained to work with deaf or hard of hearing prisoners.  Deaf or hard of hearing inmates are often unable to request aid from prison personnel when necessary.

131.   As a consequence, deaf or hard of hearing inmates are forced to request aid from other inmates, which jeopardizes their safety and security.  Likewise, IDOC personnel themselves often use other inmates to interpret for deaf or hard of hearing inmates.  This may result in an imbalanced power relationship between the deaf or hard of hearing inmate and the

interpreting inmate, which threatens the safety and well-being of inmates who are reliant on those other inmates to communicate important information, such as medical needs. Deaf or hard of hearing inmates are also forced to reveal confidential information to other inmates who interpret for them.

132.    As a result of IDOC's failure to implement adequate awareness and safety measures, deaf or hard of hearing inmates are exposed to risks of physical and mental harm not experienced by other prisoners.

**M.    Grievance Process**

133.    The Illinois Administrative Code requires all prisoners to abide by certain protocol in order to pursue and obtain relief with respect to any incidents, problems, or complaints (collectively, "grievances") incurred while in IDOC custody. 20 Ill. Adm. Code 504.810(a).

134.    This protocol requires that prisoners first attempt to resolve grievances with their respective counselors and that, if prisoners are unsatisfied with their counselor's resolution of the grievance, to then present their grievance in writing to more senior prison officials. 20 Ill. Adm. Code 504.810(b).

135.    The Administrative Code provides, "Staff assistance shall be available as requested by those offenders who cannot prepare their grievances unaided as determined by institutional staff," and further that "[e]ach facility shall take reasonable steps to ensure that the grievance procedure is accessible to offenders who are impaired, disabled, or unable to communicate in the English language." 20 Ill. Adm. Code 504.810(c).

136.    Certain deaf or hard of hearing prisoners, including some of the named Plaintiffs, are not fluent in written English, and so require the assistance of an interpreter or other aid to comprehend and satisfy the written grievance protocol.

137.    IDOC has failed to provide deaf or hard of hearing inmates with any assistance with respect to the grievance process, rendering certain deaf or hard of hearing inmates unable to effectively communicate and obtain relief from any incidents, problems, or complaints they may have and further rendering them unable to exhaust their administrative remedies prior to seeking relief from a grievance in court.

### N.    Pre-Release Parole Information

138.    Prior to releasing prisoners from its custody under parole or mandatory supervised release, IDOC provides prisoners with oral and written information regarding the terms of their release, including requirements regarding such things as official registration for certain types of offenders, housing, and compliance with the parole program, as well as the consequences stemming from a failure to abide by certain legal mandates.

139.    Without the aid of interpreters or other auxiliary aids or services, deaf or hard of hearing inmates are unable to understand the information provided during the pre-release process, subjecting them to heightened risk of violating the terms of their parole as compared with hearing inmates.

140.    IDOC has failed to provide deaf or hard of hearing inmates with the assistance necessary for them to adequately understand the information provided during the pre-release process or to effectively communicate any questions they have during this process.  Deaf or hard of hearing inmates are therefore denied adequate access to the parole pre-release program and are improperly denied equal treatment as hearing prisoners.

## VII.    CLASS ACTION ALLEGATIONS

141.    Plaintiffs Holmes, Baxter, Foster, Winfert, Johnson, Wright, Lancaster, Halterman, Eason, Childress, and Lord bring claims based on the ADA, the Rehabilitation Act, the Religious Land Use and Institutionalized Persons Act of 2000, and the United States

31

Constitution on behalf of themselves and all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

142.    Plaintiffs seek to represent a class composed of (i) all current and future deaf or hard of hearing individuals incarcerated by IDOC (ii) who require ASL or other auxiliary aids or services to effectively communicate and/or to access programs or services available to individuals incarcerated by IDOC and (iii) who have been denied effective communication and/or denied adequate access to programs or services available to individuals incarcerated by IDOC due to lack of qualified sign language interpreters or other auxiliary aids and services (hereinafter "Class").  As a result of their confinement in IDOC custody, members of the Class have been, are, and will be subjected to violations of their statutory and constitutional rights, as described in this Complaint.  Plaintiffs represent a class of persons seeking declaratory and injunctive relief to eliminate Defendants' unlawful and unconstitutional policies and practices.

143.    There are currently at least twenty-five deaf or hard of hearing individuals in IDOC custody identified by Plaintiffs who rely on ASL or other auxiliary aids or services to effectively communicate and/or to access programs or services available to individuals incarcerated by IDOC.  There are likely numerous additional individuals in IDOC custody who meet the class definition.  The proposed Class is so numerous, and membership so fluid (approximately 30,000 people enter the Illinois correctional system every year), that joinder of all members is impracticable.

144.    All Class members are equally subject to the conditions described in this Complaint, and numerous common questions of law and fact exist as to all Class members. These common questions include, but are not limited to: whether Defendants systemically fail to provide effective communication and adequate access to IDOC programs and services to

prisoners who are deaf or hard of hearing; whether Defendants' conduct has resulted in harm, and may result in serious future harm, to deaf or hard of hearing individuals by denying them effective communication and/or access to IDOC's programs and services in a manner equal to access provided to hearing individuals in IDOC's custody; and whether Defendants impose a substantial burden on the religious exercise of inmates who are deaf or hard of hearing.

145.     Plaintiffs' claims are typical of the claims of the Class. Plaintiffs are deaf or hard of hearing individuals incarcerated in IDOC facilities who rely on ASL and/or require auxiliary aids for effective communication and to access programs and services offered or available to individuals incarcerated by IDOC. The policies and practices described in this Complaint apply equally to the named Plaintiffs and to all members of the Class, and the injuries suffered by the named Plaintiffs stem from the same policies and practices that affect all members of the Class.

146.     Plaintiffs and Plaintiffs' counsel will fairly and adequately represent the interests of the Class. Plaintiffs' interests are consistent with, and are not antagonistic to, the interests of the Class as a whole, and Plaintiffs seek no relief other than the relief sought on behalf of the Class. Plaintiffs' counsel are experienced in the protection and enforcement of the statutory and constitutional rights of incarcerated individuals, including deaf or hard of hearing individuals, and have extensive experience in class action litigation.

147.     The prosecution of separate actions by individual members of the class would create the risk of establishing incompatible standards of conduct for the party opposing the Class and/or would create the risk of substantially impairing or impeding the ability of individuals not parties to the adjudication from protecting their interests.

148.     Furthermore, Defendants have refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate

respecting the class as a whole. Specifically, Defendants have uniformly failed to abide by the requirements of federal law and the Constitution of the United States with respect to the provision of an individualized assessment of the needs of each inmate who is deaf or hard of hearing so as to ensure effective communication and access to programs and services offered or available to other inmates.

## VIII.   EXHAUSTION

149.    Plaintiffs have exhausted all administrative remedies available to them. Plaintiffs requested through all of the available avenues of IDOC's internal grievance process that Defendants provide Plaintiffs equal access to IDOC programs and services provided to hearing inmates. Plaintiffs' requests were either denied or ignored.

## IX.   CLAIMS FOR RELIEF

### COUNT I

### Discrimination on the Basis of a Disability in Violation of the Americans with Disabilities Act (42 U.S.C. § 12131 et seq.)

150.    Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

151.    Defendants have violated the ADA by failing to provide effective communication for Plaintiffs and other inmates with hearing disabilities and denying such inmates, on the basis of their disabilities, the same access to Defendants' services, benefits, activities, programs, or privileges as provided to hearing individuals.

152.    Defendants subjected Plaintiffs to discrimination solely on the basis of their disabilities, in violation of their rights under the ADA. They have done this by failing to provide qualified sign language interpreters and/or other auxiliary aids and services to deaf or heard of

IDOC hearing inmates, including Plaintiffs, thereby denying them effective communication and access to programs and services available to hearing IDOC inmates.

153.    Defendants have failed to give consideration to Plaintiffs' requests, denying them their requests for accommodations which would enable equal access to services, benefits, activities, programs, or privileges available to hearing inmates in IDOC's custody.

154.    Defendants' failure to provide effective communication and the failure to provide equal access to services, benefits, activities, programs, and privileges are policies, regular practices, and/or customs of Defendants, are ongoing, and continue to this date.

155.    Defendants' failure to provide sign language interpreters and/or appropriate auxiliary aids and services has subjected Plaintiffs to discrimination on the basis of their disabilities in violation of their rights under the ADA, in ways that include, but are not limited to, ineffective communication with respect to and/or a lack of access to reception and classification programs, orientation programs, educational and vocational programs, employment/work programs, counseling services, healthcare services, religious services, telephones, televisions, library services, disciplinary proceedings, awareness and safety measures, grievances, and pre-release programs.

156.    As a proximate result of Defendants' violations of Plaintiffs' rights under the ADA, Plaintiffs have suffered and continue to suffer from discrimination, unequal treatment, exclusion from Defendants' services, benefits, activities, programs, and privileges, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, trauma, embarrassment, unnecessary loss of rights and privileges, including unnecessary disciplinary measures, and injury to their health.

157.    Defendants' failure to comply with the ADA has resulted, and will continue to result, in harm to Plaintiffs, as Plaintiffs will continue to be in the custody or under the supervision of IDOC and will continue to attempt to use or avail themselves of the services, benefits, activities, programs, and privileges available to hearing inmates in IDOC custody.  This harm will continue unless and until Defendants are ordered by this Court to make modifications to the policies, practices, and procedures pursuant to the ADA.

## COUNT II

### Discrimination on the Basis of a Disability in Violation of the Rehabilitation Act
### (29 U.S.C. § 794 et seq.)

158.    Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

159.    Defendants discriminatorily impaired Plaintiffs' ability to communicate effectively with medical personnel, prison staff, other inmates and individuals outside of prison and/or excluded Plaintiffs from educational, vocational, and religious services and prison-wide announcements.  They have done this by failing to provide appropriate auxiliary aids in violation of the Rehabilitation Act.

160.    Defendants' failure to provide appropriate auxiliary aids and services for individuals with hearing disabilities denied and continues to deny Plaintiffs, on the basis of their disabilities, the same access to Defendants' services, benefits, activities, programs, and privileges as the access provided to hearing individuals.

161.    The failure to provide appropriate auxiliary aids and services and the failure to provide comparable access to services, benefits, activities, programs, and privileges are policies, regular practices, and/or customs of Defendants.  These failures are ongoing and continue to this date.

162.    Defendants' failure to provide appropriate auxiliary aids and services has subjected Plaintiffs to discrimination on the basis of their disability in violation of their rights under the Rehabilitation Act, in ways that include exclusion from the participation in, denial of the benefits of, and subjection to discrimination with respect to reception and classification programs, orientation programs, educational and vocational programs, employment/work programs, counseling services, healthcare services, religious services, telephones, televisions, library services, disciplinary proceedings, awareness and safety measures, grievances, and pre-release programs.

163.    As a proximate result of Defendants' violations of Plaintiffs' rights under the Rehabilitation Act, Plaintiffs have suffered, and continue to suffer, from discrimination, unequal treatment, exclusion from Defendants' services, benefits, activities, programs, and requirements, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, trauma, embarrassment, unnecessary loss of rights and privileges, including unnecessary disciplinary measures, and injury to their health.

164.    Defendants' failure to comply with the Rehabilitation Act has resulted in harm to Plaintiffs, and Defendants are liable to Plaintiffs for harms suffered.  Defendants' failure to comply with the Rehabilitation Act will continue to result in harm to Plaintiffs, as Plaintiffs will continue to be in the custody or under the supervision of IDOC and will continue to attempt to use or avail themselves of the services, benefits, activities, programs, and privileges available to hearing inmates in IDOC custody.  This harm will continue unless and until Defendants are ordered by this Court to make modifications to their policies, practices and procedures pursuant to the Rehabilitation Act.

## COUNT III

**Violation of the Religious Land Use and Institutionalized Persons Act of 2000**

**"Substantial Burden on Religious Exercise"**
**(42 U.S.C. § 2000cc et seq.)**

165.    Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

166.    Governments may not impose substantial burdens on the religious exercises of institutionalized persons even if the burden results from a rule of general applicability.   42 U.S.C. § 2000cc-1(a).

167.    Plaintiffs are "institutionalized persons" within the meaning of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). 42 U.S.C. § 2000cc-1.

168.    As branches, departments, agencies, instrumentalities, and/or officials of the state of Illinois, Defendants IDOC, Salvador A. Godinez, in his official capacity as Acting Director of IDOC, and L. Rachel McKinzie, in her official capacity as ADA Coordinator of IDOC, are "governments" within the meaning of RLUIPA. 42 U.S.C. § 2000cc-5(4).

169.    Plaintiffs' RLUIPA claim is brought only against Defendants IDOC, Salvador A. Godinez, in his official capacity as Acting Director of IDOC, and L. Rachel McKinzie in her official capacity as ADA Coordinator of IDOC ("IDOC Defendants").

170.    IDOC Defendants have deprived and continue to deprive Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by unlawfully imposing a substantial burden on Plaintiffs' religious exercise.  They have done this by failing to provide interpreters or other means for enabling Plaintiffs to effectively communicate at weekly worship services.

171.    IDOC Defendants' failure to comply with RLUIPA has resulted in harm to Plaintiffs, and will continue to result in harm to Plaintiffs, as Plaintiffs will continue to be in IDOC's custody and continue to attempt to participate in weekly worship services.  This harm

will continue unless and until IDOC Defendants are ordered by this Court to make modifications to IDOC policies, practices, and procedures.

## COUNT IV

### Violation of the United States Constitution
### Freedom of Speech: First and Fourteenth Amendments
### (42 U.S.C. § 1983)

172.    Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

173.    Under the First and Fourteenth Amendments of the United States Constitution, States "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

174.    Defendants have deprived and continue to deprive Plaintiffs of their freedom of speech, as secured by the First Amendment to the United States Constitution and made applicable to the states by the Fourteenth Amendment, by discriminating against Plaintiffs because of their mode of speech.

175.    Defendants' failure to comply with the First and Fourteenth Amendments of the United States Constitution has resulted in harm to Plaintiffs, and will continue to result in harm to Plaintiffs, as Plaintiffs will remain in the custody of IDOC and continue to attempt to communicate with others across settings in IDOC. This harm will continue unless and until Defendants are ordered by this Court to make modifications to its policies, practices, and procedures pursuant to the First and Fourteenth Amendments of the United States Constitution.

## COUNT V

### Violation of the United States Constitution
### Free Exercise of Religion: First and Fourteenth Amendments
### (42 U.S.C. § 1983)

176.    Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

177.    Under the First and Fourteenth Amendments of the United States Constitution, states "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend. I.

178.    Plaintiffs' Count V is brought only against the IDOC Defendants.

179.    IDOC Defendants have deprived and continue to deprive Plaintiffs of their free exercise of religion and freedom of speech, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by substantially burdening their religious exercise.

180.    IDOC Defendants' failure to comply with the First and Fourteenth Amendments of the United States Constitution has resulted in harm to Plaintiffs, and will continue to result in harm to Plaintiffs, as Plaintiffs will remain in the custody of IDOC and continue to attempt to participate in weekly worship services.   This harm will continue unless and until IDOC Defendants are ordered by this Court to make modifications to its policies, practices, and procedures pursuant to the First and Fourteenth Amendments of the United States Constitution.

## COUNT VI

### Violation of the United States Constitution
### Freedom from Cruel and Unusual Punishment:  Eighth and Fourteenth Amendments
### (42 U.S.C. § 1983)

181.    Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

182.    Under the Eighth and Fourteenth Amendments of the United States Constitution, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

183.    Defendants have deprived and continue to deprive Plaintiffs of their right to be free from cruel and unusual punishment as secured by the Eighth Amendment to the United States Constitution and made applicable to the states by the Fourteenth Amendment.

184.    Defendants have systematically denied Plaintiffs access to basic human services and vital information during their incarceration in IDOC.  Defendants have failed to notify Plaintiffs of prison alerts, announcements, and safety instructions.  Moreover, Defendants have not provided effective communication between Plaintiffs and prison officials, other inmates and the medical staff at IDOC.  By depriving Plaintiffs of any meaningful way to communicate in their primary language, Defendants have isolated Plaintiffs in a manner equivalent to segregation for the entire duration of their prison sentences.  Defendants' actions place Plaintiffs at a substantial risk of serious future harm.  Defendants have actual knowledge of the unconstitutional conditions to which Plaintiffs were, and continue to be, subject, as Plaintiffs have submitted numerous written complaints to IDOC staff requesting that sign language interpreters and other auxiliary aids and services be made available to them.

185.    Despite Defendants' actual knowledge of the substantial medical and safety risks Plaintiffs face while in their custody, they continue to disregard Plaintiffs' medical and other needs in violation of the Eighth and Fourteenth Amendments of the United States Constitution.

186.    Defendants' failure to comply with the Eighth and Fourteenth Amendments of the United States Constitution has resulted in harm to Plaintiffs, and will continue to result in harm to Plaintiffs, as Plaintiffs will remain in the custody of IDOC and continue to attempt to avail themselves of medical treatment and other services.  This harm will continue unless and until Defendants are ordered by this Court to make modifications to their policies, practices and procedures pursuant to the Eighth and Fourteenth Amendments of the United States Constitution.

## COUNT VII

### Violation of the United States Constitution
### Equal Protection: Fourteenth Amendment
### (42 U.S.C. § 1983)

187.     Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

188.     Under the Fourteenth Amendment of the United States Constitution, "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

189.     Defendants have deprived and continue to deprive Plaintiffs of their rights to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating against Plaintiffs in their application of the laws of the state of Illinois.

190.     Defendants' failure to comply with the Fourteenth Amendment of the United States Constitution has resulted in harm to Plaintiffs, and Defendants are liable to Plaintiffs for harms suffered. Defendants' failure to comply with the Fourteenth Amendment of the United States Constitution will continue to result in harm to Plaintiffs, as Plaintiffs will remain in the custody of IDOC and continue to attempt to avail themselves, without success, of religious services, medical treatment, educational courses, reduced sentences by virtue of good time, and other services and programs that are available to other incarcerated people.  This harm will continue unless and until Defendants are ordered by this Court to make modifications to their policies, practices and procedures pursuant to the Fourteenth Amendment of the United States Constitution.

## COUNT VIII

### Violation of the United States Constitution
### Due Process: Fourteenth Amendment
### (42 U.S.C. § 1983)

191.     Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

192.     Under the Fourteenth Amendment of the United States Constitution, "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

193.     Plaintiffs' Fourteenth Amendment Due Process Claim is brought only against Defendant Salvador A. Godinez in his official capacity as Acting Director of IDOC.

194.     IDOC, at Defendant Salvador A. Godinez's direction and under his control, has deprived and continues to deprive Plaintiffs of their right to due process, as secured by the Fourteenth Amendment to the United States Constitution, by depriving Plaintiffs of interpreters during disciplinary investigations and at disciplinary hearings where certain privileges, rights, property, and/or liberties are at stake.

195.     IDOC's failure to comply with the Fourteenth Amendment of the United States Constitution has resulted in harm to Plaintiffs, and Defendant Salvador A. Godinez is liable to Plaintiffs in his official capacity as Director of IDOC for harms suffered. Defendants' failure to comply with the Fourteenth Amendment of the United States Constitution will continue to result in harm to Plaintiffs, as Plaintiffs will remain in the custody of IDOC and continue to be unable to adequately participate in IDOC disciplinary investigations and hearings. This harm will continue unless and until Defendants are ordered by this Court to make modifications to their

policies, practices and procedures pursuant Fourteenth Amendment of the United States Constitution.

## X.    PRAYER FOR RELIEF

196.    WHEREFORE, Plaintiffs respectfully request that:

197.    The Court conduct a mediated settlement conference or refer the case to its court annexed mediation program in order to assist the parties to bring about a settlement of this case;

198.    The Court determine that this action may proceed as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b);

199.    The Court appoint the undersigned as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

200.    The Court adjudge and decree that Defendants, by the organizations, systems, policies, practices, and conditions described above, have violated and continue to violate Title II of the ADA, Section 504 of the Rehabilitation Act, the Religious Land Use and Institutionalized Persons Act, and the Constitution of the United States;

201.    The Court enter such declaratory and injunctive relief against Defendants and in favor of Plaintiffs and the Class as it deems appropriate to remedy past violations of the laws of the United States and to prevent future violations of the same;

202.    The Court retain jurisdiction of this matter until Defendants demonstrate that they have fully complied with the orders of this Court, and that there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction; and

203.    The Court award Plaintiffs and the Class any further relief the Court deems appropriate, including attorneys' fees, litigation expenses, and costs.

DATED this 4th day of May, 2011.

Plaintiffs,

By their attorneys,

/s/ Robert L. Michels

Robert L. Michels
Winston & Strawn LLP
35 W. Wacker Dr.
Chicago, IL 60601-9703
Telephone: (312) 558-5600
Facsimile: (312) 558-5700
rmichels@winston.com

Alan S. Mills
Uptown People's Law Center
4413 North Sheridan
Chicago, Illinois 60640
Telephone: (773) 769-1411
Facsimile: (773) 769-2224
alanmills@comcast.net

Barry C. Taylor
Amy F. Peterson
Laura J. Miller
Equip for Equality
20 North Michigan Avenue, Suite 300
Chicago, IL 60602
Telephone: (312) 341-0022
Facsimile: (312) 341-0295
BarryT@equipforequality.org
Amy@equipforequality.org
Laura@equipforequality.org

Howard A. Rosenblum
National Association of the Deaf
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
Telephone: (301) 587-1788
Facsimile: (301) 587-1791
howard.rosenblum@nad.org

*Counsel for Plaintiffs*