**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RALPH HOLMES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 11 C 2961 |
| | ) | Hon. Marvin E. Aspen |
| SALVADOR A. GODINEZ, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MARVIN E. ASPEN, District Court Judge:

Plaintiffs, eleven deaf or hard of hearing prisoners, brought this proposed class action on behalf of themselves and others similarly situated against Defendant Salvador A. Godinez, the Acting Director of the Illinois Department of Corrections ("IDOC" or the "Department"). Plaintiffs allege that IDOC has denied them hearing accommodations needed to effectively communicate with IDOC staff and others, participate in IDOC programs and services, and follow safety warnings and directives. The complaint alleges violations of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and the United States Constitution. Presently before us are Defendant's motion to exclude the expert testimony of Elizabeth Stanoshek, Plaintiffs' motion for class certification, and Defendant's motion for summary judgment. After a recitation of the relevant facts, we will address these motions in that order. As described fully below, Defendant's motion to exclude expert testimony is denied, Plaintiffs' motion for class certification is granted with a modification to the class definition, and Defendant's motion for summary judgment is granted in part and denied in part.

# FACTUAL BACKGROUND

Unless otherwise noted, the facts described herein are undisputed and culled from the parties' Local Rule 56.1 statements of fact and exhibits. (*See* Def's Rule 56.1 Statement of Facts, Dkt. 259 [*hereinafter* Def's SOF]; Pls' Rule 56.1 Statement of Facts, Dkt. 259 [*hereinafter* Pls' SOF].)[1] The parties' statements of fact were, however, riddled with objections and many were disputed as evidenced below. As to the objections, we shall rely on admissible evidence only for purposes of our analysis. *See, e.g., Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) ("The evidence relied upon in defending a motion for summary judgment must be competent evidence of a type otherwise admissible at trial."). We decline to address objections specifically unless warranted. In addition, as we will discuss more below, many of the disputed statements of fact are broad and generalized allegations about IDOC's conduct and policies or Plaintiffs' hearing impairments and accommodations. The respective sides often support or dispute these generalized statements by simply citing a handful of anecdotal examples rather than dispositive evidence. Where they have done so, we likewise highlight the competing evidence that each party puts forth and frequently cite to the record to do so.

After briefly describing the parties, we provide some background information on deafness and hearing loss before moving into IDOC's conduct.

## I.     The Parties

The single defendant in this case is Salvador Godinez ("Godinez" or "Defendant"), the Director of IDOC. Plaintiffs sue Godinez in his official capacity only. (Def's SOF ¶ 12.) The

---

[1] The parties consolidated Defendant's Statement of Facts, Plaintiffs' Additional Statements of Fact, and their respective responses into one docket entry. (Dkt. 259.) For convenience, we refer to this single docket entry when citing these filings. In addition, our citations to statements of fact paragraph refer to the statement of fact and the response thereto. For example, we cite both Defendant's first statement of fact and Plaintiffs' response thereto as "Def's SOF ¶ 1."

Complaint includes eleven named Plaintiffs, each of whom suffer from varying degrees of hearing impairment and are, or were, inmates in the IDOC system. (Def's SOF ¶¶ 1–11.) A brief description of each follows.

Daniel Baxter ("Baxter") entered IDOC in 2002 and was released from incarceration on May 19, 2014. (IDOC Inmate Status Report for Daniel Baxter, Def's SOF Ex. 2; Def's SOF ¶ 2.) Before his release, Baxter resided at Shawnee Correctional Center ("Shawnee") for two years and Big Muddy River Correctional Center ("Big Muddy") for eight years before that. (Deposition of Daniel Baxter at 18, Def's SOF Ex. 29 [*hereinafter* Baxter Dep.].) Baxter testified that he is not deaf, but has been hard of hearing for at least ten years. (*Id.* at 25–26.) While incarcerated, Baxter did not wear hearing aids, although he asked IDOC to provide him with them. (*Id.* at 25.) He testified that he is "getting kind of rusty" at sign language, but did request the assistance of American Sign Language ("ASL") interpreters during his sentence. (*Id.* at 31–35; *see* Def's SOF ¶ 2.)

George Childress ("Childress") has been incarcerated since 2005 and housed at the Graham Correctional Center ("Graham") since 2012. (Declaration of George Childress ¶ 2, Pls' SOF Ex. 55 [*hereinafter* Childress Decl.].) He stated that he began to lose his hearing in 1969 following his service in Vietnam, and has recently become completely deaf. (Childress Decl. ¶ 3; Deposition of George Childress at 8, Def's SOF Ex. 3 [*hereinafter* Childress Dep.].) He communicates through ASL, lip-reading, and writing. (Childress Decl. ¶ 4.) Childress also suffers from diabetes and kidney disease. (*Id.* ¶ 9.)

Hannibal Eason ("Eason") has been incarcerated with IDOC at the Stateville Correctional Center ("Stateville") since 2009. Eason testified that he needs two hearing aids but currently wears only one in his right ear. (Deposition of Hannibal Eason at 5–6, Def's SOF Ex. 14

[*hereinafter* Eason Dep.].)  At his deposition, Eason did not have a battery for his hearing aid and instead relied on ASL interpreters and lip-reading.  (*Id.* at 5, 16–17.)

Curtis Foster ("Foster") was incarcerated in IDOC from 1998 until May 2015. (Deposition of Curtis Foster at 5, Def's SOF Ex. 22 [*hereinafter* Foster Dep.].)  On May 12, 2015, he died at Presence Saint Joseph Medical Center from a burst appendix.  (*See* Pls' Mot. for Additional Discovery, Dkt. 272.)  For the thirteen years preceding his death, he was incarcerated at Stateville.  Foster testified that he was born deaf.  (Foster Dep. at 6.)  The record indicates that he communicated to a degree through reading and writing, (*id.* at 40–42, 68–69), but he testified that ASL was his first language, (*id.* at 63).

Curtis Halterman ("Halterman") has worn a hearing aid in his left ear for twenty years, and can hear only a little out of his right ear.  (Deposition of Curtis Halterman at 6, Def's SOF Ex. 24 [*hereinafter* Halterman Dep.].)  Halterman first entered IDOC in 1994, and has been incarcerated at Jacksonville Correctional Center ("Jacksonville") since 2008.  (*Id.* at 5.)  He does not know ASL.  (Def's SOF ¶ 6.)

Ralph Holmes ("Holmes") has been an inmate at Dixon Correctional Center ("Dixon") since 2008 when he was originally incarcerated.  (Declaration of Ralph Holmes ¶ 2, Pls' SOF Ex. 6 [*hereinafter* Holmes Decl.].)  Holmes stated that as a child he was hard of hearing and that at age fifteen or sixteen he became completely deaf in both ears.  (*Id.* ¶ 4.)  He can hear some sounds in his left hear with the assistance of hearing aids and can use a telephone with an amplifier in his right ear.  (*Id.* ¶ 5.)  He communicates through reading, writing and lip-reading, and has taught himself limited ASL.  (*Id.* ¶ 11; Deposition of Randolph Holmes at 21, Def's SOF Ex. 20 [*hereinafter* Holmes Dep.].)

Billy Johnson ("Johnson") has been incarcerated since 2007 and housed at Stateville since 2012. (Deposition of Billy Johnson at 5, Def's SOF Ex. 4 [*hereinafter* Johnson Dep.].) Johnson was born deaf. (*Id.* at 6.) He testified that sign language is his natural language and, although he can read and write some, English is his second language. (*Id.* at 13, 42.)

Wendell Lancaster ("Lancaster") entered IDOC in 2008, was placed in Dixon shortly thereafter, and resides there still. (Declaration of Wendell Lancaster ¶ 2, 4, Pls' SOF Ex. 5 [*hereinafter* Lancaster Decl.].) Lancaster stated that he is deaf and he communicates primarily through ASL. (*Id.* ¶ 3.) He does, however, wear two hearing aids and can hear some sounds. (Deposition of Wendell Lancaster at 10, Def's SOF Ex. 15 [*hereinafter* Lancaster Dep.].) The record indicates that he is also able to communicate, at least to some extent, through reading and writing in English. (*See id.* at 7, 31, 86–87.)

Daniel Lord ("Lord") was first incarcerated at Joliet Correctional Center ("Joliet") in 1989 and was transferred to Dixon in 1995. (Declaration of Daniel Lord ¶ 2, Pls' SOF Ex. 7 [*hereinafter* Lord Decl.].) Lord stated that he was born with hearing loss and became fully deaf by age three. (*Id.* ¶ 4.) He communicates through ASL and testified that he knows only limited English. (Deposition of Daniel Lord, Def's SOF Ex. 21 at 28, 41–42 [*hereinafter* Lord Dep.].)

Aaron Winfert ("Winfert") has been deaf in his left hear and hard of hearing in his right ear since age three. (Declaration of Aaron Winfert ¶ 2, Pls' SOF Ex. 16 [*hereinafter* Winfert Decl.].) Winfert was incarcerated at Menard Correctional Center ("Mendard") in 2006 and resides there still. (*Id.* ¶ 5.) He was also incarcerated at Taylorville Correctional Center ("Taylorville") for six months in 2004 related to a separate sentence. (*Id.* ¶ 4.) Winfert communicates through ASL and the record indicates that, to a lesser degree, he can also read, write, and read lips. (Deposition of Aaron Winfert at 13, 63–63, Def's SOF Ex. 5 [*hereinafter*

Winfert Dep.].)  He testified that he understands fifty percent of spoken words when he reads lips.  (*Id.* at 13, 20–22.)

Jason Wright ("Wright") was incarcerated in 2008 and has been housed at Graham since 2010.  (Declaration of Jason Wright ¶ 2, Pls' SOF Ex. 56 [*hereinafter* Wright Decl.].)  He stated that he was born deaf in both ears and communicates through sign language.  (*Id.* ¶ 3.)  The record indicates that he can also read and write at least some in English.  (Deposition of Jason Wright at 14, 25, 74, Def's SOF Ex. 13 [*hereinafter* Wright Dep.].)

## II.    Hearing Disabilities

Plaintiffs' expert Professor Dennis Cokely, Ph.D. identifies two primary types of hearing disabilities: deaf and hard of hearing.  According to Professor Cokely, deaf individuals include those who cannot hear at all and those who can hear loud noises but cannot understand speech.  (Expert Report of Dennis Cokely, Ph.D. at 4–5, Cert. Mem. Ex. 17 [*hereinafter* Cokely Rpt.].)  Hard of hearing individuals can hear and understand speech, but they have reduced hearing ability.  (*Id.*)  For the purposes of this opinion, we will sometimes refer to both deaf and hard of hearing individuals together as "hearing impaired" or "hearing disabled."

The ways and extent that hearing disabled individuals communicate vary widely based on the type and degree of their disability and other factors such as life experiences and the age at which their disability manifested.  (*Id.* at 5.)  For example, some who have suffered deafness since childhood rely primarily on ASL to communicate, and thus their ability to read and write English and read lips is limited.  (*Id.* at 10–18.)  Conversely, late-deafened individuals, even those who have taught themselves ASL, may need to rely heavily on lip reading and written communication, or a combination of English-based communications and ASL.  (*Id.* at 21–22.)

### III.    IDOC Hearing Policies and Accommodations

The parties have categorized Plaintiffs' allegations into various sub-topics. We will roughly adopt that organization of the facts in this memorandum.

#### A.  IDOC's ADA Administrative Directive

In 2012, IDOC enacted an ADA related Administrative Directive ("ADA Directive"), which it amended in 2013. (Def's SOF Ex. 9, IDOC Administrative Directive § 04.01.111 [hereinafter *AD*].) Prior to 2012, IDOC did not have a similar ADA-focused directive and the record indicates that the Department placed less focus on ADA compliance. (*See Daubert* Mem. at 6, Dkt. 242; Deposition of Alan Pasley at 102–05, 152–55, 190–91, Pls' SOF Ex. 53 [*hereinafter* Pasley Dep.] (discussing training before the ADA Directive); Kimberly Butler 30(b)(6) Deposition at 10, Def's SOF Ex. 8 [*hereinafter* Butler 30(b)(6) Dep.] (testifying that before 2012 IDOC did not have a process to track ADA requests).) The purpose of the ADA Directive is "to provide instructions to staff for providing accommodations to offenders with disabilities." (*Id.* at 1.) It directs that the Department "shall not discriminate against offenders with known disabilities and shall provide reasonable accommodations to ensure access to programs, activities, and services in accords with the [ADA]." (*Id.*) The directive also defines "deaf" and "hard of hearing." (*Id.* at 2.) We will discuss specific provisions of the ADA Directive below where relevant, but in general it sets forth ADA compliance requirements and mandates ADA training for IDOC staff. (*Id.* at 2–6.)

Following and/or in connection with the ADA Directive, IDOC also modified a number of its forms, added ADA inserts into its inmate orientation handbook, and appointed various ADA compliance officers. (Deposition of Rachel McKinzie at 47–48, Pls' SOF Ex. 13 [hereinafter *McKinzie Dep.*].) IDOC's Agency ADA Compliance Officer, Patrick Keane, is

responsible for coordinating the Department's overall compliance with the ADA. (AD at 3.)
In addition, each correctional facility has its own ADA Coordinator who is responsible for
reviewing inmates' requests for ADA accommodations, developing and monitoring
Communication Plans and other disability accommodations, and submitting an annual
compliance report to the Agency ADA Compliance Officer. (AD at 3–4.) Mr. Keane is not
aware how each ADA Coordinator monitors accommodations under the ADA Directive at their
own facilities. (Pls' SOF ¶ 3(E).)

The ADA Directive instructs IDOC facilities to audit their compliance with the Directive
annually. (AD at 1; Deposition of Glen Austin at 30, Pls' SOF Ex. 52 [*hereinafter* Austin
Dep.].) According to IDOC's designated representative on its audit process, as of August 2014,
most facilities were still in the process of conducting their first ADA audit. (Pls' SOF ¶ 3(A).)

We pause here to note that because Plaintiffs are seeking only declaratory and injunctive
relief as to IDOC's future conduct, evidence that predates the 2012 ADA Directive and
corresponding shift in IDOC's ADA compliance policies is significantly less relevant than more
recent evidence. (*See* SJ Mem. at 2–3, Dkt. 238.) We keep this principle in mind as we recite
the background facts and conduct our analysis.

### B. Identifying, Classifying and Tracking Inmate Hearing Impairments

#### i.    Identification

IDOC does not have a comprehensive written procedure for identifying hearing impaired
inmates. Nonetheless, inmates in need of hearing accommodations can be identified in a number
of ways, beginning with the intake process. When offenders are first admitted to IDOC, they are
initially placed in a Reception and Classification Center ("RNC"). (Def's SOF ¶ 14.) IDOC has
four RNC's, each which adjoins a larger correctional facility. The ADA Coordinator from the

larger parent facility supports the adjoining RNC.  (Alan Pasley 30(b)(6) Deposition at 16, Def's SOF Ex. 7 [*hereinafter* Pasley 30(b)(6) Dep.]; *see* Deposition of Kevin Senor at 83, Pls' SOF Ex. 8 [*hereinafter* Senor Dep.].)  Offenders reside in one of the four RNC's for approximately one to three months while IDOC gathers information about the inmate and assigns his permanent placement.  (Louis Shicker 30(b)(6) Deposition at 9, Def's SOF Ex. 6 [*hereinafter* Shicker 30(b)(6) Dep.]; Pasley 30(b)(6) Dep. at 10–12.)

Since IDOC does not keep sign language interpreters on stand-by at RNCs, they are not available to offenders during their first twenty-four hours at the facility.  (Deposition of Louis Shicker at 20–22, Pls' SOF Ex. 38 [*hereinafter* Shicker Dep.]; *see* Pls' SOF ¶ 12(A).)  The parties dispute whether IDOC consistently makes interpreters available after that initial twenty-four hour period.  Plaintiffs Wright and Eason both stated that they did not receive sign language interpreters at any point during reception and classification.  (Pls' SOF ¶ 14(B).)

The parties also dispute whether Video Remote Interpreting ("VRI") is available and in fact employed at RNCs as needed.  VRI is a video telecommunication service that uses web cameras to provide sign language interpreting services.  (Def's SOF ¶ 29.)  IDOC executed a contract for VRI services in 2013, but as of January 2014 when Mr. Keane gave his deposition, not all facilities were VRI equipped.  (VRI Contract, Def's SOF Ex. 12; Deposition of Patrick Keane at 218–20, Pls' SOF Ex. 4 [*hereinafter* Keane Dep.].)  Moreover, Plaintiffs contend that even where VRI is available, IDOC arbitrarily denies inmates access, although they do not point to any specific examples.  (Def's SOF ¶ 29.)

Typically within twenty-four hours of arriving at an RNC, offenders meet with both a non-medical Correction Counselor and with a nurse who conducts a preliminary medical screening of the inmate.  (Def's SOF ¶¶ 14, 18.)  Offenders are also seen by a medical provider

who performs a physical examination and gathers medical history. (Def's SOF ¶ 15.)
The Administrative Directive covering these intake screenings requires the nurse who conducts
the preliminary screening to "observe[]" the offender's "auditory ability." (Pls' SOF ¶ 13(A);
*see* Offender Physical Examination Administrative Directive § 04.02.101(II)(G)(1), Cert. Reply
Ex. 4 [*hereinafter* Physical Exam Directive].)[2] The Directive also requires the medical provider
who performs the physical examination to complete form DOC 0099, which IDOC's Medical
Director testified involves a "gross assessment of hearing ability." (Physical Exam Directive
§ 04.02.101(II)(G)(2); Shicker Dep. at 13–15; *see* Pls' SOF ¶ 13(A); Shicker 30(b)(6) Dep.
at 12–14.) No medical procedures are conducted to detect hearing loss at this point. (Shicker
30(b)(6) Dep. at 11.) At RNC facilities, hearing disabilities are primarily self-identified by
inmates or discovered by medical professionals through visual observation and verbal
questioning. (Def's SOF ¶¶ 14–15; Pls' SOF ¶ 13(D); Pasley 30(b)(6) Dep. at 12–13; Shicker
30(b)(6) Dep. at 11–15.)

If a medical provider detects indication of hearing loss, he may recommend that further
screening and formal audiometry testing be conducted after the offender is transferred to his
permanent facility.[3] (Def's SOF ¶ 16; Shicker 30(b)(6) Dep. at 17–18.) Plaintiffs contest,
however, whether audiometry testing is in fact employed as part of IDOC's regular screening
process, noting that the Administrative Directive regarding offender physical examinations does
not mention audiometry testing, and at least three Plaintiffs with hearing deficiencies testified

---

[2] Plaintiffs' attached to their Additional Statement of Facts what appears to be an outdated
version of this Administrative Directive. We assume this was an error, since the corresponding
deposition testimony clearly refers to a more recent version attached to Plaintiffs' Reply to Class
Certification as Exhibit 4.

[3] The screening machine that IDOC uses to test offenders for hearing loss is not usually available
at RNCs. (Shicker 30(b)(6) Dep. at 17–18; *see* Pls' SOF ¶ 13(B).)

that they did not receive any audiometry testing until several years after being incarcerated. (Def's SOF ¶ 16; *see* Pls' SOF ¶¶ 15(B)–15(E).)

In addition to formal screening interviews and medical examinations, other prison staff discover inmates' hearing impairments through self-reporting, notice from a family member, or notice from the transferring county jail. (Def's SOF ¶ 19; *see* Butler 30(b)(6) Dep. at 11–12.)

The parties also dispute whether RNC personnel adequately document and communicate recognized or reported hearing impairments. (Def's SOF at ¶¶ 17–19, 21.) Doctor Louis Shicker, IDOC's 30(b)(6) witness on the Department's efforts to identify hearing impairments at RNCs, testified that the medical professionals who screened new offenders "would have to make the [prison staff] aware" if an inmate required hearing accommodations. (Shicker 30(b)(6) Dep. at 18–19.) Doctor Shicker could not, however, articulate any procedure, formal or informal, through which this notification occurs. (*Id.*) Alan Pasley, the individual responsible for the classification of female inmates at Logan Reception and Classification Center, testified that correction counselors record any observed hearing impairment in the Automated Receiving and Classification System ("ARCS")[4] and other staff log notifications of hearing disabilities in incident reports. (Pasley 30(b)(6) Dep. at 15–16.) Mr. Pasley explained that, regardless of how the information was obtained, it would be forwarded up the "chain of command," including to the facility's ADA Coordinator. (*Id.* at 15–16, 18–19, 25–26.) Despite Mr. Pasley's contention, the ADA Coordinator at Stateville, Kevin Senor, testified that he is not notified when a disabled inmate is identified during the RNC intake process, nor is he aware if anyone else is. (Senor Dep. at 75–76.) Plaintiffs also deny that incident reports are ever generated to record hearing

---

[4] The ARCS is a computer system that IDOC uses during the intake process to collect inmate information. (Pasley 30(b)(6) Dep. at 17.) Mr. Pasley explained that correction counselors directly input information gathered during the intake interview into the system, and at the end of the intake process that information is saved and placed in the offender's master file. (*Id.*)

impairments, and challenge whether IDOC takes appropriate action when self-reporting occurs. (Def's SOF ¶ 19.)

    ii.  Central Tracking

  IDOC does not have a central database or document that identifies all inmates with known hearing impairments. (Pls' SOF ¶ 1(A).) IDOC's Agency ADA Coordinator, Patrick Keane, testified that in order to compile a list of all hearing impaired inmates he would have to either call all of the individual facilities or go through 48,000 medical files. (Keane Dep. at 113–15; *see* Pls' SOF ¶ 1(C).) He was unaware, however, whether individual facilities maintain lists of their own hearing impaired inmates. (Keane Dep. at 116.) The record reflects inconsistencies in this regard among the facilities. For example, the ADA Coordinator at Dixon does maintain a list of identified hearing impaired offenders at his facility,[5] (Deposition of Troy Hendrix at 83–88, Pls' SOF Ex. 9 [*hereinafter* Hendrix Dep.]), but the ADA Coordinator at Stateville is not aware of any similar list there, (Senor Dep. at 63–64; *see* Pls' SOF ¶ 2(C)).

  Nonetheless, IDOC does maintain an electronic central Offender Tracking System ("OTS") to store information on its offenders. (Deposition of Sandra Funk at 134–37, Pls' SOF Ex. 14 [*hereinafter* Funk Dep.].) Medical staff and counselors can record disabilities in OTS, (*id.* at 146–47), but IDOC determined that due to its age the system cannot be used to systematically track and identify all hearing impaired inmates, (McKinzie Dep. at 210–11). When a prison transfer is requested for a particular offender, the Transfer Coordinator's Office ("TCO") can learn that an inmate has a disability from OTS, the inmate's RNC intake file, or the TCO's own file on the inmate. (*Id.* at 173, 181–82.) The record shows that in some instances

---

[5] Hendrix admitted that even this list was incomplete. There was at least one offender at Dixon who medical personnel identified as having a "profound hearing loss" but who was not included on Dixon's list of hearing impaired offenders. (Hendrix Dep. at 94–96.)

receiving facilities have not been notified of an inmate's known hearing impairment and the disability was not recorded in OTS. (*See* Funk Dep. at 178–82.)

Currently, offenders may elect to have the word "deaf" written on the back of their identification card. (Def's SOF ¶ 31.) Defendants claim that inmates may show these identification cards to IDOC staff to "resolve problems." (*Id.*) Several Plaintiffs testified that this ID badge has been helpful to them or that they like it, (Childress Dep. at 9; Winfert Dep. at 58; Wright Dep. at 21–22), while other Plaintiffs testified that the badge is not helpful because correctional officers insist that it face forward to show the inmate's picture, (Eason Dep. at 39–40; Lord Dep. at 22).

iii. Communication Plans

With the adoption of the ADA Directive, IDOC began using Communication Plans to track accommodations for hearing impaired offenders. (Def's SOF ¶ 28; *see* AD at 4; Keane Dep. at 308 (explaining Communication Plans are a new procedure that began after the ADA Directive); Butler 30(b)(6) Dep. at 9–10.) Communication Plans are one-page forms that list possible hearing accommodations—such as sign language services, hearing aids, and closed captioning—with a box to check whether each accommodation is approved for that offender. (Plaintiffs' Communication Plans, Def's SOF Ex. 11 [*hereinafter* Comm. Plans].) It also includes space for IDOC to write notes regarding each approved accommodation as it relates to that offender. (*Id.*) In some instances, the note section simply states that a certain accommodation is approved for use "as necessary" or "as needed." (*Id.*)

According to Kimberly Butler, Defendant's 30(b)(6) witness regarding Communication Plans, if an offender is identified as needing accommodations for hearing loss, the ADA Coordinator meets with the offender in person to discuss what accommodations are needed and

appropriate. (Def's SOF ¶¶ 22–23; Butler 30(b)(6) Dep. at 11–14.) The ADA Coordinator—who the ADA Directive does not require to be medically trained or otherwise experienced in identifying communication needs—may consult with a licensed specialist regarding appropriate accommodations if he decides such guidance is required. (Pls' SOF ¶ 5(A); McKinzie Dep. at 109–14; *see* AD § II(G)(4)(a)(3).) After or while meeting with the offender and consulting with any licensed professionals, the ADA Coordinator fills out the Communication Plan. (Butler 30(b)(6) Dep. at 15.) If there is a question as to whether a facility can provide a recommended accommodation, the ADA Coordinator consults with the Warden who has final authority to approve or deny requests. (*Id.* at 16, 32–33; Def's SOF ¶ 24.) Butler testified that in making final decisions, IDOC considers each offender's specific needs, noting that the medical staffs' determinations regarding the inmate's disability "weigh heavily," and also considers the offender's own preferences. (Butler 30(b)(6) Dep. at 22–23; Def's SOF ¶ 24.)

The parties dispute whether the Communication Plans effectively or accurately document and provide for offenders' hearing accommodation needs. (Def's SOF ¶ 22.) Although the ADA Directive became effective in 2012, Plaintiffs contend that IDOC did not create Communication Plans for all but one of the named Plaintiffs until 2014. (*Id.*; Comm. Plans.) Moreover, a number of Plaintiffs stated in sworn declarations that when they met with their ADA Coordinator to discuss their Communication Plan the conversation was very brief and they were not provided with a sign language interpreter. (Def's SOF ¶ 22; Pls' SOF ¶ 6(A).) They do not believe that the process involved a detailed or intelligent assessment of their needs, and disagree with some of the determinations made in their Plans. (Def's SOF ¶ 22; Pls' SOF ¶ 6(A).) For example, Plaintiff Holmes stated that his meeting with ADA Coordinator Tony Hendrix was "very short and Mr. Hendrix simply summarily checked off a few items on a form." (Holmes

Decl. ¶ 24.)  A sign language interpreter was not present, and Mr. Holmes does not believe that "[his] opinions or needs were taken into consideration with respect to [the] process."  (*Id.* ¶¶ 23–24.)  Although his Communication Plan states that auxiliary aids are not applicable to him, he believes that they are.  (*Id.* at 25–26.)

The ADA Directive requires that, once a Communication Plan is completed, copies must be given to the offender and ADA Agency Compliance Officer and placed in the offender's master file and his medical file.  (AD § II(G)(4)(c); Def's SOF ¶ 26.)  Plaintiff Holmes stated that he did not remember receiving a copy of his Communication Plan until his deposition in this case.  (Pls' SOF ¶ 6(C).)  And Plaintiff Winfert stated that the Communication Plan he received contemporaneous to his meeting with ADA Coordinator Butler, dated July 9, 2013, was different from the one that Defendant filed in support of the instant motion for summary judgment, dated June 19, 2013.  (Winfert Decl. ¶; *see* Pls' SOF ¶ 6(C).)

Under the ADA Directive, it is the ADA Coordinator's responsibility to ensure that the approved accommodations are effectively implemented.  (Def's SOF ¶ 25; AD § II(G)(4)(c).)  Inmates who have received a copy of their Communication Plan may show it to prison staff to demonstrate that they are entitled to accommodations.  (Def's SOF ¶ 26.)  But Plaintiffs contend that these plans are not followed or even consulted by prison staff.  (*Id.*; Pls' SOF ¶ 6(B).)  At least four named Plaintiffs stated that they have either never been provided or are not consistently provided with the accommodations approved in their Communication Plans.  (Pls' SOF ¶ 6(B).)  For instance, despite approval for these accommodations, Plaintiff Holmes has missed meals because he does not always receive alternative notification of the audio meal announcements and he has been denied sign language interpreter services on numerous occasions.  (Holmes Dep. at 13–16, 94–96.)

It is possible for modifications to be made to an offender's Communication Plan over time; although it is unclear whether and how often such modifications are made. (Def's SOF ¶ 27.) In addition, when an inmate transfers prisons, he must obtain a new Communication Plan based on the accommodations available at the new prison. (Def's SOF ¶ 27; Pls' SOF ¶ 5(B); McKinzie Dep. at 123–24.) An offender may bring his old Communication Plan with him to show staff at the new facility, but it is not effective there and, as discussed above, Plaintiffs dispute whether IDOC has sufficient procedures to ensure that receiving facilities are notified of transferring inmates hearing disabilities. (Pls' SOF ¶ 5(B); McKinzie Dep. at 123–24.)

iv.     Grievance System

IDOC inmates file grievances through a largely written process. (Def's SOF ¶ 76; 20 Ill. Admin. Code. § 504.810.) According to the senior Chairperson of the Administrative Review Board ("ARB"), Terri Anderson, inmates file all grievances with their counselors first. (Deposition of Terri Anderson at 87, Pls' SOF Ex. 57 [*hereinafter* Anderson Dep.].) If an inmate is not satisfied with his counselor's response, he can forward his grievance to his facility's grievance office. (*Id.*) The grievance office then makes a recommendation to the warden, who makes the final facility level determination. (*Id.*) The offender may then appeal the facility decision to the ARB. (*Id.* at 87–88.)

Under the ADA Directive, ADA grievances should be "promptly" forwarded to the facility ADA Coordinator, but there is no specific time requirement for when this must occur.[6] (Pls' SOF ¶ 39(B).) Nor does IDOC require that ADA accommodations be provided within a certain timeframe. (Pls' SOF ¶ 39(E).) ADA grievances follow the same resolution timeframe

---

[6] The Stateville ADA Coordinator testified that he usually receives ADA grievances within a few days after they are filed. (Senor Dep. at 116.) On at least one occasion, however, he did not receive a grievance from Plaintiff Foster until three months after filed it. (Pls' SOF ¶ 39(C).)

as other grievances.  (Pls' SOF ¶ 39(D).)  As of January 2014, the entire grievance process, from

the time the offender filed a grievance until the ARB issued a final decision, lasted an average of

eight months.[7]  (Anderson Dep. at 92; *see* Pls' SOF ¶ 39(F).)

### C.  ADA Training for IDOC Employees

The ADA Directive requires staff with regular offender conduct to receive annual ADA

training, and requires ADA Coordinators to receive additional specialized training on

accommodation needs for hearing impaired inmates.[8]  (AD § II(H).)  IDOC's former manager of

training testified that prison staff does receive annual ADA training that covers inmates' rights

under the ADA and "very basic knowledge" regarding how to communicate with hearing

impaired offenders.  (Pasley 30(b)(6) Dep. at 20–21; Def's SOF ¶ 20.)  IDOC incorporated this

ADA-specific training into its "cycle training," which is the term used for IDOC's annual

employee training.[9]  (Pasley Dep. at 22; *see* Deposition of Kelly Graham at 15–16, Pls' SOF

Ex. 15 [*hereinafter* Graham Dep.] (testifying that she recalled receiving ADA training during her

June 2013 cycle training).)  This ADA training consists of a thirty-page PowerPoint presentation

that employees review independently on the computer.  (Pasley Dep. at 200–01, 234–35;

*see* ADA Cycle Training Presentation, Pls' SOF Ex. B.)  Since the training is web-based, it is not

interactive and employees cannot ask questions on the spot.  (Pls' SOF ¶ 11(D).)  It is possible

for employees to click through the slides without reading them, and IDOC does not administer a

---

[7] According to IDOC policy, this process should take no more than six months: two months at
the facility level and four months for ARB review.  (Anderson Dep. at 88–90.)  Grievances may
also be expedited if they qualify as an emergency.  (*Id.* at 91.)

[8] A draft paragraph requiring annual specialized training for ADA coordinators and cycle
training on deaf and hard of hearing issues for other correctional employees was removed from
the final ADA Directive.  (Pls' SOF ¶ 11(A).)

[9] Employees must attend minimum of sixteen hours of cycle training annually, typically over the
course of two days, although some employees are required to receive twenty-four or forty hours
of training.  (Pasley Dep. 231–33.)

test afterwards to gauge comprehension.  (*Id.*)  Outside of cycle training, the record indicates that IDOC employees typically do not receive any additional ADA training, with the exception of the ADA Coordinator training discussed below.[10]  (*See* Pasley Dep. at 211–21.)

With the adoption of the new ADA Directive, IDOC also prepared specialized training for ADA Coordinators.  It appears that Patrick Keane first administered this training to all ADA Coordinators in the summer of 2013.  (Pasley Dep. at 167–69; Hendrix Dep. at 238.)  Mr. Pasley and ADA Coordinators recall the training lasting approximately one day, with hour estimates ranging from three to six hours.  (Pasley Dep. at 167; Senor Dep. at 29–31, 53; Hendrix Dep. at 59.)  New ADA Coordinators assigned to the position after the training's initial roll-out are directed to Mr. Keane for training on an individual basis.  (Pasley Dep. at 165–66, 176–76, 186.)  According to Mr. Pasley, the only additional ADA training that ADA Coordinators receive is the ADA component of cycle training.  (Pasley Dep. at 180, 182.)  And ADA Coordinators Hendrix and Senor testified that they have not received any ADA training other than the one-day ADA Coordinator training.[11]  (Hendrix Dep. at 238; Senor Dep. at 53; *see* Pls' SOF ¶ 12(B).)

Mr. Keane also received ADA training when he assumed the role of Agency ADA Compliance Officer.  He testified that he attended a day-long training at the Attorney General's office, and has also discussed ADA issues with Rachel McKinzie, a former legal officer for the Department.  (Keane Dep. at 50–54.)  According to Mr. Keane, IDOC does not require him to participate in any additional ADA training in the future.  (*Id.* at 64–65.)

---

[10] Other trainings may reference the ADA.  For instance, IDOC's Transfer Coordinator testified the training that instructs facilities how to prepare an inmate transfer packets lists the facilities that are ADA preferred, but it does not discuss the ADA in any other way.  (Pls' SOF ¶ 11(E).)  Defendants have not, however, identified any other substantive ADA training.

[11] Former ADA Coordinator Cassandra Davis does not recall receiving any formal ADA training.  (Pls' SOF ¶ 12(C).)  However, her tenure as ADA Coordinator ceased in June 2013, which might have been before IDOC launched its current ADA Coordinator training.  (*See* Deposition of Cassandra Davis at 63, Pls' SOF Ex. 11 [*hereinafter* Davis Dep.].)

Plaintiffs argue that IDOC's staff is inadequately trained to accommodate, understand, and communicate with hearing impaired offenders. Plaintiff Lancaster stated that he has frequently seen officers making fun of and being disrespectful to him and other deaf inmates. (Pls' SOF ¶ 12(D).) He also recalls an incident when he first entered IDOC in which he told correction officers that he was deaf but they nonetheless expected him to answer when they called his name out loud in a group. (*Id.*) Plaintiff Holmes similarly stated, without providing specifics, that IDOC employees often assume that he can hear because he does not know American Sign Language ("ASL") well, and thus they do not take the time to effectively communicate with him. (*Id.*)

## D.    Accommodations for Hearing Impaired Inmates

Plaintiffs argue that IDOC systemically discriminates against hearing impaired inmates in large part by failing to provide accommodations necessary for them to participate in or receive benefits from various IDOC services, programs and activities. Before discussing the specific services, programs and activities involved in Plaintiffs' claims, we will briefly explain the more technical accommodations that Plaintiffs argue should be available to them as needed.

<u>Sign Language Interpreters.</u>  Plaintiffs contend that some inmates only communicate through ASL. Other hearing impaired inmates do not know ASL at all, or are not fluent. (Def's SOF ¶¶ 1, 2, 6.) It is uncontested that IDOC has not always provided ASL interpreters for hearing impaired inmates, even at preferred facilities.[12]  (Pls' SOF ¶ 7(A).) The parties do dispute, however, whether it is IDOC's current policy to provide interpreters when necessary. (*Id.*) IDOC's former legal officer, Ms. McKinzie, testified that IDOC has experienced difficulty finding ASL interpreters who are willing and qualified to work in prisons, and also

---

[12] Preferred facilities are those that have more services and accommodations available for hearing impaired inmates. (*See* Funk Dep. at 223; McKinzie Dep. at 229.)

acknowledged that IDOC has had contractual disputes related to payment with its interpretation

services provider. (McKinzie Dep. at 37–42; *see* Funk Dep. at 222–23.) Defendant discredits

this testimony by noting that Ms. McKinzie retired from IDOC in June 2013. (Pls' SOF ¶ 7(A).)

      <u>Hearing Aids.</u> IDOC contracts with the healthcare services vendor Wexford Health

Sources ("Wexford") to provide the majority of medical, dental, mental health, pharmaceutical

and consultant care at all its correctional facilities. (Shicker Dep. at 6–8.) Wexford's policy on

hearing aids at IDOC facilities permits offenders to have only one hearing aid even if a second

hearing aid would improve their hearing ability, except in cases of "severe bilateral hearing

loss." (Pls' SOF ¶ 8(A).) If an offender's hearing aid is lost or broken due to negligence, the

offender is to be issued a disciplinary ticket and charged for the replacement. (McKinzie Dep.

at 284–86 (citing Wexford's policy on hearing aids).)[13] It is undisputed that in some instances it

is too loud in prisons for hearing aids to be effective, although Plaintiffs stress that they are

normally useful and important. (Def's SOF ¶ 50.)

      Some Plaintiffs testified that they have waited a few months to a year-and-a-half to

receive a replacement hearing aid, and IDOC denied Plaintiff Halterman's request for one

altogether even though, according to him, his does not work properly and has needed repair six

or seven times. (Pls' SOF ¶¶ 9(B), 9(C).) In addition, Plaintiff Baxter testified that he does not

wear a hearing aid because IDOC denied his requests for one. (Pls' SOF ¶ 9(C).) Similarly,

IDOC has denied Plaintiff Winfert's requests for a hearing aid in the past, and although he

currently wears ones, he testified that the batteries wear out every two months and it takes IDOC

a week to replace them. (Pls' SOF ¶¶ 9(C), 10(B).)

---

[13] Before 2012, Wexford's policy did not allow replacement for loss under any circumstance.
(10/03 Wexford Hearing Aid Policy, Pls' SOF Ex. 41.)

Video Remote Interpreting.  As previously mentioned, IDOC contracted with a VRI service provider in 2013.  Although Defendant asserts that the contract provides for VRI at all IDOC facilities, at the time of Mr. Keane's deposition in January 2014, not all facilities were equipped.  (Keane Dep. at 218–21.)  Mr. Keane testified that if an offender at a non-equipped facility wants to use VRI, they will be transferred to a facility that is equipped.  (*Id.*)

Even where VRI is available, Plaintiffs argue that IDOC arbitrarily denies inmate requests to use the equipment.  They point to a 2012 email in which an IDOC health care administrator relayed that a Wexford agent instructed staff to only use VRI when "notes and picture pointing does not work since it is very expensive."  (Def's SOF ¶ 29 (citing 6/13/12 Sudbrink Email to McKinzie, Pls' SOF Ex. 19).)  In addition, during Professor Cokely's tours of IDOC facilities he observed that the VRI equipment at Dixon was in a locked cabinet and no one that he spoke with knew who had the key.  (Cokely Rpt. at 37–38.)  At Stateville, the VRI equipment was covered in dust.  (*Id.*)  According to Professor Cokely's report, he was not permitted to see either of the units operate.  (*Id.* at 38.)

Plaintiffs who have been permitted to use VRI recount the service as choppy and ineffective.[14]  (Def's SOF ¶ 29.)  And another internal IDOC email reveals that insufficient internet bandwidth caused issues with VRI picture clarity and fluidity in 2012.  (1/13/12 Sudbrink Email to Moore, Pls' SOF Ex. 20; *see also* Cokely Rpt. at 38–39 (explaining inmate testimony suggests Dixon and Stateville have insufficient bandwidth connectivity for VRI)).

---

[14] Plaintiff Lancaster testified that on the five or so occasions that he has used VRI in the medical unit it has been "choppy and laggy," preventing him from understanding the doctor and causing the conversations with medical staff to go "over his head."  (Lancaster Dep. at 63–64.)  Plaintiff Lord similarly described his experience with VRI at IDOC: "It's pixelated, jumpy.  It freezes….It's not clear, not easy to understand."  (Lord Dep. at 42.)  And Plaintiff Holmes said the service was ineffective because the screen continually freezes so the doctor cannot understand what he signs.  (Holmes Dep. at 44–45, 91–92.)

Telephone/Teletypewriting Service.  A teletypwriter ("TTY"), also known as a telecommunication device for the deaf ("TDD"), is a telephone equipped with a keyboard and a display screen.  TTY devices enable hearing impaired individuals to communicate over telephone lines by sending and receiving typed messages.

Inmate "Helpers."  Hearing-abled inmates can work as helpers for hearing impaired inmates.  (*See* Def's SOF ¶ 78.)  For example, IDOC assigned such a helper to Plaintiff Childress.  The helper attends medical appointments with him and has also helped him at meals.  (Childress Dep. at 14–16.)  Childress testified that the helper is not a sufficient substitute for an ASL interpreter, however, because he does not understand sign language.  (*Id.* at 14–16; 35–36; *see also* Wright Dep. at 75–76 (testifying that IDOC brought another inmate to help him communicate during his eye exam but it was a "real struggle" to do so).)

Visual Alarms.  IDOC uses an audio alarm system to notify inmates of emergency situations, such as fires and tornados; however, many hearing impaired inmates cannot hear or understand these alerts.  (Pls' SOF ¶¶ 36(A), 36(B).)  Non-audio alarms, such as flashing lights and vibration devices, could be used in tandem with audio alarms to notify hearing impaired offenders when emergency situations and other scheduled activities occur.  (*See* Pls' SOF ¶ 35(F); Johnson Dep. at 58–59 (explaining both vibrating and flashing light alarms).)

Other Auxiliary Aids.  Other aids such as headphones and telephone amplifiers are also beneficial to some hearing impaired inmates.  For example, headphones may allow hard of hearing inmates to hear the television, and telephone amplifiers permit them to use normal telephones.  The parties agree that in the past some inmates have been required to purchase auxiliary aids on their own; however, they contest whether that remains IDOC's current policy.  (Pls' SOF ¶ 10(C).)

With the descriptions of these primary accommodations in mind, we turn to the services, programs and activities involved in Plaintiffs' claims. The ADA Directive provides that offenders' Communication Plans "may include . . . [c]oordination of communication accommodations when information being relayed is complex, exchanged for a lengthy period of time, or involves legal due process." (AD § II(G)(4)(b).) It further explains that this type of information "may include, but is not limited to" communications such as: orientation; counseling; education and vocational programing; medical and mental health services; religious services; due process hearings; and pre-release instructions. (*Id.*) Citing this Directive, Defendant asserts that it is IDOC's policy to provide accommodations for hearing impaired offenders in these and other contexts when necessary and/or subject to reasonable alternatives and security issues. (*See* Def's SOF ¶¶ 36, 38, 44, 45, 51, 62.) Plaintiffs' complaint focuses on these and other categories, each of which we will discuss in turn.

                i.     Orientation

Pursuant to IDOC policy, when offenders first enter IDOC and when they transfer between facilities they participate in an orientation process. (Def's SOF ¶ 32.) During orientation inmates watch a video presentation and should also receive a written orientation manual. Orientation is intended to educate the offender on the "facility's expectations" of them and what each offender can expect in return from the facility's programs and services. (Orientation Administrative Directive § 04.01.105(II)(F)(3), Def's SOF Ex. 16.) The information covered is complex and important. (Pls' SOF ¶ 16(A).) It includes topics such as disciplinary rules, grievance procedures, security and emergency procedures, work and educational services, protective custody, etc. (*Id.*; Orientation Manual, Def's SOF Ex. 18

[*hereinafter* Orientation Manual].)  The orientation manual also includes a short section on IDOC's ADA policies.[15]  (Orientation Manual § IV(J).)

The IDOC staff who facilitate orientation should have received ADA cycle training, but they are not trained in sign language.  (Pls' SOF ¶ 16(B).)  The ADA directive states that offenders' Communication Plans "may" include accommodations for orientation.  (Def's SOF ¶ 33.)  Defendant contends that IDOC offers ASL interpreters during the orientation video when necessary, but there is limited evidence in the record to show that these services are actually provided.  Neither IDOC's Agency ADA Compliance Officer nor its former Legal Officer was aware whether any IDOC facilities have ever provided ASL interpreters during orientation. (Keane Dep. at 296–97; McKinzie Dep. at 222–23; *see* Pls' SOF ¶ 16(C).)  Plaintiff Wright did receive an interpreter to answer questions about the orientation manual, but this accommodation was first provided in 2012, two years after he entered the facility and four years after he entered the IDOC system.  (Def's SOF ¶ 35; Pls' SOF ¶ 18(D).)  In addition, Plaintiff Lancaster viewed an ASL interpreted orientation video, but not until it was shown at Dixon in 2013 or 2014, at least five years after he entered the facility.  (Lancaster Decl. ¶ 6.)  The parties have not identified, and we have not seen, any additional evidence of ASL interpretation being offered during orientations.  Plaintiffs who described their pre-2012 orientation experiences testified that they did not receive ASL interpreters and some also stated that they had difficulty understanding the oral presentation and/or orientation manuals.[16]  (Def's SOF ¶¶ 32, 34; Pls' SOF ¶¶ 17(A), 17(B), 18(B).)  Moreover, some Plaintiffs do not recall participating in an orientation program and/or receiving an orientation manual at all.  (Pls' SOF ¶ 18(A).)

---

[15] Ms. McKinzie testified that prior to 2012 the ADA information in the orientation manuals was inconsistent between facilities, and in some cases was incorrect.  (McKinzie Dep. at 52–53; *see* Def's SOF ¶ 34; Pls' SOF ¶ 18(C).)

[16] This testimony relates to orientations that occurred prior to the 2012 ADA Directive.

ii.     Educational and Vocational Programs

IDOC operates an Office of Adult Education and Vocational Services that offers inmates various educational programs to inmates.  Shortly after entering IDOC, offenders are given an education assessment.  (Deposition of Christine Ann Boyd, Pls' SOF Ex. 35 at 47 [*hereinafter* Boyd Dep.].)  If they test below a sixth grade education level, they are required to attend a 90-day Adult Basic Education ("ABE") class.  (*Id.*)  Inmates who test above a sixth grade education level or who have passed the ABE exam may take GED classes, and offenders who have obtained their GED diploma and a received an ABE test score of 8.0 or higher are eligible for vocational courses taught through local community colleges.  (*Id.* at 44–49, 120–21.)  IDOC also offers inmates other life skills programs such as anger management, addiction recovery, and parenting classes.  Participating in any of these educational, vocational, or other programs could lead to a sentencing credit towards an inmate's early release.  (Hendrix Dep. at 25, 153.)

The ADA directive states that offenders' Communication Plans "may include" accommodations for educational and vocational programming.  (AD § II(G)(4)(b)(1)(5); Def's SOF ¶¶ 36, 38.)  IDOC's former Chief of Programs and Support Services testified that it was IDOC's policy to provide interpreters for offenders to participate in educational and vocational programs.  (Deposition of Deborah Denning at 17, Pls' SOF Ex. 12 [*hereinafter* Denning Dep.]; *see* Pls' SOF ¶ 19(A).)  Defendant identified two instances, one in 1998 and the other in 2013, where IDOC provided an ASL interpreter to assist an inmate during ABE.  (Def's SOF ¶¶ 37, 41.)  IDOC also recently provided Plaintiff Wright with an ASL interpreter for some of his vocational construction classes.  (Def's SOF ¶ 39.)  And since April 2014 Plaintiff Holmes received an interpreter for his Inside Outside Dad program—although the interpreter missed a

few of those classes and IDOC refused to provide him with an interpreter for the Discipleship program. (Def's SOF ¶ 40.)

The record also contains instances when IDOC has failed to provide inmates with interpreters for educational and vocational programs. (*See* Pls' SOF ¶¶ 20(A)–20(C).) For example, Plaintiff Winfert testified that he requested an interpreter for the GED classes that he was taking at the time of his deposition, but IDOC did not provide one. (Winfert Dep. at 35–36.) He explained that he had trouble understanding the classes and failed the exam once already. (*Id.*) He also testified that he could not participate in anger management courses in 2011 because IDOC could not provide him with an interpreter.[17] (*Id.* at 40–42.) Plaintiff Johnson was also taking GED classes at the time of his deposition, which he found difficult to understand because he did not have an interpreter. (Johnson Dep. at 16.) Plaintiff Lancaster testified that he has not been able to participate in classes such as alcohol abuse and violence prevention because no interpreter was available. (Lancaster Dep. at 69–70, 80.) He also stated that he has been unable to participate in a sex offender program mandated by the criminal court because IDOC has not provided him an interpreter.[18] (Lancaster Resp. to Interrog. No. 11–12, Pls' SOF Ex. 23 [*hereinafter* Lancaster Interrog.].) He believes that he cannot earn good time credit until he completes this course. (*Id.*) Other Plaintiffs have also stated more generally that they recall being unable to participate in these programs because an interpreter was not available to them. (*See* Pls' SOF ¶¶ 20(A)–20(C); Holmes Decl. ¶ 14.)

---

[17] Defendant objects that many of these examples are inadmissible because Plaintiffs have not established that the offenders are otherwise qualified to enroll in the courses of programs. This objection is surprising and baseless considering Defendant stated in his opening summary judgment brief that "[f]or the purposes of this motion, Defendant does not dispute that deaf inmates are qualified individuals with a disability." (SJ Mem. at 4.)

[18] Lancaster also testified, however, that in the year leading up to his deposition IDOC granted each one of his requests for an interpreter. (Def's SOF ¶ 80.)

### iii. Job Assignments

IDOC runs an employment program allowing inmates to hold jobs and receive wages. (See Boyd Dep. at 70–72; Deposition of Kimberly Butler at 194–95, Pls' SOF Ex. 54 [*hereinafter* Butler Dep.]; Hendrix Dep. at 183–86.) Inmates who wish to participate may submit a request for a position, which is then reviewed by assignment officers and, if approved, the warden must sign off on the placement. (Boyd Dep. at 71; Butler Dep. at 195; Hendrix Dep. at 184–85.) Placement in skilled jobs like plumbing typically require that the inmate has some background in that profession, and IDOC may also consider disciplinary issues before approving a placement. (Hendrix Dep. at 185–86; Boyd Dep. at 71–72.) Tony Hendrix was not aware of IDOC offering any accommodations to hearing impaired inmates to participate in job placements at Dixon. (Hendrix Dep. at 186; *see* Funk Dep. at 62 (testifying that she could not recall providing an accommodation to a hearing impaired inmate at Pittsfield work camp who wanted to hold a job from 1992 to 2002).) And Kimberly Butler, current Warden and former ADA Coordinator at Menard, testified that she has never provided an interpreter to assist an inmate with their job responsibilities, but she has also never received a request for work accommodations from a hearing impaired inmate. (Butler Dep. at 195–96.)

Plaintiffs Winfert, Wright, Lord, and Halterman have job assignments. (Def's SOF ¶ 42.) None of them receive an interpreter to assist them. Plaintiffs Wright and Winfert do not feel they need an interpreter, (Wright Dep. at 58; Winfert Dep. at 13–14), but Plaintiff Lord testified that having an interpreter would be helpful, (Lord. Dep. at 10–11, 14–16). Plaintiff Holmes was employed in the general store until January 2015, but he was fired from that job after he was found with soup and food in his housing unit. (Def's SOF ¶ 42; 2/17/15 Peterson Ltr. to Lovellette, Pls' SOF Ex. 36 [*hereinafter* 2/17/15 Peterson Ltr.].) He claims that he received

permission to possess those items from his boss, but that he was unable to communicate this defense during his disciplinary hearing because he did not have an interpreter. (*Id.*)

Although Plaintiff Lord is currently employed repairing eyeglasses, he was previously denied a position as a fork lift operator for the general store. (Pls' SOF ¶ 21(C); Lord Resp. to Interrog. No. 13, Pls' SOF Ex. 48 [*hereinafter* Lord Interrog.].) According to Lord, IDOC told him it was too dangerous for him to work in that role because he is deaf. (Lord Interrog. No. 13.) Similarly, while in Dixon between 2008 and 2010, Plaintiff Wright was told that he could not work as a lawn mower because another deaf inmate was injured while performing that work. (Pls' SOF ¶ 21(D).)

### iv.   Communication with Counselors

Each inmate is assigned to a Correctional Counselor at their facility. When IDOC is fully staffed, each Correctional Counselor is assigned to one housing unit that holds two hundred inmates. (Deposition of Sarah Robinson at 11, Pls' SOF Ex. 10 [*hereinafter* Robinson Dep.].) Counselors process grievances, transfer requests, work release requests, supplemental sentence credit reviews, etc. (*Id.* at 10.) They are also available to inmates on a daily basis to discuss requests, grievances, or personal issues, and must meet with each inmate at least once every sixty days. (*Id.* at 12–13.)

The ADA directive states that Communication Plans "may include" accommodations for counseling "when the information being relayed is complex, exchanged for a lengthy period of time, or involves legal due process." (AD § II(G)(4)(b)(1)(5); *see* Def's SOF ¶ 44.) Defendant contends that it is IDOC's policy to provide accommodations such as VRI and live ASL interpretation for communications with counselors when necessary, without identifying any instances in the record where they have done so. On the other hand, Plaintiffs Holmes,

Lancaster, and Winfert, stated that IDOC has never provided them with an interpreter to communicate with their counselors, leading to instances where they have been unable to effectively communicate about important matters.  (Holmes Decl. ¶ 10; Lancaster Decl. ¶ 7; Winfert Decl. ¶ 20; *see* Def's SOF ¶ 43.)  And Sarah Johnson, a Correction Counselor at Jacksonville, said that she has never used an interpreter to communicate with a hearing impaired inmate.  (Robinson Dep. at 19.)

Defendant also asserts that offenders can communicate with their counselors through written notes.  (Def's SOF ¶ 43.)  Indeed, Plaintiffs Johnson and Wright testified that they do this, but that the communication is not always effective.  (Johnson Dep. at 23, 55; Wright Dep. at 25–26.)  Plaintiff Winfert testified that he used to write notes with his counselor, but now he only reads her lips and must repeatedly ask her to slow down.  (Winfert Dep. at 21–22; Winfert Resp. to Interrog. No. 14, Pls' SOF Ex. 24 [*hereinafter* Winfert Interrog.].)  He only understands about half of their conversations.  (Winfert Dep. at 22.)  Plaintiff Lancaster also recounted a specific situation when he tried to ask his counselor about the rules on good time through writing.  (Lancaster Dep. at 34–35.)  She did not answer his question; instead, her response was entirely off-topic, leading him to believe that she did not understand him.  (*Id.*)  In addition, the record shows that Plaintiff Holmes has limited writing ability and he reads below the fourth grade level.  (Holmes Resp. to Interrog. No. 2, Pls' SOF Ex. 37.)  Thus, it takes longer for him to communicate through writing, and even then he can only communicate effectively on simple subjects.  (*Id.*)  He stated that his counselor told him that it takes too long to communicate with him through reading and writing.  (Holmes Decl. ¶ 9.)

v.     Medical and Mental Health Services

A number of Plaintiffs testified that they have difficulty communicating effectively with medical staff because of their hearing impairment.  (Pls' SOF ¶ 24(E).)  The ADA Directive states that Communication Plans "may include" accommodations for medical and mental health services "when the information being relayed is complex, exchanged for a lengthy period of time, or involves legal due process."  (AD § II(G)(4)(b)(1)(5); *see* Def's SOF ¶ 45.)  Defendant contends that the Health Care Unit employs VRI, ASL interpretation services, and written notes to communicate with hearing impaired inmates.  (Def's SOF ¶¶ 46–47.)

Inmates indeed communicate with staff in the health care unit through written notes. (Pls' SOF ¶ 24(A).)  Some Plaintiffs report, however, that they are not always able to communicate fully with the doctors and nurses through writing.  (*Id.*)  According to Plaintiffs' expert witness, relying on written communication is not an effective means of communication for most deaf people.  (Cokely Rpt. at 13.)  In addition, IDOC's medical director and former legal counsel agreed that "for deaf inmates or hard of hearing inmates whose primary language is ASL, most visits with their treating physician require a sign interpreter for effective communication."  (Pls' SOF ¶ 23(C).)

The parties dispute whether live ASL interpretation is used in the health care unit. IDOC's medical director was not aware whether anyone in the Department has confirmed whether Wexford ever uses live ASL interpreters to communicate with hearing impaired inmates.  (Shicker Dep. at 53–54.)  Defendant identifies two IDOC letters, one to Plaintiff Lancaster and one to an unknown inmate, scheduling "interpreter services" for medical

appointments in August 2013.  (Def's SOF ¶ 47.)  Plaintiffs Lancaster,[19] Winfert and Lord[20] stated, however, that they have never been provided with a live sign language interpreter in the health care unit.[21]  (Def's SOF ¶ 47; Pls' SOF ¶ 25(A).)  Plaintiff Childress similarly testified that medical staff has denied his requests for interpreters and told him that interpreters are too expensive.[22]  (Childress Dep. at 10–11.)  Plaintiff Wright stated that he has made nearly fifty requests for an ASL interpreter prior to medical appointments, and IDOC granted his request on only one occasion.  (Wright Resp. to Interrog. No. 6, Pls' SOF Ex. 27 [*hereinafter* Wright Interrog.].)  He recalled that during that visit the physician told him that communication was "much better" with the interpreter.[23]  (*Id.*)

VRI is a possible alternative to live ASL interpretation.  As previously mentioned, IDOC entered into a contract for VRI services in 2013.  VRI has been used in the health care units at some facilities, but the parties dispute whether it is employed as often as needed and whether it works effectively.  IDOC's medical director was not aware whether the Department or his office has taken any steps to confirm whether VRI is working properly.  (Shicker Dep. at 51–52.)  In

---

[19] The medical unit did not provide an interpreter when Lancaster injured his little finger playing basketball.  He testified that he was unable to effectively communicate with IDOC medical staff at the time.  The medical staff took x-rays and wrapped the finger in tape, but the finger remains permanently bent, hindering his ability to effectively sign.  (Pls' SOF ¶ 26 (C).)

[20] In late January 2015, Lord requested an interpreter for a psychiatric appointment.  As of February 27, IDOC had not scheduled the appointment, even though hearing-abled inmates who requested appointments around the same time had already met with the doctor.  (Pls' SOF ¶ 26(E).)  IDOC told him they were in the process of requesting an interpreter for him.  (*Id.*)

[21] Plaintiff Holmes also stated that since his Communication Plan was signed in April 2014 he has requested ASL interpretation services in the medical unit but has not been provided with them, (Holmes Dep. at 96), although at least on some occasions he has used VRI, (*id.* at 91).

[22] Childress believes that ineffective communication with health care staff resulted in repeated episodes of uncontrolled diabetes, including once instance where he went into a diabetic coma, and progressive kidney disease and dialysis dependence.  (Pls' SOF ¶ 26(B).)

[23] Wright believes that he is not receiving the proper migraine medication because he cannot communicate fully with medical staff.  (Pls' SOF ¶ 26(D).)

March 2014, Plaintiff Winfert testified that Menard still does not offer VRI services in the Health Care Unit.[24]  (Winfert Dep. at 18.)  Plaintiff Childress—who is a diabetic, receives dialysis, and has difficulty understanding his doctor—testified that medical staff told him VRI was available but ignored his requests to use it during his appointments.  (Childress Dep. at 11–15, 33.) Plaintiff Wright has seen VRI equipment in Graham, but testified that IDOC never told him it could be used for medical appointments.  (Wright Dep. at 11.)  And Plaintiffs Lancaster and Holmes explained that when they did use VRI in the health care unit, the picture froze and was choppy and unclear, making it difficult for them to understand the interpreter and communicate with their doctors.  (Lancaster Dep. at 63–64; Holmes Dep. at 44–45, 91–92.)  The last time Plaintiff Johnson was at the health care unit before his deposition, IDOC offered him VRI services, but it appears that he refused them.  (Johnson Dep. at 34–35.)

IDOC's medical director did not identify any formal monitoring done by IDOC to ensure that Wexford is providing ASL interpreters and hearing aids in accordance with their contract. (Pls' SOF ¶ 12(B).)  The record indicates that IDOC's medical staff could nonetheless learn that Wexford failed to adequately provide ASL interpretation or hearing aids through inmate complaints or monthly facility meetings where IDOC nurses review all the occasions when Wexford denied services to an inmate in the prior month.  (Shicker Dep. at 97, 100–101.)  If an issue with Wexford's services was brought to IDOC's medical director's attention, he would meet with the vendor on an "as-needed" basis.  (*Id.* at 97, 104.)

---

[24] Although Winfert says that there has never been a time where he did not receive the correct medication due to a communication issue with medical staff, there have been occasions where was unable to explain his malady to them.  (Winfert Dep. at 17–20.)

vi.    Religious Services and Programs

Inmates at IDOC facilities are generally permitted to practice their religions.  (Davis Dep. at 244.)  IDOC employs chaplains to work at its facilities and holds services for a variety of religions.  (*Id.* at 245; Denning Dep. at 36–27.)  IDOC prisons also have various faith-based programs such as Bible study, and volunteer groups sometimes provide services such as baptisms and religious counseling.  (Davis Dep. at 245–56.)

The ADA directive states that Communication Plans "may include" accommodations for religious services.  (AD § II(G)(4)(b)(1)(5).)  Defendant contends that it is IDOC's policy to provide hearing accommodations for religious services, including ASL interpreters.  (Def's SOF ¶ 51.)  Defendant cites two IDOC memoranda, both dated December 9, 2013, which notify Plaintiffs Lord and Lancaster that they will be provided with an interpreter to participate in a Discipleship 101 program beginning December 11, 2013.  (Def's SOF ¶ 51; 12/9/13 IDOC Discipleship Memoranda, Def's SOF Ex. 23.)  Indeed, Plaintiff Lancaster testified that he was receiving an interpreter for a gospel class that began in December 2013.  (Lancaster Dep. at 20–21.)  Plaintiff Holmes, however, testified that his request for an interpreter in the Discipleship program was denied.  (Def's SOF ¶ 51.)  IDOC agrees that Plaintiffs Winfert and Johnson should also receive interpreters for religious services.  (Def's SOF ¶ 52.)  Winfert and Johnson requested such interpretation services sometime before their respective depositions in March and April of 2014, but by January 28, 2015 when Defendant filed his statement of facts, IDOC was still "working to provide" these services.  (*Id.*)

Although not discussed in Defendant's statement facts, the Dixon facility has provided a special religious service for hearing disabled prisoners.  (Compl. ¶ 94.)  Indeed, Plaintiff Lancaster testified that he attends the deaf religious services at Dixon.  (Lancaster Dep. at 27–

28.)  He indicated, however, that these services are run by third parties and are not provided consistently.  (Lancaster Decl. ¶ 9.)  Plaintiff Lord similarly stated that a third party previously ran a deaf religious service at Dixon, but he believes the program is no longer running.  (Lord. Interrog. No. 18.)  And Plaintiff Wright, who is currently incarcerated at Graham, testified that while he was at Dixon he participated in a deaf Christian ministry.  (Wright Dep. at 66.)

The record indicates that, other than the deaf religious service at Dixon, IDOC does not typically provide interpreters for religious services and programs.  The Stateville ADA Coordinator, Kevin Senor, testified that Stateville does not provide interpreters for religious services; he does not know why.  (Senor Dep. at 159; Pls' SOF ¶¶ 28(A)–28(B).)  He explained that inmates at Stateville have requested interpreters for religious services, but he was not aware of IDOC granting any of those requests.  (Senor Dep. at 159–60; *see* Lancaster Dep. at 39–40 (testifying that he recently asked Senor for an interpreter to attend religious services); *but see* Davis Dep. at 248 (testifying that she does not recall inmates requesting interpreters for religious services during her time as ADA Coordinator at Dixon).)  Plaintiffs likewise testified that IDOC does not provide interpreters for religious services and programs at Dixon, Menard, or Graham.  (Holmes Dep. at 90 (prayer room at Dixon); Lord Dep. at 28 (Sunday religious services at Dixon); Winfert Interrog. No. 16 (weekly church services at Menard); Childress Dep. at 24–25 (chapel at Graham); Wright Dep. at 65–66 (various services and programs at Graham).)  And Plaintiffs Winfert, Wright, Holmes, and Foster stated that their specific requests for interpreters were denied or ignored.  (Holmes Dep. at 96; Wright Dep. at 65–66 (testifying that the chaplain at Graham denied his request for an interpreter during religious services); Winfert Dep. at 42–44 (testifying that he asked the chaplain at Mendard for an interpreter but never received one); Foster Dep. at 40–41 (testifying that he asked the chaplain for an interpreter for religious services

but has not been provided with one).)  A number of Plaintiffs also stated that the absence of interpreters prevents them from participating in these services and programs.  (Winfert Interrog. No. 16; Holmes Dep. at 37, 96; Childress Resp. to Interrog. No. 16, Pls' SOF Ex. 25 [*hereinafter* Childress Interrog.]; Johnson Resp. to Interrog. No. 16, Pls' SOF Ex. 51 [*hereinafter* Johnson Interrog.]; Lancaster Interrog. No. 16; Wright Dep. at 66–69; Foster Dep. at 40–41.)

Plaintiff Baxter, who is hard of hearing but not entirely deaf, attends religious services but stated that he has missed services on occasion because he did not hear the church bells. (Baxter Resp. to Interrog. No. 16, Pls' SOF Ex. 46.)

vii.    Telephones

Hearing-abled inmates at IDOC are permitted to use telephones to communicate with family, friends, legal counsel, etc.  Deaf inmates cannot communicate through standard telephones at all, and hard of hearing inmates often require hearing aids or amplification devices to use them effectively.  IDOC thus employs TTY devices, and occasionally hearing amplified phones or video phones, to allow hearing impaired inmates to communicate with individuals outside the prison.[25]  The 2012 ADA Directive requires each facility to establish a procedure for offender access to TTY equipment.  (AD § II(G)(3)(c).)  In particular, offenders who use TTY equipment may not be restricted from using standard telephones, and vice versa.  (*Id.*)

Standard telephones are located throughout the prisons, including in the housing unit common rooms, and IDOC staff and inmates testified that offenders are generally permitted to

---

[25] The parties' statements of fact do not focus on amplification devices or video phones, so neither do we.  But we expect that non-TTY telephone accommodations may be an issue in this case going forward.  Professor Cokely's expert report explains that TTY devices are not effective for all hearing impaired individuals and they are going out of use.  (*See* Cokely Rpt. at 39–42.)

use the phones at their will during dayroom hours seven days a week.[26] (Hendrix Dep. at 220; Orientation Manual at 37; Butler Dep. at 182; Holmes Dep. at 92–93; Eason Dep. at 18–19.) TTY machines, however, are housed in separate secure rooms. (*See* Pls' SOF ¶ 20(C).) At Western, for example, the primary TTY machine is located in the shift commander's office and a backup device is located in the health care unit. (Deposition of Forrest Ashby at 26, Pls' SOF Ex. 47 [*hereinafter* Ashby Dep.]; *see also* Holmes Dep. at 92–93 (testifying that the TTY at Dixon is housed in the health care unit); Winfert Dep. at 68–69 (testifying that he would like TTY devices to be located in the yard like regular telephones).) The parties dispute whether it is necessary to store the TTY machines separately from the regular phones. (Def's SOF ¶ 54.) Defendant explains this placement by asserting that some TTY machines only function on outside telephone lines, and those lines are only available in the administrative parts of the facilities. (Def's SOF ¶ 54.) In support, Defendant cites testimony of the current Programs Warden at Jacksonville, Michael Brown. Mr. Brown explained that the TTY machine at his facility did not work on the secured telephone line near the central control unit, but it regained functionality when they connected it to an outside line in the clinical services building. (Deposition of Michael Brown at 89–92, Def's SOF Ex. 27 [hereinafter Brown Dep.].) Mr. Brown also testified that they are currently working to increase TTY availability so that hearing impaired inmates have the same access to telephones as hearing-abled inmates. (Brown Dep. at 89–90.) Plaintiff contests that Mr. Brown's testimony adequately establishes TTY machines can only function in administrative rooms. (Def's SOF ¶ 54.)

---

[26] At Western, dayroom hours refers to approximately six hours in total from 8:00 a.m. to 9:30 p.m. (Orientation Manual at 10.) Similarly, general population offenders at Dixon are permitted to use standard telephones from 7:00 a.m. to 11:00 a.m. and 12:00 p.m. to 9:30 p.m. (Hendrix Dep. at 220; *see* Holmes Dep. at 59.)

Since TTY machines are not located in the housing unit common areas, inmates require assistance from IDOC staff to make calls. (Ashby Dep. at 29–30; Hendrix Dep. at 221; Butler Dep. at 182–83.) In order to use a TTY machine, IDOC staff must either escort the offender to the room where the machine is stored or bring the machine to the housing unit. (Ashby Dep. at 28–30; Hendrix Dep. at 221–22; Foster Dep. at 12–13; Johnson Dep. at 7.) The parties seem to dispute whether IDOC consistently provides inmates access to TTY machines in a timely fashion, and whether the delays that do occur are linked to the inmate's disability. The record shows that offenders are sometimes able to use the TTY machine shortly after making a request. (*See* Halterman Dep. at 17–18 (explaining that he normally gains access to the TTY within thirty minutes of making a request, although once within the last year he had to wait until the next day); Foster Dep. at 17 (stating a guard typically brings the TTY device within five minutes of his request).) In other instances, however, offenders have been denied access or required to wait hours and even days before using a functional TTY device. (Pls' SOF ¶ 29(A); *see* Holmes Dep. at 57; Winfert Dep. at 31–32; Easton Dep. at 20–21.) Plaintiffs have attributed these delays to the unavailability of staff trained to operate the machine, (Halterman Dep. at 19), the limited number of devices at each facility or complete absence of any TTY device, (Holmes Dep. at 57; Winfert Dep. at 31; Pls' SOF ¶ 30(D); Baxter Dep. at 26–30), the devices' location within the facility, (Pls' SOF ¶ 29(C)), broken or otherwise non-functioning devices, (Foster Dep. at 13–20; Johnson Dep. at 6–7), and security lockdowns that bar inmates from leaving their cell block to reach the device, (Winfert Dep. at 29–30). Defendant concedes that TTY access is sometimes limited by the location of the device, (Pls' SOF ¶ 29(C)), and IDOC staff admitted that TTY machines have been inoperable or unavailable at times, (Hendrix Dep. at 224; Pls' SOF ¶ 30(E).). Yet Defendant simultaneously argues that, in the instances where IDOC has denied or

delayed Plaintiffs' TTY access, Plaintiffs have not proven that they would have been able to use a regular phone if they were hearing abled. (Pls' SOF ¶ 29(A).)

The parties also dispute whether TTY access is limited to shorter durations, fewer days of the week, and narrower times during the day than regular phone use. (Pls' SOF ¶ 30(B).) According to IDOC's Administrative Directive, offenders in the general population may use standard telephones for up to thirty minutes at a time, and administrative detention offenders and eligible offenders in segregation are limited to fifteen minutes. (Def's SOF ¶ 56; Administrative Directive § 05.03.150(II)(G)(1)(b).) Because typing communications on a TTY takes longer than speaking, offenders using a TTY device are entitled to three times as long (ninety or forty-five minutes respectively). (*Id.*)

In practice, the record reveals that hearing-abled inmates are not always bound by the thirty-minute limit, and as stated above, regular phones are generally available to them each day of the week in common rooms. (Hendrix Dep. at 220; Holmes Dep. at 58 (testifying that his TTY use is limited to ninety minutes but hearing-abled prisoners are allowed to use the phones for "as long as they want").) There is evidence that TTY use is more restricted. (*See* Pls' SOF ¶ 30(B).) Some Plaintiffs testified that IDOC terminates their TTY calls before the ninety-minute limit. (Winfert Dep. at 78–79 (testifying that his counselor ends his TTY calls after thirty to thirty-five minutes); Eason Dep. at 25–27 (testifying that the telephone line goes dead after about fourty minutes on the TTY); Johnson Dep. at 8–9 (officers told him time was limited to thirty minutes); Lancaster Interrog. No. 5; *but see* Holmes Dep. at 58 (testifying that IDOC gives him approximately ninety minutes to use TTY).) In addition, Plaintiffs testified that TTY machines are accessible for fewer hours each day than regular phones, or only on certain days of the week. (*See* Eason Dep. at 19 (from 7:00 a.m. to 3:00 p.m. only); Winfert Dep. at 78–79

(once a week for thirty minutes); Johnson Dep. at 7 (Tuesdays, Thursdays, and Saturdays).)
Some Plaintiffs complained that these time restrictions prevent them from accessing the phones
when their family members are available. (*See* Eason Dep. at 23–24; Holmes Decl. ¶ 20.)

ix.   Televisions

IDOC facilities typically provide televisions for inmates to watch movies and television
programs, either in common rooms, individual cells, or both. At facilities where offenders have
televisions in their individual cells, IDOC usually requires them to purchase the televisions
themselves. (*See* Butler Dep. at 222–26; Brown Dep. at 117–18.) It appears undisputed that
closed captioning is available for television programs in individual cells and common rooms.
It is disputed, however, whether closed captioning or subtitles are available and activated for
movies. Defendant asserts that closed captioning is not available for all movies, but that IDOC
activates it when it is. (Def's SOF ¶ 61.) Plaintiffs Wright, Winfert, Lancaster, and Lord
expressed that closed captioning or subtitles are available for some movies, but not all. (Winfert
Dep. at 26; Lancaster Dep. at 86; Lord Interrog. No. 5; Wright Dep. at 29.) On the other hand,
Plaintiffs Johnson, Foster, Eason, and Childress testified that no movies have closed captioning.
(Johnson Dep. at 25; Foster Dep. at 69; Eason Dep. at 57–58; Childress Dep. at 25–27.)

The parties also dispute whether IDOC adequately ensures that the closed captioning
function is turned on in common rooms. The ADA Directive requires that closed captioning be
activated for dayroom televisions and recreational DVD programing in units that house hearing
impaired offenders. (AD § II(F)(8).) But Plaintiffs dispute whether IDOC effectuates this policy
in practice. (Def's SOF ¶ 59.) Defendant asserts that officers and hearing impaired inmates turn
closed captioning on in common rooms, but that other offenders are able to turn it off. (Def's
SOF ¶ 60.) Plaintiffs agree that officers can turn closed captioning on, but dispute whether they

are always willing to do so and whether all hearing impaired offenders likewise have the ability to activate it. (*Id.*) Of the evidence cited by Defendant, Plaintiff Wright is the only individual who testified that he is personally able to activate closed captioning in the common room. (Wright Dep. at 17.) Plaintiffs Lancaster and Halterman testified that closed captioning is turned on in common rooms when they request it, but neither stated that he could activate it himself. (Lancaster Dep. at 54–55; Halterman Dep. at 17–18.) And Plaintiff Lord merely stated that Dixon has closed captioning in the common room, but that IDOC staff does not always ensure that it remains activated. (Lord Dep. at 33–34; Lord Interrog. No. 5.)

x.      Notification of Emergencies and Activities

In many cases IDOC employs auditory messaging to notify inmates of emergency situations and other activities. (Brown Dep. at 105–08 (discussing the alert procedures at Jacksonville).) For example, inmates are alerted to certain emergency situations, like fires, with auditory alarms. (*Id.* at 105.) In addition, when a fight breaks out between inmates, officers issue oral stand-still orders or fire a warning shot.[27] (*Id.* at 206–08; Lord Dep. at 23.) Similarly, many non-emergency activities, such as meal and gym time, are announced verbally by the officers in each cell block.[28] (Brown Dep. at 107; Keane Dep. at 381–82; Butler Dep. at 210.) Most hearing impaired inmates cannot hear or understand these announcements and alarms. (Pls' SOF ¶¶ 36(A), 36(B).) While some housing units and administrative buildings deploy flashing lights in tandem with certain auditory alarms, others do not. (*Id.*; Pls' SOF ¶¶ 35(B)– 35(D); Hendrix Dep. at 105, 187 (stating that he does not think Dixon has visual fire alarms);

---

[27] Defendant asserts that when a warning gunshot is fired in a facility, hearing impaired offenders follow what they see other offenders doing. (Def's SOF ¶ 75.) In support, he cites two anecdotal examples, which Plaintiffs dispute. (*Id.*)

[28] Michael Brown, Programs Warden at Jacksonville, testified that he is currently trying to have a flashing light installed to notify hearing impaired inmates to non-emergency activities like church. (Brown Dep. at 108–09.)

Wright Decl. ¶ 19 (stating that Graham has only flashing alarms in the school building); Baxter Dep. at 52 (testifying that he never saw flashing lights at Shawnee or Big Muddy); Halterman Dep. at 41–42 (testifying that fire alarm at Jacksonville has a flashing light); Brown Dep. at 105 (same); Butler Dep. at 82 (indicating that Menard has fire alarm strobe lights in some areas).)

The ADA Directive requires facilities to have emergency evacuation plans for ADA inmates, but IDOC's Agency Compliance Officer is not aware of any such provisions in place. (Pls' SOF ¶ 37(A).)  In addition, the ADA Coordinator at Graham was not aware whether the facility's emergency evacuation plans include accommodations for hearing impaired inmates. (Pls' SOF ¶ 37(B).)  The warden at Menard testified that in some emergency situations, such as earthquakes or floods, the typical procedure is for IDOC officers to walk down every corridor and evacuate inmates in an orderly fashion.  (Butler Dep. at 205–06.)

Defendant contends that it is IDOC's policy to inform staff which inmates are hearing impaired so that the staff can provide those inmates with alternative forms of auditory notifications.  (Def's SOF ¶ 66.)  Plaintiffs dispute whether IDOC has such a policy, pointing out that the ADA Directive only states that an offender's Communication Plan "may" include "alternative notification methods for auditory announcements."[29]  (Id. (citing AD § II(G)(4)(b)(1)(b)).)  Since January 2014, IDOC has issued at least one memorandum for each Plaintiff regarding alternative notification of auditory announcements to the housing unit control

---

[29] On Plaintiffs Holmes's, Lord's, and Lancaster's Communication Plans, IDOC checked the box for alternative notification of auditory announcements and indicated that a memorandum would be circulated monthly to notify staff that accommodations are required.  (Communication Plans; see Butler 30(b)(6) Dep. at 17.)  Plaintiffs Childress's and Winfert's Communication Plans state that their cell mates know ASL and relay audible notifications to them, and Plaintiff Halterman's states that he has a vibrating watch.  (Id.)

officers.[30]  (Def's SOF ¶ 68; Alternative Notification Memoranda, Def's SOF Ex. 30 [*hereinafter* Alternative Notification Memo].)  The memoranda state that the housing unit is responsible for communicating every auditory announcement to named offenders through face-to-face communication.  (*Id.*; Def's SOF ¶ 67; *see* Hendrix Dep. at 192 (explaining IDOC's "fairly new" policy regarding face-to-face notification of meal time).)

The parties dispute whether, in practice, IDOC officers consistently relay auditory announcements to hearing impaired inmates in person.  (*See* Def's SOF ¶¶ 69–73.)  Plaintiffs contend that hearing impaired inmates, who cannot hear the auditory announcements, are often forced to rely on the goodwill of fellow inmates, and in some cases miss meals, visitors, church services, medical appointments, etc.  (*See* Pls' SOF ¶¶ 35(F). 36(A), 36(B), 38(B).)  As with other topics, each side offers a series of anecdotal examples to support their respective positions:

- Plaintiff Wright: Normally other inmates have to alert him if he has a visitor.  Only one officer tells him about visitors "once in a while."  (Wright Dep. at 16–17; Def's SOF ¶ 69.)  Officers have notified him of fire drill evacuations in person.  (Wright Dep. at 40; Def's SOF ¶ 69.)

- Plaintiff Johnson: He has not missed a visitor at Stateville.  He explained that he asks visitors to come on the weekends when his cellmate is available to notify him of their arrival.  (Johnson Dep. at 33; Def's SOF ¶ 70.)  He has missed showers, yard time, and meals when his cell mate is not around.  (Johnson Dep. at 29–32.)  He testified that since he has been in his current cell block, no officer has notified him of meal time, shower time, or yard time.  (*Id.*)

- Plaintiff Winfert: He testified that on one occasion IDOC staff verbally informed Winfert that a drill was underway.  (Winfert Dep. at 52; Def's SOF ¶ 71.)  When his cellmate is not around, he occasionally misses a meal.  (Winfert Dep. at 55–56.)  Officers at Menard do not tell him individually when it is meal time.  (*Id.*)

- Plaintiff Baxter: During severe weather storms at Big Muddy, he became aware of emergencies only because "people" would run around the deck and "yell it" and someone would point to the alarm.  (Baxter Dep. at 51–52; Def's SOF ¶ 71.)

---

[30] The memoranda for Plaintiffs Winfert and Halterman are dated January 2015, a couple weeks before Defendant filed his motion for summary judgment.  (Alternative Notification Memo.)

- Plaintiff Hannibal: Before being placed in segregation about one year before his deposition, a lieutenant told him when church services began. Since being released from segregation and housed in a different unit, he has not been to church because he cannot hear the announcement. (Hannibal Dep. at 48–49; Def's SOF ¶ 72.)

- Plaintiff Lancaster: Officers notify him of visitors through writing. (Lancaster Dep. at 39; Def's SOF ¶ 73.) The last time that he was evacuated for an emergency, an officer did not notify him until "everyone else had left." (Lancaster Dep. at 41–43; Def's SOF ¶ 73; *see* Pls' SOF ¶ 38(B).) He stated that at Dixon he has missed meals approximately fifty times due to his hearing loss. (Lancaster Interrog. Resp. No. 3.)

- Plaintiff Holmes: His Communication Plan, dated April 2014, states that a memorandum regarding alternative notification of auditory announcements would be sent to housing officers. (Holmes Dep. at 82, 93–94; Def's SOF ¶ 66.) He testified, however, that since that time no officers have relayed auditory announcements to him. (Holmes Dep. at 94; Def's SOF ¶ 66.) He has missed visitors and over one-hundred meals in the last two years because he could not hear the announcements and staff did not notify him individually. (Holmes Dep. at 13–18.) He also explained that he cannot hear announcements for the medication line, and sometimes his fellow offenders do not relay the notification. (*Id.* at 6–7; 47–49.) As a result, he has missed taking his medication "a lot of times." (*Id.* at 48.)

- Plaintiff Eason: He testified that he has missed meals and yard time because he cannot hear the announcement. (Eason Dep. at 46–47; Eason Interrog. Resp. No. 3.) Officers at Stateville never tell him that it is meal time. (Eason Dep. at 46–47.)

- Plaintiff Lord: Sometimes officers tell him that it is meal time and sometimes they do not. (Lord Dep. at 29.) He has missed many meals when officers failed to notify him individually. (*Id.* at 30–31.) He also testified that he cannot hear when officers fire shots instructing inmates to "hit the ground." (*Id.* at 23.) He has to rely on other inmates gestures, and believes the situation is dangerous. (*Id.*) In addition, he stated that sometimes officers forget to notify him when a fire drill occurs, and indicated that as a result he does not evacuate as quickly as other inmates. (*Id.* at 35–36.)

- Plaintiff Childress: While incarcerated at Dixon, he missed over thirty meals because of his hearing loss, but since transferring to Graham in 2012 he does not recall missing any. (Childress Interrog. Resp. No. 3.) During fire and/or tornado drills at Dixon, he and another hearing impaired offender did not evacuate with the other inmates because they could not hear the alarms. (Childress Dep. at 20–21.)

The parties also dispute whether face-to-face communication is the most appropriate accommodation, or whether visual alarms, such as flashing lights, should be used instead or in addition. Plaintiffs Holmes and Lancaster stated that they have asked IDOC to provide visual alarm systems to notify them of emergencies and other events like meals and medication line.

(Pls' SOF ¶ 35(E); Lancaster Interrog. Resp. No. 5.)  And Plaintiffs Johnson and Foster similarly testified that they would prefer to have a visual alarm instead of relying on officers to relay auditory alarms and notices.  (Pls' SOF ¶ 35(F); Foster Dep. at 53–54.)

Finally, although the parties agree that vibrating watches, which inmates can set to vibrate at scheduled activity times, can be helpful, they dispute whether IDOC provides them to hearing impaired inmates.  (Def's SOF ¶ 74.)  IDOC purchased a vibrating watch for Plaintiff Holmes about two months before his deposition.  (Holmes Dep. at 69–71.)  Plaintiffs Lancaster and Lord, on the other hand, purchased their own vibrating watches in 2012 for nearly $100.00. (Lancaster Dep. at 46–47; Lord Decl. ¶ 15.)  And IDOC has denied other inmates' requests for these watches.  (Wright Dep. at 34; Denning Dep. at 79, 108–10; *see* Pls' SOF ¶¶ 10(D), 10(E).)

xi.     Law Library

IDOC facilities have law libraries where offenders can research state and federal law and photocopy legal materials.  (*See* Orientation Manual at 19–21.)  Plaintiffs Winfert, Wright, Foster, Halterman, and Baxter all testified that they do not have difficulty using the law library because of their hearing impairments.  (Def's SOF ¶ 58; Baxter Dep. at 7–8, 17–18.)  On the other hand, Plaintiff Johnson testified that it is hard for him to communicate with the law library staff because they do not understand ASL.  (Johnson Dep. at 41–42.)  He would like library staff to assist him, but he cannot understand the librarian because English is his second language. (*Id.*)  Plaintiff Eason also testified that he needs help understanding the legal language in the law library.  (Eason Dep. at 40.)

xii.    Disciplinary Hearings

If an IDOC staff member believes that an inmate has committed an actionable offense while incarcerated, he or she records the offense in a disciplinary report, commonly referred to as

a ticket. (Graham Dep. at 44.) After the ticket is reviewed by the shift commander, reviewing officer, and hearing officer, the hearing officer schedules a hearing before the Adjustment Committee. (*Id.* at 41–45.) The Adjustment Committee consists of two members, the Adjustment Committee Chairman who runs the hearings and oversees the process, and a second committee person. (*Id.* at 39–40.) At the hearing, the Committee reads the offender the charges, asks him to make a plea, and allows him to offer any defenses. (*Id.* at 45.) Offenders are also supposed to receive a written copy of the report at least twenty-four hours before the hearing. (*Id.* at 48–49.) After the hearing, the Adjustment Committee makes a recommendation to the warden as to whether the ticket is substantiated and, if so, what punishment is warranted. (*Id.* at 43, 45.) The warden then makes the final determination.[31] (*Id.* at 45–46.)

The ADA directive states that Communication Plans "may include" accommodations for due process and disciplinary hearings, and Defendant contends that it is IDOC's policy to provide accommodations at disciplinary hearings when necessary. (Def's SOF ¶ 62.) Plaintiffs argue, however, that in practice IDOC fails to sufficiently accommodate them. Kelly Graham, the Adjustment Committee Chairman at Western, did not know whether IDOC's disciplinary hearing rules mention accommodations for disabled inmates. (Pls' SOF ¶ 32(B).) When an offender tells Mr. Graham that he is hearing impaired, the Adjustment Committee determines for itself whether the inmate can adequately communicate or whether the hearing should be adjourned until accommodations can be made. (Pls' SOF ¶ 32(C); Graham Dep. at 67–69, 74–75.) Mr. Graham did not receive ADA training specific to his role as Adjustment Committee Chairman, but testified that training on how to determine if an inmate can effectively

---

[31] If the Adjustment Committee and Warden recommend revocation of good time, that recommendation must also be approved by the Office of Inmate Issues and/or the Illinois Prisoner Review Board. (Anderson Dep. at 18, 22.)

communicate would be "beneficial." (Graham Dep. at 73.) On at least one occasion, Mr. Graham denied an inmate's request for hearing accommodations—specifically to communicate through writing—at a disciplinary hearing.[32] (Pls' SOF ¶ 32(D).)

According to the Dixon ADA Coordinator, Tony Hendrix, Dixon did not use sign language interpreters at disciplinary hearings until 2012. (Pls' SOF ¶ 32(E); *see* Lancaster Decl. ¶ 10 (stating Dixon first starting providing him interpreters for disciplinary hearings in 2014).) Indeed, Plaintiffs Holmes and Childress testified that IDOC denied requests for interpreters, and even pen and paper, before 2012. (Holmes Dep. at 54–56, 88–89; Childress Dep. at 27–29.) Nonetheless, IDOC has denied requests for accommodations after 2012 as well. (Wright Dep. at 19–20; Johnson Dep. at 43–44; Johnson Suppl. Interrog. Resp. No. 6, Pls' SOF Ex. 31 [*hereinafter* Johnson Suppl. Interrog.]; Baxter Dep. at 31–35; Foster Dep. at 23–26; *see* Pls' SOF ¶ 33(A).) For example, Plaintiff Johnson requested an ASL interpreter for a disciplinary hearing that occurred on May 13, 2014. (Johnson Suppl. Interrog. No. 6.) According to Johnson, IDOC told him his request was denied because he "can read lips" and because he "speaks." (*Id.*) Johnson did not fully understand the hearing or why IDOC also denied his request to have two officers testify as witnesses. (*Id.*)

The parties appear to dispute whether certain accommodations, such as ASL interpreters, are necessary for hearing impaired inmates to communicate effectively during discipline hearings. Defendant points out that even though Plaintiffs Wright, Johnson, and Baxter did not receive ASL interpreters at recent disciplinary hearings, they were not disciplined. (Def's SOF ¶¶ 63–65.) Plaintiffs dispute that failure to discipline equates with effective communication. (*Id.*) For instance, Plaintiff Johnson described one occasion in which the Adjustment Committee

---

[32] It appears this hearing occurred in the first half of 2012. The inmate filed a grievance related to the hearing, which is dated June 2012. (Graham Dep. at 57–58.)

wrote back and forth with him and expunged his ticket, but he still did not fully understand the hearing. (Johnson Dep. at 43–44; *see also* Holmes Dep. at 88–89; Holmes Decl. ¶ 19.)

Moreover, Plaintiffs identify other instances, before and after 2012, where IDOC denied an inmate's request for hearing accommodations and the inmate *was* disciplined. (Baxter Dep. at 31–34 (eighteen days segregation); Foster Dep. at 23–26, 61–64 (one month segregation and commissary restriction); Childress Dep. at 27–29 (two weeks without commissary); Holmes Dep. at 55–56 (beat up and put in segregation for about thirty days); Johnson Interrog. No. 7 (transferred to a more restrictive prison); 2/17/15 Peterson Ltr. (fired from job); *see* Pls' SOF ¶¶ 33(A), 33(C).) For most of these occurrences, the Plaintiff stated that he was not able to fully understand the hearing or effectively communicate his defense. (Childress Dep. at 28–29; Foster Dep. at 23–26, 61–64; Holmes Dep. at 88–89; Lancaster Decl. ¶¶ 10–12; Johnson Interrog. No. 7 (hands handcuffed behind his back with no ASL interpreter); 2/17/15 Peterson Ltr.)

xiv.    Prisoner Review Board

The Illinois Prisoner Review Board ("PRB") is a separate entity from IDOC. 730 ILCS § 5/3-3-1. The PRB determines a variety of issues related to prisoners' release and parole, including eligibility and the conditions of parole. 730 ILCS 5/3-3-2. They also review IDOC disciplinary cases when the Department seeks to revoke more than thirty days of an inmate's sentence credits in a twelve-month period. *Id.* Prisoners may appear before the PRB during their incarceration, particularly when their sentence is nearing an end. Defendant contends that IDOC sends the PRB a memorandum regarding each hearing impaired offender, notifying the Board that the prisoner requires a sign language interpreter. (Def's SOF ¶ 77.) IDOC indeed sent a memorandum to this effect regarding Plaintiff Holmes, but Defendant has not identified any evidence that they did so for other hearing impaired offenders. (*Id.*; *see* Pls' SOF ¶ 34(B).)

## IV.    Class Action Complaint

Named Plaintiffs filed this case as a class action on May 4, 2011, and now move to

certify a Rule 23(b)(2) class.  Plaintiffs define the proposed class as follows:

> (i) all current and future deaf or hard of hearing individuals incarcerated by
> IDOC, and (ii) who require accommodations, including interpreters or other
> auxiliary aids or services, to communicate effectively and/or to access programs
> or services available to individuals incarcerated by IDOC [from January 1, 2007,
> to the present].

(Cert. Mem. at 1–2, Dkt. 203.)  They contend that the proposed class consists of at least one

hundred individuals spread across nineteen correctional facilities.  Plaintiffs seek declaratory and

injunctive relief on behalf of the proposed class under Rule 23(b)(2) to remedy the alleged

systemic past violations and to prevent future violations.  (*Id.* at 1.)

## V.    Expert Witness Reports

Plaintiffs disclosed two expert witnesses: Dennis Cokely, a professor of ASL and Modern

Languages at Northeastern University, and Elizabeth Stanoshek, the former ADA Coordinator

for the Nebraska prison system and a current area director for Prison Fellowship Ministries.

Professor Cokely's report discusses the nature of deafness and the deaf community, forms of

communication used by the deaf community, popular misconceptions regarding hearing

impairments, and IDOC's failure to properly identify, understand, and accommodate deaf and

hearing impaired inmates, and it recommends ways that IDOC could remedy these failures.

(*See* Cokely Rpt.)  Ms. Stanosheck's report focuses on IDOC's failure to adopt and/or implement

ADA compliant policies and procedures for identifying, understanding, and assisting deaf and

hearing impaired inmates.  She also discusses IDOC's actual failures to accommodate deaf and

hearing impaired inmates, and opines that effective accommodations would further IDOC's

efforts to maintain security within the prisons.  (*See Daubert* Mem. Ex. B., Expert Report of

Elizabeth Stanosheck (hereinafter [*Stanosheck Rpt.*]).)  Defendant moves to exclude

Ms. Stanosheck's testimony but not Professor Cokely's.

## DISCUSSION

We begin our analysis by addressing Defendant's motion to exclude Ms. Stanosheck's

testimony, then move to Plaintiffs' motion for class certification, and end with Defendant's

motion for summary judgment.

## I. Motion to Exclude Expert Testimony

Defendant seeks to exclude Ms. Stanosheck's expert testimony on the grounds that it is

cumulative with Professor Cokely's testimony and is unreliable.  Federal Rule of Evidence 702

explains that an expert witness may be qualified by "knowledge, skill, experience, training, or

education."  There is no requirement that an expert hold any particular credentials to give expert

opinion testimony.  *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The court

should also consider the proposed expert's full range of experience and training in the subject

area."); *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000).

Nevertheless, an expert's testimony must be both relevant and reliable to be admissible.

Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 1174

(1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 2795 (1993).

The Seventh Circuit has imposed a two-step analysis, requiring first that evidence be established

as reliable by verifying that the expert "knows of what he speaks" and is not offering "subjective

belief or unsupported speculation," and, second, that we determine that the evidence will assist

us in understanding the evidence.  *Cummins v. Lyle Indus.*, 93 F.3d 362, 367–68 (7th Cir. 1996)

(citations omitted); *see also Pierce v. Chi. Rail Link, LLC*, 3 C 7524, 2005 WL 599980, at *4

(N.D. Ill. Mar. 15, 2005) (extending the *Cummins* test to non-scientific expert testimony).

### A.    Cumulative Testimony

First, we agree with Plaintiff that whether expert testimony is cumulative is an issue more appropriately addressed as a motion in limine before trial.  It is true that the cumulativeness of testimony goes to relevance, which in turn is applicable to our analysis under *Daubert*. *See United States v. Gardner*, 211 F.3d 1049, 1055 (7th Cir. 2000) ("Evidence is 'cumulative' when it adds very little to the probative force of the other evidence in the case, so that if it were admitted its contribution to the determination of truth would be outweighed by its contribution to the length of the trial, with all the potential for confusion, as well as prejudice to other litigants." (quoting *United States v. Williams*, 81 F.3d 1434, 1443 (7th Cir. 1996))).  Nonetheless, the concerns presented by cumulative testimony—principally, delay of trial and prejudice—do not impact our resolution of summary judgment or class certification.  *See Abrams v. Van Kampen Funds, Inc.*, 1 C 7538, 2004 WL 1433620, at *4 (N.D. Ill. June 25, 2004) ("[A]ny question of whether the opinion of a second expert is unnecessarily cumulative would be an evidentiary issue for a trial before a jury, not an issue to be considered when a judge is ruling on a summary judgment motion.").

Accordingly, we deny Defendant's motion to exclude Ms. Stanosheck's testimony as cumulative without prejudice.  Defendant may re-raise this argument before trial if he chooses. In proceeding, both parties should keep in mind that we will not allow truly cumulatively evidence at trial, but we also recognize that limited overlap is often unavoidable.  Moreover, we will not, now or later, dictate to Plaintiffs which of its qualified experts must discuss each topic.

### B.    Expert Qualifications

We now turn to Defendant's challenges to Ms. Stanosheck's qualifications, which are meek at best.  He asserts that because she has not managed prison security operations or been

responsible for security decisions, she is not qualified to offer the opinion that IDOC could implement ADA compliant accommodations without interfering with safety needs.  (*Daubert* Reply at 4, Dkt. 260.)  He also argues that because Ms. Stanosheck is not an anthropologist she cannot opine on IDOC's "culture"—*i.e.*, the Department's policies, procedures, and practices regarding ADA compliance for hearing impaired inmates.  (*Daubert* Mem. at 6.)

Ms. Stanosheck does, however, have twenty years of experience as the ADA Coordinator for the Nebraska Department of Correctional Services ("NDCS").[33]  In that role, she was responsible for developing and implementing ADA compliance programs and she responded to all deaf and hard of hearing inmate requests for ADA accommodations in Nebraska's correctional facilities.  (Stanosheck Rpt. at 1–4.)  Her responsibilities brought her to Nebraska's facilities, where she interviewed prison staff and inmates extensively and trained NDCS employees on ADA compliance for hearing impaired offenders.  (*Id.* at 2.)  She gained "first-hand knowledge" of NDCS administrative operations, programs, services, and activities, and became familiar with the unique struggles that hearing disabled inmates face.  (*Id.* at 2.) In addition to her work in Nebraska, Ms. Stanosheck has assisted at least five other state correctional departments in achieving ADA compliance, aided the development of an ADA Coordinators Certification program, and frequently speaks at ADA presentations and conferences.  (*Id.* at 3–4.)  In order to familiarize herself with IDOC's attempts at ADA compliance, she reviewed the depositions and exhibits in this case, inspected two large IDOC correctional facilities, and held in-person meetings with inmates at those prisons.  (*Id.* at 5.)

Ms. Stanosheck's extensive work in ADA compliance in Nebraska and elsewhere more than qualifies her to offer opinions regarding IDOC's ADA compliance.  We have no doubt that

_____

[33] The following qualifications are taken from Ms. Stanosheck's report.  Defendant has not disputed any of these facts.

with respect to IDOC's ADA policies, procedures, and practices, Ms. Stanosheck "knows of what [s]he speaks" and is not offering "subjective belief or unsupported speculation." *Cummins*, 93 F.3d at 367–68. As to her opinions related to prison security, her experience here may be less obvious, but we can reasonably infer that her work developing and implementing ADA compliance programs required consideration of and interaction with prison security and safety measures. Moreover, Defendant will have every opportunity to cross-examine her experience in this regard at trial. Accordingly, we find Ms. Stanosheck is sufficiently qualified to render the opinions articulated in her report.

### C.     Methodology & Relevance

Finally, Defendant attacks the relevance of Ms. Stanosheck's opinions, in essence arguing that they are not sufficiently tailored to the named Plaintiffs to help the trier of fact decide the issues in this case. (*Daubert* Mem. at 5.) He argues that her opinions regarding the interplay between ADA accommodations and IDOC security needs are not helpful because they do not take into consideration the specific security precautions of the individual Plaintiffs. (*Daubert* Mem. at 6.) And he similarly contends that Ms. Stanosheck's opinions regarding IDOC culture is not probative of whether IDOC discriminated against the individual named Plaintiffs. (*Id.*; *Daubert* Reply at 4.) In reply, Defendant specifies that his critiques target the method that Ms. Stanosheck used to reach her conclusions, not the conclusions themselves. (*Daubert* Reply at 3.) But in effect, we view Defendant's argument as a critique that Ms. Stanosheck's opinions are irrelevant because they do not sufficiently address the named Plaintiffs' unique conditions.

Defendant's arguments seem to ignore that Plaintiffs are not requesting individual damages or other specific relief. Rather, they are bringing a class action seeking declaratory and

injunctive relief to remedy what they claim to be a widespread and systematic failure by IDOC to provide accommodations for deaf and hearing disabled offenders. Thus, Ms. Stanosheck's opinions regarding the IDOC's overarching culture and the interplay between potential accommodations and security concerns hit the heart of Plaintiffs' claims. Accordingly, Defendant's motion to exclude Ms. Stanosheck's testimony as unreliable or irrelevant is denied.

## II. Plaintiffs' Motion for Class Certification

Since Federal Rule of Civil Procedure 23(c)(1) requires us to decide class certification "as soon as practicable," we address Plaintiffs' motion next. Plaintiffs move to certify a class of all current and future deaf or hard of hearing inmates in IDOC custody from January 1, 2007, to the present whom require accommodations to effectively communicate and/or access IDOC programs or services. (Cert. Mem. at 1–2.) This proposed class seems to include those that IDOC identified as deaf or hard of hearing, and those that they have failed to discover. Plaintiffs argue that certification of this class is proper under the Rule 23(a) requirements and seek declaratory and injunctive relief under Rule 23(b)(2). Our task, as the Seventh Circuit recently described it, is "to determine if the plaintiffs[] presented a scenario in which judicial efficiency would be served by allowing their claims to proceed en masse through the medium of a class action rather than through individual litigation." *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, — F.3d —, No. 14-2843, 2015 WL 4667904, at *3 (7th Cir. Aug. 7, 2015).

Pursuant to Rule 23(a), a class may be certified "only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). If the numerosity, commonality, typicality, and adequacy

requirements are satisfied, the plaintiff must also demonstrate that the proposed class qualifies under at least one of the three subsections of Rule 23(b).  Fed. R. Civ. P. 23(b); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012); *Cavin v. Home Loan Ctr., Inc.*, 236 F.R.D. 387, 391 (N.D. Ill. 2006).  Here, Plaintiff seeks certification under Rule 23(b)(2), which permits class actions where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  In other words, Plaintiffs must show that a single injunction would provide relief to the entire class.  *Strait v. Belcan Eng'g Grp., Inc.*, 911 F. Supp. 2d 709, 719 (N.D. Ill. 2012). Finally, the scope of the proposed class must be "sufficiently definite."  *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 493 (7th Cir. 2012); *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977).

Plaintiff bears the burden of proving that the proposed class meets the requirements for certification under Rule 23.  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule."); *Messner*, 669 F.3d at 811 (holding that it is sufficient for the plaintiff to prove disputed Rule 23 requirements by a preponderance of the evidence).  The Supreme Court has stressed that "certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) [and Rule 23(b)] have been satisfied.'"  *Comcast*, 133 S. Ct. at 1432 (quoting *Wal-Mart*, 131 S. Ct. at 2551); *see also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014) ("[T]he court should assess whether the class allegations are satisf[ied] through evidentiary proof.").  This analysis frequently demands "overlap with the merits of the plaintiff's underlying claim."  *Comcast*, 133

S. Ct. at 1432 (quoting *Wal-Mart*, 131 S. Ct. at 2551). Thus, the district court "must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010) (citing *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)); *Starr v. Chi. Cut Steakhouse, LLC*, 12 C 04416, 2014 WL 7146061, at *7 (N.D. Ill. Dec. 15, 2014). On the other hand, if factual or legal determinations are not necessary to resolve disputes over Rule 23 requirements, the court should not decide them. *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013). We retain broad discretion in determining whether class certification is appropriate given the particular facts of the case. *Kress v. CCA of Tennessee, LLC*, 694 F.3d 890, 892 (7th Cir. 2012); *Cavin*, 236 F.R.D. at 391; *Murray v. New Cingular Wireless Servs., Inc.*, 232 F.R.D. 295, 298 (N.D. Ill. 2005).

Defendant opposes class certification on four grounds, claiming that Plaintiffs: (1) present an indefinite and vague class definition; (2) do not meet the commonality requirement; (3) do not meet the typicality requirement; and (4) fail to establish that Defendant refused to act on grounds generally applicable to the entire class. (Cert. Resp. at 2, Dkt. 243.) We consider each argument in turn. In addition, we also address two of the named Plaintiffs' standing, which is an issue that the parties have raised informally throughout their briefings, and briefly consider the additional Rule 23(a) requirements of adequacy and numerosity.

### A.     Named Plaintiffs' Standing

Daniel Baxter and Curtis Foster, two named Plaintiffs, are no longer in IDOC custody. "To have standing to sue as a class representative it is essential that a plaintiff must be a part of that class, that is, he must possess the same interest and suffer the same injury shared by all

members of the class he represents." *Keele v. Wexler*, 149 F.3d 589, 592–93 (7th Cir. 1998)

(quoting *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 216, 94 S. Ct. 2925,

2930 (1974)); *accord Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156, 102 S. Ct. 2364, 2370

(1982); *Schultz v. Prudential Ins. Co. of Am.*, 678 F. Supp. 2d 771, 782 (N.D. Ill. 2010).

This rule relates to the broader principle that "the plaintiff generally must assert his own legal

rights and interests, and cannot rest his claim to relief on the legal rights or interests of third

parties." *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 100 (2d Cir.

2007) (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 95 S. Ct. 2197, 2205 (1975)).

      Here, the proposed class is limited to inmates who are currently incarcerated with IDOC

or who will become incarcerated before expiration of the class period. This class requirement is

necessary because Plaintiffs seek only future injunctive relief. Inmates who are no longer

incarcerated do not have a legally cognizable interest in enjoining IDOC's future behavior,

particularly absent any showing of a reasonable expectation that he or she will return. *Allen v.*

*Murakami*, 6 C 125, 2006 WL 2035630, at *2 (D. Haw. July 18, 2006) (finding former inmate's

claims for injunctive relief were moot after he was released on parole); *see also Parsons v. Ryan*,

289 F.R.D. 513, 524 (D. Ariz. 2013) *aff'd*, 754 F.3d 657 (9th Cir. 2014) (finding an inmate

released on parole was not an adequate representative for a class of inmates challenging prison

officials' customs and practices). Without a personal interest in the case, plaintiffs do not have

standing themselves, let alone on behalf of putative class members. Since Plaintiffs Baxter and

Foster are no longer incarcerated, they do not have a personal interest in the relief requested and

thus do not have standing to assert the class claims. They are therefore improper class

representatives and are dismissed from the case.

### B. Class Definition

An implied requirement of Rule 23(a) dictates that the plaintiffs' proposed class definition be "sufficiently definite that its members are ascertainable." *Jamie S.*, 668 F.3d at 493; *Alliance*, 565 F.2d at 977. Plaintiffs need not identify every class member at the certification stage. *Burrow v. Sybaris Clubs Int'l, Inc.*, 13 C 2342, 2015 WL 1887930 at *5 (N.D. Ill. Apr. 24, 2015) (citing *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 245 (N.D. Ill. 2014)). But to satisfy this requirement, they must define the class with reference to "objective criteria" and propose "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Jenkins v. White Castle Mgmt. Co.*, 12 C 7273, 2015 WL 832409, at *5 (N.D. Ill. Feb. 25, 2015) (quoting *Hayes v. Wal–Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)); *N.B. v. Hamos*, 26 F. Supp. 3d 756, 763 (N.D. Ill. 2014). When "there is no way to know or readily ascertain who is a member of the class," the class "lacks the definiteness required for class certification." *Jamie S.*, 668 F.3d at 496; *Steimel v. Minott*, 13 C 957, 2014 WL 1213390, at *5 (S.D. Ind. Mar. 24, 2014). Since definiteness is a threshold issue for class certification, we address this requirement next. *See Hamos*, 26 F. Supp. 3d at 763.

Defendant contends that the proposed class is not ascertainable for two primary reasons. First, he argues that we cannot readily identify all inmates who are "deaf" or "hard of hearing" because those terms are not defined and require medical or other scientific testing. (Cert. Resp. at 12–13.) Second, he asserts that we cannot ascertain which offenders "require accommodations . . . to access programs or services" without first determining, through a highly individualized case-by-case analysis, whether those offenders are otherwise eligible to participate in those programs. (*Id*. at 13–14.) Plaintiffs respond, primarily to the Defendant's

first argument, by pointing to IDOC's own policies and procedures for identifying deaf and hard of hearing inmates. (Cert. Reply at 12, Dkt. 249.) More specifically, Plaintiffs point out that IDOC's ADA Directive defines "deaf" and "hard of hearing," IDOC's intake and classification process is supposed to include a gross hearing assessment and contemplates the use of audiologist testing, and IDOC's Communication Plans identify hearing disabled inmates. (Cert Mem. at 13; Cert. Reply. at 12–13.) Although Plaintiffs maintain that IDOC fails to consistently employ these identification methods—glossing over their concurrent argument that these procedures are insufficient—they argue that it has the ability to do so. (Cert. Reply at 12–13.)

As explained below, we find that the proposed class definition is too broad to the extent it includes hearing impaired inmates who remain unidentified by IDOC. This case is similar to *Jamie S. v. Milwaukee Public Schools*, where the Seventh Circuit held a class that consisted largely of disabled students "who may have been eligible for special education but were *not identified* and *remain[ed] unidentified*" was fatally indefinite. *See Jamie S.*, 668 F.3d at 495. In that case, the plaintiffs brought claims against the Milwaukee Public School System ("MPS") under the Individuals with Disabilities Education Act ("IDEA"). Their claims focused on the obligation of states that receive federal funding to identify children who require special education, *i.e.*, the Child-Find requirements. *Id.* at 485. The Seventh Circuit explained that "identifying disabled students who might be eligible for special-education services is a complex, highly individualized task, and cannot be reduced to the application of a set of simple, objective criteria." *Id.* at 496. The process is "child specific and requires the application of trained and particularized professional educational judgment." *Id.* Since the proposed class was comprised primarily of children that MPS failed to identify, ascertaining class membership would require, at a minimum, submitting all disabled students in Milwaukee schools through this highly

individualized evaluation.  *Id.*; *see also Steimel*, 2014 WL 1213390 at *12 (finding the proposed

class indefinite when the only way to ascertain class membership was "via a Court mandated

individualized inquiry into the specific needs of each [potential class member]").

Similarly here, Plaintiffs have not articulated an objective and administratively feasible

way for us to ascertain the yet-to-be-identified deaf or hard of hearing inmates.  Plaintiffs first

suggest using audiologists, although they don't indicate whether these medical professionals

must examine all 49,000 IDOC inmates or some subset of that population.  (Cert. Mem. at 13.)

Either way, Plaintiffs do not propose a standard measure to categorize deafness and hearing loss

even after an audiology test were applied.  And the definitions of deaf and hard of hearing in the

ADA Directive use plain language rather than quantitative objective metrics.  (ADA Directive

§ II(E).)  Thus, just as identifying class members in *Jamie S.* required trained and particularized

professional judgment, ascertaining unidentified hearing impaired offenders would require an

individualized inquiry that involved some level of medical or scientific judgment.  *See Jamie S.*,

668 F.3d at 496.

Moreover, even if Plaintiffs did propose an administratively feasible test to determine

hearing loss, certain class members might not be ascertained until after liability was established

and thus after the class period closed.  How would we determine whether the newly identified

deaf and hard of hearing inmates first became disabled before, during or after the class period?

Only those disabled before or during the class period would be proper members.  *See id.* at 495

(questioning how the court would determine, years after the fact, whether a potential class

member might have been eligible for special education services during the class period).

Plaintiffs cite *N.B. v. Hamos* to support the ascertainability of their proposed class

definition.  We agree that *Hamos* is also helpful to our analysis, but we stress a critical fact that

Plaintiffs' analogy to the case overlooks. In that case, the plaintiffs sought to certify a class of all child Medicaid recipients in Illinois who were not receiving "medically necessary home and communication based services to treat or ameliorate their disorders." *Hamos*, 26 F. Supp. 3d at 762. The defendant objected that the class was indefinite because the term "medically necessary" required expert evidence. *Id.* at 763–64. Judge Tharp agreed that the diagnosis of mental and behavioral disorders "is an individualized and child-specific undertaking," but found that membership in the class was dependent on a pre-existing diagnosis. *Id.* at 764. And once a child was diagnosed, the applicable statutory framework objectively defined "medically necessary" services to include all of those recommended by the qualified healthcare provider. *Id.* at 765–66. The court determined that since completion of the individualized assessment was a precondition to class membership, the court would not need to monitor or review those determinations and thus ascertainment of class membership was administratively feasible. *Id.* at 767. Importantly, however, before certifying the class, Judge Tharp modified the language of the proposed definition to emphasize this precondition. Under the court's definition, the class included all Medicaid-eligible children in Illinois who "*have been diagnosed* with a medical or behavioral disorder," and "for whom a licensed practitioner [recommended services] to correct or ameliorate their disorders." *Id.* at 769 (emphasis added).

Here, Plaintiffs' proposed definition does not likewise presuppose a pre-existing diagnosis of deafness or hearing loss, but we find that the class must be limited in a similar way. That is, since there are no objective means by which we can reasonably ascertain unidentified deaf or hard of hearing inmates, the class must be limited to those that IDOC identified and documented or otherwise received written notice of during the class period. *See Corey H. v. Bd. of Educ. of City of Chi.*, 92 C 3409, 2012 WL 2953217, at *6 (N.D. Ill. July 19, 2012)

(reaffirming the definiteness of a class comprised of students that the defendant, Chicago Public Schools, itself "classified as having a disability"); *Flynn v. Doyle*, 6 C 537, 2007 WL 805788, at *3 (E.D. Wis. Mar. 14, 2007) (finding class of "qualified individuals with a disability" was sufficiently definite where "the defendants' own records [would] identify which inmates ha[d] a disability"); *see also Hernandez v. Cty. of Monterey*, 305 F.R.D. 132, 152 (N.D. Cal. 2015) (certifying a class of inmates with disabilities, as defined by federal and state law). This definition includes all inmates for whom IDOC executed a Communication Plan or otherwise documented as hearing impaired, and for whom IDOC received a grievance alleging hearing loss or deafness, from either the inmate himself or his family member, during the class period.

As thus defined, documented association with deafness or hearing loss is a precondition to class membership, providing objective and administratively feasible means to ascertain the class. *See Hamos*, 26 F. Supp. 3d at 768; *see also Birchmeier*, 302 F.R.D. at 249 (certifying a class where individuals could prove membership through documentation). Even if ascertainment will require the parties to cull through inmate records to find Communication Plans and grievances, the cost and time involved in identifying class members does not preclude certification. *See Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 539 (6th Cir. 2012) (collecting cases that found "the size of a potential class and the need to review individual files to identify its members are not reasons to deny class certification"); *Moreno v. Napolitano*, 11 C 5452, 2014 WL 4911938, at *6 (N.D. Ill. Sept. 30, 2014) ("[T]he necessity of manually reviewing [tens of thousands of] forms does not preclude certification of the class."); *Birchmeier*, 302 F.R.D. at 248 (finding a class was sufficiently ascertainable even if the plaintiff had to exert considerable time and expense to match over 930,000 phone numbers with individuals' names). In any event, the parties have already begun this process. In his interrogatory responses,

Defendant identified fifty-six inmates who either self-identified as deaf or hard of hearing during the class period or who IDOC believes to be deaf or hard of hearing. (Def's Suppl. Interrog. Resp. No. 1, Cert. Mem. Ex. 1.) In addition, Plaintiffs assert that they discovered at least another thirty during discovery, citing IDOC Communication Plans issued to inmates who are not listed in the relevant interrogatory response. (Cert. Mem. at 4; *see* Cert. Mem., Exs. 2–16.) These individuals likely comprise a large majority of the class.

Before moving on, we will also briefly address Defendant's argument that the proposed definition requires us to determine whether potential class members were actually qualified to participate in the programs and services that they claim IDOC denied them access to. (Cert. Resp. at 13–14.) It may be true that in order to succeed on their claims Plaintiffs must prove that they would have been able to participate in the programs and services at issue but for IDOC's failure to provide them the necessary accommodations. This, however, is a merits determination that we do not need to resolve at the class certification stage. *See Amgen*, 133 S. Ct. at 1195 ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."); *Messner*, 669 F.3d at 823 (explaining the fact that "some class members' claims will fail on the merits" is "a fact generally irrelevant to the district court's decision on class certification").

To be sure, "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *Messner*, 669 F.3d at 825 (quoting *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009)). But a class definition is not overbroad simply because it includes some members who Defendant may later prove suffered no injury. *Id.* at 823–24; *see In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014) ("[*Wal-Mart*] demonstrates that district courts do not err by failing to ascertain at

the Rule 23 stage whether the class members include persons and entities who have suffered 'no injury at all.'"); *see also Neale v. Volvo Cars of N. Am., LLC*, — F.3d —, 2015 WL 4466919, at *5 (3d Cir. July 22, 2015) ("We now squarely hold that unnamed, putative class members need not establish Article III standing.")). While it may eventually prove true that some class members were ineligible to participate in certain IDOC programs and services due to their unique security restrictions, educational backgrounds, etc., this finding is not readily apparent for "a great many" class members. *See Messner*, 669 F.3d at 825–26. To the contrary, we expect ineligibility to be the outlier rather than the norm.

To avoid denying class certification based simply on a non-fatal overreach of Plaintiffs' proposed class definition, we elect to exercise our discretion to narrow the class to a reasonably ascertainable group. *Messner*, 669 F.3d at 815 (suggesting that over-inclusive class definitions "can and often should be resolved by refining the class definition rather than by flatly denying class certification on that basis"); *In re Motorola Sec. Litig.*, 644 F.3d 511, 518 (7th Cir. 2011) ("[A] district court has the authority to modify a class definition at different stages in litigation."); *see Hamos*, 26 F. Supp. 3d at 769 (narrowing the proposed class definition). Based on the discussion above, we propose the following class definition:

> (i) all individuals incarcerated by IDOC currently and in the future; (ii) who IDOC classified as deaf or hard of hearing or who notified IDOC in writing during the Class Period, either personally or through a family member, that he or she was deaf or hard of hearing; and (iii) who require accommodations, including interpreters or other auxiliary aids or services, to communicate effectively and/or to access programs or services available to individuals incarcerated by IDOC during the Class Period.[34]

We review the remaining disputed Rule 23 requirements with this definition in mind.

---

[34] The Class Period is defined as January 1, 2007, to the present. (*See* Cert. Mem. at 1.)

### C.    Numerosity

To satisfy the numerosity requirement, Plaintiffs must prove the class is so large that joinder is impractical.  Fed. R. Civ. P. 23(a)(1); *Streeter v. Sheriff of Cook County*, 256 F.R.D. 609, 612 (N.D. Ill. 2009).  There is no objective threshold for numerosity, but courts have found that a class of forty is typically enough to satisfy the requirement.  *Id.*; *McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002).  During discovery, Defendant identified fifty-six inmates who either self-identified as hearing impaired during the class period or who IDOC believes are hearing impaired.  (Cert. Mem. at 4; Def's Suppl. Interrog. Resp. No. 1, Cert. Mem. Ex. 1.)  Plaintiffs claim that they identified at least thirty additional class members, citing IDOC Communication Plans.  (Cert. Mem. at 4; *see* Cert. Mem., Exs. 2–16.)  It appears that most, if not all, of these inmates fall under our modified class definition since IDOC has recognized or received notice of their hearing disabilities.  According to Plaintiffs, these class members have limited financial resources and are incarcerated in nineteen different IDOC facilities across the state.  (Cert. Mem. at 5.)  We find, and Defendant does not contest, that under these circumstances the class is sufficiently numerous such that joinder of all class members would be impractical.  Accordingly, Plaintiffs successfully demonstrated Rule 23(a)(1) numerosity.

### D.    Commonality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  Plaintiffs need only articulate a single common issue, but that question must be "capable of classwide resolution" such that its answer is "apt to drive the resolution of the litigation."  *Wal-Mart*, 131 S. Ct. at 2551; *see Jamie S.*, 668 F.3d at 497.  In other words, the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart*, 131 S. Ct. at 2551; *see Mullins v. Direct Digital, LLC*,

— F.3d —, 2015 WL 4546159, at *17 (7th Cir. July 28, 2015). For that reason, commonality "demands more than a showing that the class members have all suffered a violation of the same provision of law at the hands of the same defendant." *Suchanek*, 764 F.3d at 755–56 (quoting *Wal-Mart*, 131 S. Ct. at 2551). Instead, they must show that the class members "have suffered the same injury." *Wal-Mart*, 131 S. Ct. at 2551.

Common questions may arise when defendants engage in standard conduct or practice that affects the entire class. *Suchanek*, 764 F.3d at 756 (quoting *In re IKO Roofing Shingle Products Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014)); *Kurgan v. Chiro One Wellness Centers LLC*, 10 C 1899, 2014 WL 642092, at *6 (N.D. Ill. Feb. 19, 2014). A single system-wide illegal practice or policy can satisfy the commonality requirement. *Wal-Mart*, 131 S. Ct. at 2553; *Bolden v. Walsh Const. Co.*, 688 F.3d 893, 897 (7th Cir. 2012) ("[T]he Court in *Wal–Mart* explained that a multi-store (or multi-site) class could satisfy Rule 23(a)(2) if the employer used a procedure or policy that spanned all sites."); *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 489–90 (7th Cir. 2012) (finding that commonality was satisfied under *Wal-Mart* when the plaintiffs challenged the defendant's company-wide policies); *see Kurgan*, 2014 WL 642092, at *6 (finding the legality of the defendant's "uniform, official, corporate policy" was a common issue central to the litigation). In such a case, the plaintiffs must evidence "significant proof" that the systemic policy or practice alleged exists. *Wal-Mart*, 131 S. Ct. at 2553; *Jamie S.*, 668 F.3d at 498.

Here, Plaintiffs claim that IDOC's statewide policies and practices regarding accommodations for deaf and hard of hearing offenders violate the ADA, the Rehabilitation Act, the RLUIPA, and the First, Eighth and Fourteenth Amendments. (Cert. Mem. at 6.) Within this overarching complaint, they contend there are numerous legal and factual questions common to

the class. Exemplars include whether IDOC systematically failed to provide class members with effective communication and adequate access to its programs and services; whether IDOC provides class members with safe and effective visual notification systems to advise them of emergencies; whether IDOC has failed to establish sufficient policies to allow class members to participate in religious services under RLUIPA; and whether IDOC's policies and practices violate the Eighth and Fourteenth Amendments. (*Id.* at 8–9.) Plaintiffs' briefing makes clear that their claims target alleged systemic discrimination against deaf and hard of hearing inmates, "which emanates from generally applicable policies and procedures that altogether fail to account for deaf and hard of hearing inmates." (Cert. Reply at 7.) They explain that because these issues focus on the failures of IDOC's *system-wide* policies and practices, they are common to the entire class. (Cert. Mem. at 8.)

Defendant relies on *Wal-Mart* to contest commonality. In *Wal-Mart*, three named plaintiffs sued Wal-Mart under Title VII, alleging sex discrimination in pay and promotion decisions made by thousands of managers across the country. They brought the class claims on behalf of approximately 1.5 million current and former Wal-Mart employees. Although Wal-Mart had an official policy against discrimination, the plaintiffs alleged the company had "a strong and uniform corporate culture" permitting bias against women that influenced the discretionary decision-making of Wal-Mart's managers. *Wal-Mart*, 131 S. Ct. at 2553, 2548. This corporate culture, the plaintiffs alleged, resulted in a common discriminatory practice that impacted every female employee. *Id.* In denying certification, the Supreme Court explained that commonality could conceivably be established by "significant proof that [defendant] operated under a general policy of discrimination." *Wal-Mart*, 131 S. Ct. at 2553; *see Chi. Teachers Union*, 2015 WL 4667904, at *5; *Vang v. Kohler Co.*, 488 F. App'x 146, 147 (7th Cir. 2012)

(explaining that a "single, firm-wide policy . . . could satisfy Rule 23(a)(2)"); *Jamie S.*, 668 F.3d at 498. In that case, however, the plaintiffs failed to proffer such evidence. *Wal-Mart*, 131 S. Ct. at 2553–56; *see Chi. Teachers Union*, 2015 WL 4667904, at *5. Without proof of a system-wide policy acting as "glue" to hold thousands of highly individualized employment decisions together, the Supreme Court could not find that the class would "generate common answers apt to drive the resolution of the litigation." *Id.* at 2551–52; *see Bolden*, 688 F.3d at 898 (explaining that a "single . . . policy was the missing ingredient in *Wal-Mart*").

Defendant attempts to depict Plaintiffs' claims as likewise challenging hundreds of individual decisions regarding inmate hearing accommodations made by numerous IDOC employees at different facilities.[35] (Cert. Resp. at 8.) But, although Plaintiffs' claims are supported by anecdotal examples, their complaint principally attacks IDOC's system-wide policies, including its written ADA Directive. *See P.V. ex rel. Valentin v. School Dist. of Philadelphia*, 289 F.R.D. 227, 233–34 (E.D. Penn. 2013) ("Defendants fail to recognize, however, that the central tenant of Plaintiffs' Complaint alleges a systemic failure, not a failure of the policy as applied to each member individually."). Even if determining appropriate hearing accommodations requires individualized considerations down the line, common issues bind the Plaintiffs' claims together if IDOC's high level policies and practices do not conform to the law. *See Chi. Teachers Union*, WL 4667904, at *6; *see Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) (finding inmates' alleged exposure to statewide policies regarding the conditions of confinement and health care services in Arizona prisons satisfied the commonality requirement).

---

[35] Defendant states that Plaintiffs' basis for commonality is "that they are deaf or hard-of-hearing and accordingly require accommodations." (Cert. Resp. at 7.) We find this description disingenuous. Plaintiffs' statement of the common issues, which spans over an entire page in their opening brief, does not allege those facts at all and instead explicitly focuses on IDOC's "systematic[]" failures and its "policies and practices." (Cert. Mem. at 8–9.)

Indeed, as the Seventh Circuit has recently confirmed "a [system]-wide practice is appropriate for class challenge even where some decisions in the chain of acts challenged . . . can be exercised by local [officers] with discretion—at least where the class at issue is affected in a common manner, such as where there is a uniform policy or process applied to all." *Chi. Teachers Union*, WL 4667904, at *7.

Unlike in *Wal-Mart*, we find that Plaintiffs have met their burden to show "significant proof" of the system-wide policies and practices alleged. *See Parsons*, 754 F.3d at 680 (explaining that plaintiffs sufficiently proved the system-wide policies alleged with "formal [prison] policies, admissions by [prison] officials in discovery documents, declarations by the named plaintiffs . . . and [plaintiffs'] expert report"); *Brand v. Comcast Corp., Inc.*, 302 F.R.D. 201, 219 (N.D. Ill. 2014) (relying on class members' testimony to find "significant proof of the common question of whether a hostile work environment existed"); *Olson v. Brown*, 284 F.R.D. 398, 400 (N.D. Ind. 2012) (finding that the named plaintiff showed that a jail's practices "caused inmates to suffer the same potential injury, which tie[d] all their jail standards claims together").

First, it is undisputed that IDOC has a written ADA Directive, the purpose of which is "to provide instructions to staff for providing accommodations to offenders with disabilities." (ADA Directive § II(A).)  Defendant concedes that "[t]his Directive applies across all prisons in Illinois to all offenders with hearing issues."  (Cert. Resp. at 5.)  Some of Plaintiffs' claims directly challenge whether this written policy sufficiently protects class members' rights under federal law.  For instance, they allege that to comply with the ADA, the Directive must mandate more in-depth training and experience for ADA Coordinators and other IDOC staff.  (Cert. Reply at 4.)  Whether the ADA Directive—an express and undisputed statement of IDOC system-wide

policy—satisfies IDOC's obligations under the ADA is indeed a common question apt to drive resolution of the litigation.

As for claims not directly derived from IDOC's written policies, Plaintiffs present expert testimony and anecdotal evidence to support their allegations. Professor Cokely concluded that "the great majority of IDOC's failures in ensuring effective communication with/by [hearing impaired] inmates is a result of its failure to implement, and ensure the consistent application of, an adequate institutional policy concerning those inmates." (Cokely Rpt. at 42–43.) Similarly, after listing numerous specific deficiencies—such as inadequate staff training, failure to consider inmates' accommodation preferences, and failure to provide ASL interpreters—Ms. Stanosheck opined in her report that "[a]t the core of the many shortcomings I've outlined above is the IDOC's failure to put into place, on a system-wide basis, a comprehensive policy or procedure sufficient to ensure effective communication for deaf and hard of hearing inmates." (Stanosheck Rpt. at 8.) Moreover, Ms. Stanosheck found that the ADA Directive was not only insufficient to ensure compliance with the ADA, but even its requirements were being systematically ignored or misunderstood. (*See id.* at 19–21.) She concluded that "IDOC has instilled a culture of accepting non-compliance with the ADA's requirement to provide deaf and hard of hearing inmates with effective communication." (*Id.* at 19.) Unlike the expert in *Wal-Mart* who could not say "whether .05 percent or 95 percent of the employment decisions" were affected by the alleged discriminatory culture, 131 S. Ct. at 2554, Ms. Stanosheck has broadly opined that "inmates in the IDOC system as a whole . . . are not being provided effective communication," (Deposition of Elizabeth Stanosheck at 92, Cert. Mem. Ex. 24 [*hereinafter* Stanosheck Dep.]).

In addition, each of the remaining nine named Plaintiffs testified through depositions, affidavits, and interrogatory responses that IDOC has failed to provide and/or specifically denied

or ignored their requests for accommodations. (*See* Cert. Reply at 6–7 (highlighting pertinent testimony).) The testimony also indicates that the lack of hearing accommodations has resulted in exclusion from various IDOC programs and services, such as vocational programs, televisions and telephones, and religious services. (*Id.*) Based on Plaintiffs' representations, uncontested by Defendants, the class appears to consist of somewhere between eighty-six and a little over one hundred inmates. Taking the high-end of this range, the accounts of each named Plaintiff represent approximately one for every eleven class members. *See Wal-Mart*, 131 S. Ct. at 2556 (explaining that while anecdotal testimony from 1 in every 12,500 class members was statistically insignificant, similar testimony from 1 in every 8 class members in *Teamsters v. United States*, 431 U.S. 324, 97 S. Ct. 1843 (1977) was substantial). This sampling is statistically significant and represents persuasive evidence that IDOC systematically fails to provide inmates with necessary hearing accommodations.

After rigorously reviewing all the evidence submitted by Plaintiffs—IDOC's express written policies, experts' reports, and Plaintiffs' testimony—we find that they have sufficiently proved the existence of the statewide policies and practices alleged. Despite factual variations in putative class members' situations, Plaintiffs' allegations regarding IDOC's system-wide failures are the "glue" that ties their claims together. *Hill v. Wells Fargo Bank, N.A.*, 12 C 7240, 2015 WL 232127, at *9 (N.D. Ill. Jan. 16, 2015) ("Rule 23(a)(2) does not demand that every member of the class have an identical claim, and some degree of factual variation will not defeat commonality provided that common questions yielding common answers can be identified.") Thus, Plaintiffs satisfied the commonality requirement under Rule 23(a)(2).

Our decision is consistent with numerous other courts that have found, after *Wal-Mart*, that the commonality requirement was met in cases where prisoners alleged system-wide

practices and/or failures resulting in constitutional and statutory violations. *See, e.g.*, *Lacy v. Dart*, 14 C 6259, 2015 WL 1995576, at *4 (N.D. Ill. Apr. 30, 2015) (finding wheelchair bound detainees' claims that Cook County violated their rights under the ADA and Rehabilitation Act presented common questions of law and fact); *Hernandez*, 305 F.R.D. at 154 ("Post-*Wal-Mart*, courts continue to find the commonality requirement satisfied in cases challenging correctional facility conditions similar to those at issue here."); *Scott v. Clarke*, 12 C 00036, 2014 WL 6609087, at *15 (W.D. Va. Nov. 20, 2014) (citing cases recognizing that after *Wal-Mart* "commonality does not serve as a barrier to the certification of class actions in cases involving prisoners' claims alleging a pattern and practice of conduct resulting in unconstitutional conditions of confinement"); *Henderson v. Thomas*, 289 F.R.D. 506, 511 (M.D. Ala. 2012) (finding commonality for prisoners' ADA claims challenging Alabama's policy of segregating HIV positive inmates); *see also Kenneth R. ex rel. Tri-Cty. CAP, Inc./GS v. Hassan*, 293 F.R.D. 254, 268 (D.N.H. 2013) (finding whether there was a "systemic deficiency" in defendant's provision of health services under the ADA and other federal statutes was a common question under *Wal-Mart*); *Lane v. Kitzhaber*, 283 F.R.D. 587, 596 (D. Or. 2012) ("Based on *Wal-Mart*, no court has yet declined to certify an ADA Title II case.").

**E.      Typicality**

Defendant also challenges the Rule 23(a)(3) typicality requirement, which demands that the claims or defenses of the named plaintiffs be typical of those of the punitive class members. Fed. R. Civ. P. 23(a)(3). Claims are typical if they "arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members" and if they "are based on the same legal theory" as other class members. *Arreola v. Godinez*, 546 F.3d 788, 798 (7th Cir. 2008) (quoting *Oshana v. Coca–Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006));

*Streeter*, 256 F.R.D. at 612; see *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) (explaining that courts should look to "the defendant's conduct and the plaintiff's legal theory" to analyze typicality).  Some factual distinction and variance in the injuries sustained by each class member will not defeat typicality, so long as the plaintiffs' claims "have the same essential characteristics" as the putative class members' claims.  *Oshana*, 472 F.3d at 514; *see Rosario*, 963 F.2d at 1018; *Chi. Teachers Union, Local 1 v. Bd. of Educ. of the City of Chic.*, 12 C 10338, 2015 WL 3372298, at *5 (N.D. Ill. May 22, 2015); *Curry v. Kraft Foods Global, Inc.*, 10 C 1288, 2011 WL 4036129, at *2 (N.D. Ill. Sept. 12, 2011).

Here, the claims of named Plaintiffs and putative class members arise from the same conduct by IDOC, *i.e.*, its policies and practices regarding accommodations for deaf and hard of hearing inmates.  Defendant once again attempts to persuade us that this case is about hundreds of individual denials for hearing accommodations instead of IDOC's systemic policies and practices.  (Cert. Resp. at 11.)  But, as we have discussed, Plaintiffs could not be clearer that the converse is true.[36]  While they cite anecdotal examples in support of their system-wide allegations, named Plaintiffs' and punitive class members' claims both focus on the same alleged policies and standard practices, which affect hearing impaired inmates across the state.  Likewise, the named Plaintiffs and putative class members share the same legal theories; they all allege that IDOC's statewide practices and policies violate their constitutional rights and federal statutes by not providing deaf and hard of hearing inmates with effective communication or equal access to programs and services.

---

[36] *See Chi. Teachers Union*, 2015 WL 3372298, at *6 (noting the defendant's similar "fundamental failure to come to grips with plaintiffs' theory of the case" where plaintiffs' theory focused on a school district's single policy rather than the individual discretion of its principals).

To take an example, Plaintiff Lancaster's claim is not that a specific IDOC officer violated his Eighth Amendment right by failing to provide him with an ASL interpreter to communicate with medical staff after he injured his finger playing basketball on a particular date. Nor does he seek damages related to that incident. Rather, his claim—the same as all other named Plaintiffs and putative class members—is that IDOC's systemic failure to provide meaningful communication with medical staff violates his Eighth Amendment right by exposing him to a substantial risk of harm in the past, present, and future. Thus, despite factual differences, the named Plaintiffs claims are typical of the other class members in that they focus on the same conduct and are based on the same legal theories. *See Fonder v. Sheriff of Kankakee Cty.*, 12 C 2115, 2013 WL 5644754, at *6 (C.D. Ill. Oct. 15, 2013) (finding plaintiff's claims were typical of the class where plaintiff challenged the same prison strip search policy as class members); *Streeter*, 256 F.R.D. at 613 ("[T]he likelihood of some range of variation in how different groups of new detainees were treated does not undermine the fact that the claims of each class [member] share a common factual basis and legal theory." (quoting *Young v. Cty. of Cook*, 6 C 552, 2007 WL 1238920, at *6 (N.D. Ill. Apr. 25, 2007))); *Phipps v. Sheriff of Cook Cty.*, 249 F.R.D. 298, 301 (N.D. Ill. 2008) ("That the particular conditions may differ slightly from one cell block to the next, or that there are factual distinctions between the actual injuries suffered by [the named plaintiff] and the class members, does not defeat typicality under Rule 23(a)(e)." (quotation omitted)).

Before moving on, we will briefly address Defendant's arguments to the contrary. First, Defendant's case law is either inapplicable or readily distinguishable. His two lead cases do not even deal with typicality. In *Lewis v. Casey*, 518 U.S. 343 (1996), the Court merely explained that named plaintiffs must demonstrate injury to have standing, and *East Texas Motor Freight*

*Sys., Inc. v. Rodriguez*, 431 U.S. 395 (1981) found that named plaintiffs were not adequate class representatives because they could not have suffered any injury.

In addition, in *Kress v. CCA of Tennessee*, the Seventh Circuit found that the district court did not abuse its discretion in determining named plaintiffs were not typical of a class of "any and all persons" confined in a prison where the plaintiffs' claims were based on a change to the prison's medical policy that may not have negatively impacted every class member. 694 F.3d at 893. The court distinguished the case from *Smentek v. Sheriff of Cook Cty.*, 9 C 529, 2010 WL 4791509 (N.D. Ill. Nov. 18, 2010), where the typicality requirement was satisfied because there was evidence that all class members experienced some injury from the prison's medical practice at issue. *Kress*, 694 F.3d at 893. *Smentek* is more analogous here than *Kress* because Plaintiffs challenge IDOC policies and practices regarding accommodations for hearing impaired inmates that impact *all* class members. Equally, we do not find the analysis in *Wrightsell v. Sheriff of Cook Cty.*, 8 C 5451, 2009 WL 482370 (N.D. Ill. 2009) relevant. There, a class of detainees claimed that they received untimely dental care in violation of the Eighth Amendment. *Id.* at *1. Unlike in this case, the plaintiffs in *Wrightsell* sought damages for their injuries under Rule 23(b)(3). *Id.* The court found typicality was lacking because resolution of the claims would require a case-by-case analysis of each detainees' unique situation. *Id.* at *3.

This litigation will focus on whether IDOC's policies and procedures are illegal as applied to all hearing impaired inmates, and thus will not depend on the intensive individualized analysis the courts were concerned about in *Kress* and *Wrightsell*. We will consider individual violations as evidence of the illegality of IDOC's broader policies and procedures, but the success or failure of each class members' claims—and whether we grant statewide injunctive relief—does not principally turn on his or her unique circumstances. *See Lacy*, 2015 WL

1995576, at *5 ("Plaintiffs' claims do not require an individual evaluation of plaintiffs' disabilities or the accommodations allegedly provided, but rather ask the court to determine whether courthouse facilities and defendants' actions comply with federal statutes.").

Second, we are also unpersuaded by Defendant's argument that Plaintiffs must individually show that they are qualified to participate in the programs and services that they challenge. The vast majority of services and programs that they complain about do not appear to require any special qualification. For example, all inmates are permitted to participate in the grievance process, all inmates would have the right to be notified of emergency situations, and all inmates would have the right to receive proper medical treatment. *See Lacy*, 2015 WL 1995576, at *5 ("Defendants' argument that plaintiffs must show that they are qualified to make use of the 'services, programs and activities in question' is nonsensical, because plaintiffs have a constitutional right to attend their court proceedings."). Moreover, although inmates may be subject to occasional disciplinary or safety restrictions that could limit their right to use certain services at certain times, these temporary restrictions would not impact their right to seek future injunctive relief since there is a high likelihood that the restriction would be lifted at some time during their incarceration. We recognize that inmates may be truly ineligible for a program in a handful of cases, but we believe these instances are few and do not defeat typicality where named Plaintiffs' and putative class members share the same legal claims based on the same conduct. *See generally CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 725 (7th Cir. 2011) (quoting *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996)); *Boundas v. Abercrombie & Fitch Stores, Inc.*, 280 F.R.D. 408, 412 (N.D. Ill. 2012) ("[T]ypicality under Rule 23(a)(3) should be determined with reference to the [defendant's] actions, not with respect

to particularized defenses it might have against certain class members.").  Accordingly, we find that Plaintiffs have satisfied the requirements of Rule 23(a)(3).

### F.    Adequacy

Under Rule 23(a)(4), named plaintiffs must "fairly and adequately protect the interests of the class" by having a "sufficient interest in the outcome [of the litigation] to ensure vigorous advocacy."  Fed. R. Civ. P. 23(a)(4); *Lacy*, 2015 WL 1995576 at *5.  This inquiry has two parts: (1) the adequacy of the named plaintiffs' counsel, and (2) the adequacy of the named plaintiffs themselves as representatives of the class.  *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011); *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598 (7th Cir. 1993)).

Defendants do not challenge the adequacy of the named Plaintiffs or their counsel. We agree that Plaintiffs' counsel, experienced and qualified law firms and legal aid agencies, are more than capable of serving as adequate class counsel in this action.  Named Plaintiffs can also adequately represent the class.  They share the same interest in achieving effective communication and appropriate hearing accommodations in IDOC facilities, and they share the same injury by being exposed to policies and practices that they claim deprive them of such communication and accommodations.  They do not appear to have any interests in conflict with the putative class members, and they have been active participants in the case, demonstrating a sufficient interest in vigorously pursuing the litigation.  Thus we find the adequacy requirement is met under Rule 23(a)(4).

### G.    Conduct Generally Applicable to the Class

In addition to the four Rule 23(a) requirements, Plaintiffs must show that the proposed class is certifiable under one of the Rule 23(b) subsections, in this case Rule 23(b)(2). Rule 23(b)(2) requires that the defendant "has acted or refused to act on grounds generally

applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). Class actions certified under Rule 23(b)(2) are appropriate only when the class seeks injunctive or declaratory relief and any requested damages are incidental in nature. *Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 826 (7th Cir. 2011); *In re Allstate Ins. Co.*, 400 F.3d 505, 507 (7th Cir. 2005). Moreover, "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Jamie S.*, 668 F.3d at 499 (quoting *Wal-Mart*, 131 S. Ct. at 2557). "Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of this type of class. *Chi. Teachers Union*, WL 4667904, at *10 (quoting *Amchen Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S. Ct. 2231, 2245 (1997)).

Plaintiffs here do not seek damages; rather they ask us for a declaration that IDOC's policies and practices regarding accommodations for hearing impaired inmates violate federal law, and any other declaratory or injunctive relief appropriate to remedy past violations and prevent future violations. (Compl. ¶¶ 200–201.) A single declaration that the policies and practices alleged violate federal law would be final and would provide relief to each class member equally. This request for relief is sufficient to certify the class under Rule 23(b)(2). *See Chi. Teachers Union*, 2015 WL 4667904, at *11 (explaining that the plaintiffs' request for a declaration that the defendant's system-wide policy violated federal law was sufficient to certify the class under Rule 23(b)(2), even where the plaintiffs also requested individualized relief); *Hernandez*, 305 F.R.D. at 163–64; *Olson*, 284 F.R.D. at 415; *Bumgarner*, 276 F.R.D. at 457–58.

Defendant's primary argument against Rule 23(b)(2) certification echoes his summary judgment brief. He claims that IDOC *does* have effective policies and practices in place to accommodate deaf and hard of hearing inmates, and those policies and practices are carried out throughout IDOC's facilities. (Cert. Resp. at 4–6.) In light of this, Defendant argues, Plaintiffs must litigate any individual failures independently. (*Id.* at 6.) As we explain in our summary judgment analysis, however, there are considerable disputed facts as to whether IDOC has appropriate policies and procedures in place and whether those that do exist are sufficient or even practiced and enforced. In fact, we determined above that Plaintiffs presented significant proof of the systemic failures alleged. Thus, Plaintiffs allegations regarding IDOC's system-wide policies and practices remain viable in this litigation. Resolution of those claims in Plaintiffs' favor could be remedied by class-wide declaratory and/or injunctive relief.

Moreover, even if Plaintiffs did request individual relief, which they do not, "individualized relief does not preclude certification of a class for common equitable relief." *Chi. Teachers Union*, WL 4667904, at *1; *see also Lacy*, 2015 WL 1995576, at *6 ("The injunctive relief plaintiffs seek as a class would resolve their alleged injuries at one time, regardless of the level of accommodation individual class members require."). Since all class members seek the same declaratory and injunctive relief regarding IDOC's statewide policies and practices, we find that certification is appropriate under Rule 23(b)(2).

Having concluded that Plaintiffs satisfied their burden under Rule 23(a) and Rule 23(b) to show Plaintiffs' claims would be more efficiently resolved as a class action than individually, we grant Plaintiffs' motion for class certification with the modification to the class definition described above. We turn next to Defendants' motion for summary judgment.

## II.    Defendant's Motion for Summary Judgment

Defendant moved for summary judgment on all Plaintiffs' claims. He largely argues that IDOC does provide adequate hearing accommodations for its deaf and hard of hearing inmates such that it is not in violation of any federal law. We recognize that since the enactment of the 2012 ADA Directive IDOC has been making some advances, but whether these strides are sufficient to protect hearing impaired inmates under federal law and whether they have been adequately implemented remains unclear. (*See, e.g.*, Senor Dep. at 269 (testifying that IDOC is making improvements to its ADA accommodations, but the advances are slow).) As discussed more below, the record is riddled with factual disputes and evidentiary holes that prevent us from ruling on the majority of Plaintiffs' claims as a matter of law.

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to identify those portions of the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "must go beyond the pleadings" and identify portions of the record demonstrating that a material fact is genuinely disputed. *Id.*; Fed. R. Civ. P. 56(c).

In deciding whether summary judgment is appropriate, we cannot resolve issues of credibility, weigh evidence, or either draw or reject inferences; these determinations must be left to the finder-of-fact. *Williams v. City of Chi.*, 733 F.3d 749, 752 (7th Cir. 2013) ("Neither [the

Seventh Circuit] nor the district court can resolve issues of credibility when deciding a motion for summary judgment or an appeal from its grant."); *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007). We must instead accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513.

## A. ADA & Rehabilitation Act Claims

Count I alleges numerous violations of the ADA and Count II alleges Rehabilitation Act violations based on the same conduct. Relief under the Rehabilitation Act and the ADA are coextensive, and, with one exception that is irrelevant for the purposes of this motion,[37] courts use the same standards to analyze claims under both statutes. *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012); *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004) (quoting *Ozlowski v. Henderson*, 237 F.3d 837, 842 (7th Cir. 2001)). Thus, our analysis of Plaintiffs' ADA claim will apply equally to their Rehabilitation Act claim.

### i. Legal Framework

The ADA is intended to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1) (2003). Title II of the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (2003).

Under Title II's implementing regulations, "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid

---

[37] The Rehabilitation Act also requires that the program in which the plaintiff was involved received federal financial assistance. *Novak v. Bd. of Trustees of S. Illinois Univ.*, 777 F.3d 966, 974 (7th Cir. 2015); *see* 29 U.S.C. § 794(a). This element is not disputed here.

discrimination on the basis of a disability." 28 C.F.R. § 35.130(b)(7). With regard to hearing disabilities, public entities must "take appropriate steps to ensure that communications with . . . participants . . . with disabilities are as effective as communications with others," *id.* § 35.160(a)(1), and to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity," *id.* § 35.160(b)(1).

> The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place. In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

*Id.* § 35.160(b)(2); *see id.* § 35.104 (listing types of auxiliary aids and services). In providing appropriate auxiliary aids, "[t]he public entity shall honor the choice of the individual with a disability unless it can demonstrate that another effective means of communication exists or that use of the means chosen would not be required under § 35.164." 28 C.F.R. pt. 35, app. A. The Appendix to the regulations further explains that:

> Although in some circumstances a notepad and written materials may be sufficient to permit effective communication, in other circumstances they may not be sufficient. For example, a qualified interpreter may be necessary when the information being communicated is complex, or is exchanged for a lengthy period of time. Generally, factors to be considered in determining whether an interpreter is required include the context in which the communication is taking place, the number of people involved, and the importance of the communication.

28 C.F.R. pt. 35, app. B. The regulations also require public entities to meet specific standards when employing VRI. 28 C.F.R. § 35.160(d).

Notwithstanding, § 35.164 provides narrow limits on public entities' obligations to accommodate hearing impaired participants under § 35.160. Specifically, a public entity is not

required to "take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." *Id.* § 35.164. Before denying a proposed accommodation, however, the public entity "has the burden of proving that compliance with [§ 35.160] would result in such alterations or burdens." *Id.* It must also issue a "written statement of the reasons" for its conclusion, and ensure that the alternative aids offered provide the hearing-impaired individual with the services at issue "to the maximum extent possible." *Id.*

Counts I and II allege that Defendant failed to provide reasonable accommodation for Plaintiffs' hearing impairments under these rules and regulations. Plaintiffs claim that Defendant failed to provide effective communication tools to inmates with hearing disabilities, and denied them equal access to IDOC services, benefits, activities, programs, or privileges. They claim that these failures are systemic and result from widespread discriminatory policies, procedures, and actions. (*See* Cert. Reply at 1.) The parties agree that to prove this claim under Title II of the ADA, Plaintiffs must show: (1) that they are qualified individuals with a disability; (2) who were either excluded from participating in, or denied the benefits of, a public entity's services, programs, or activities; and (3) such exclusion, denied of benefits, or discrimination was by reason of their disability.[38] *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015); *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996); *Phipps v. Sheriff of Cook Cty.*, 681 F. Supp. 2d 899, 913 (N.D. Ill. 2009); *see* 42 U.S.C. § 12132. After these requirements are established, "the burden shifts to the [D]efendant to show that the accommodation[s] provided [were] either effective, or that the accommodation[s] sought and not provided would have

---

[38] Because Plaintiffs do not request compensatory or punitive damages, they need not show that the discrimination was intentional. *Phipps*, 681 F. Supp. 2d at 917 ("[I]t is necessary to show intentional discrimination in order to recover compensatory damages (as opposed, say, to injunctive relief)"); *see Strominger v. Brock*, 592 F. App'x 508, 511 (7th Cir. 2014).

resulted in a fundamental alteration of the [programs, activities, or services], or an undue financial or administrative burden." *Tucker v. Tennessee*, 539 F.3d 526, 532–33 (6th Cir. 2008) (citing *Tennessee v. Lane*, 541 U.S. 509, 532, 124 S. Ct. 1978, 1993–94 (2004)).

Defendants do not dispute that Plaintiffs are qualified individuals with a disability, but they deny that Plaintiffs were excluded from participating in IDOC services, programs, or activities because of their hearing disabilities.[39]  (SJ Mem. at 4.)  In other words, Defendant contends that IDOC does provide effective accommodations for inmates' hearing disabilities.

In the prison context, whether accommodations are reasonable must be judged "in light of the overall institutional requirements," including "[s]ecurity concerns, safety concerns, and administrative exigencies."[40]  *Love*, 103 F.3d at 561; *see* 28 C.F.R. § 35.130(h).  Determining the reasonableness of a particular accommodation, especially in the prison context, is "highly fact-specific" and determined on a case-by-case basis.  *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838–89 (7th Cir. 2001); *Phipps*, 681 F. Supp. 2d at 921 (explaining that whether an accommodation is reasonable is an even "more complex" inquiry in the prison context); *see Chisolm v. McManimon*, 275 F.3d 315, 327 (8th Cir. 2001) ("Generally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment.").

---

[39] A plaintiff may prove an ADA or Rehabilitation claim through either direct or indirect proof of discrimination.  *Novak*, 777 F.3d at 974; *Rothman v. Emory Univ.*, 123 F.3d 446, 451 (7th Cir. 1997).  Plaintiffs in this case have chosen to prove their claim through the direct method, thus they must present "either direct evidence of discrimination or circumstantial evidence that creates a 'convincing mosaic' of discrimination."  *Novak*, 777 F.3d at 974 (citing *Winsley v. Cook Cty.*, 563 F.3d 598, 604 (7th Cir. 2009)).

[40] It is well established that the ADA and Rehabilitation Act apply to inmates in state prisons.  *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209–10, 118 S. Ct. 1952, 1953–55 (1998); *Phipps*, 681 F. Supp. 2d at 913.

ii.     Analysis

Plaintiffs present a slew of different programs, activities, and services for which they contend IDOC fails to provide reasonable accommodations under the ADA.  These include: (1) reception and classification; (2) orientation; (3) educational and vocational programs; (4) work programs; (5) counselor services; (6) medical, mental health, and rehabilitative services; (7) religious services; (8) telephones; (9) televisions; (10) library services; (11) disciplinary proceedings; (12) emergency and routine notification services; (13) grievance process; and (14) pre-parole services.  (*See* Compl. ¶¶ 63–140.)  In conducting our analysis, we consider Plaintiffs' claims as to each one of these programs separately.  *See* Fed. R. Civ. P. 56(g); *Phipps*, 681 F. Supp. 2d at 919 (ruling separately on wheelchair-bound plaintiffs' three claims that prison did not provide them shower chairs, shower bars, and accessible sinks).  We reiterate that an ADA violation exists only if the defendant's action or inaction prevents the plaintiff from participating in a program, activity or service.  Certain of Plaintiffs' complaints, such as IDOC's alleged failure to properly train its employees and centrally track hearing impaired offenders, do not specifically target programs, activities, or services, and thus cannot alone sustain a claim under the ADA.  (*See* SJ Reply at 4, Dkt. 258.)  Despite this limitation, that evidence is still relevant to the extent such inaction contributed to a widespread denial of access to the programs, activities, and services that Plaintiffs do challenge.

With the exception of work programs, which we discuss separately, Defendant's primary argument for each of these services or programs is that IDOC has enacted policies and procedures to provide reasonable accommodations for hearing impaired offenders to participate effectively, and that it is following those policies and procedures.  (SJ Mem. at 2.)  We start by addressing work programs, and then analyze the remaining programs and services together.

As we prefaced, Defendant raises a unique argument with respect to IDOC's work programs. He argues that Plaintiffs' Title II ADA work program claim must fail because work programs do not constitute "services, programs, or activities" under the statute. (SJ Mem. at 7.) We recognize that typical ADA employment claims must be brought under Title I, not Title II. *Brumfield v. City of Chi.*, 735 F.3d 619, 630 (7th Cir. 2013); *Neisler v. Tuckwell*, 13 C 821, 2015 WL 998439, at *4 (E.D. Wis. Mar. 5, 2015). We do not, however, agree that prison job programs constitute employment under Title I. Defendant's reading of *Murdoch v. Washington*, which he relies on for his position, is incorrect. 193 F.3d 510 (7th Cir. 1999). In that case the Seventh Circuit held that Title II *did* apply to the plaintiff's claim that prison officials prevented him from participating in a vocational program because of his disability, but the district court properly dismissed the claim because he failed to meet his burden of proof under statute. *Id.* at 512. The court further noted that Title I *did not* apply because the plaintiff was "an inmate of the prison, not an employee or job applicant." *Id.* Numerous other courts, including in this circuit, have permitted prisoners to bring Title II ADA claims related to job assignments. *See Jaros*, 684 F.3d at 673 (permitting plaintiff to proceed with his Rehabilitation Act claim that IDOC prevented him from participating in work release program because of his cane); *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011) (finding the plaintiff's allegation that the defendant prevented him from working in a prison kitchen because of his disability stated a claim under Title II of the ADA); *Neisler*, 2015 WL 998439, at *5 (allowing prisoner to pursue an employment-related claim under Title II of the ADA); *Muhammad v. Randle*, 9 C 1014, 2010 WL 2680708, at *2 (S.D. Ill. July 2, 2010) (allowing prisoner to pursue Title II ADA claim related to prison work); *see also Love*, 103 F.3d at 560 (affirming verdict under the ADA in favor of prisoner who was denied access to the prison's work programs). We hold that IDOC's

job assignment program constitutes "services, programs, or activities" under Title II of the ADA. Thus, Defendant's motion is denied as to Plaintiffs' claims related to accommodations for IDOC job programs.

Turning to the rest of the programs and services challenged, Defendant argues that IDOC's policies and procedures do reasonably accommodate deaf and hard of hearing inmates. He does not clearly specify whether he is claiming that IDOC provides inmates with the specific hearing accommodations that they request, effective alternate accommodations, or a combination of both. *See* 28 C.F.R. §§ 35.160(b)(2), 35.164, pt. 35, app. A (requiring public entities to provide the accommodation requested unless it can demonstrate that another effective means of communication exists or that the requested accommodation would result in a fundamental alteration of the program or service or undue financial or administrative burden). We assume, however, that Defendant would assert IDOC employs a combination of those two practices. Regardless, as laid out in detail in our recitation of the facts, an overwhelming number of material facts are still disputed as to IDOC's accommodations for each program and service at issue. Defendant's sweeping statements that it provides reasonable accommodations in each category are simply not sufficiently supported by the scant record evidence cited.

For instance, Defendant claims that IDOC has a policy to provide accommodations, including ASL interpreters, to otherwise qualified offenders to participate in educational and vocational programs. (SJ Mem. at 6.) His only evidentiary support for this assertion is the ADA Directive that states Communication Plans "may" include accommodations for educational and vocational programming, and a handful of examples when IDOC did provide ASL interpreters to inmates for these programs. (*Id.*) Plaintiffs match Defendant's evidence by citing numerous occasions where IDOC did not, or explicitly refused to, provide interpreters in this context.

(SJ Resp. at 6–7, Dkt. 254.)  What we are left with is competing evidence, which is minimal at best, that creates a disputed issue of fact as to whether IDOC routinely provides hearing impaired inmates with adequate accommodations in educational and vocational programs.  Even without Plaintiffs' countervailing evidence, the language in the ADA Directive and handful of anecdotal examples cited by Defendant is insufficient for us to conclude, as a matter of law, that IDOC has, and consistently employs, a system-wide policy of providing reasonable accommodations for these programs.  *See Phipps*, 681 F. Supp. 2d at 922 (denying summary judgment where the plaintiffs disputed the defendant's contentions that its prison facilities complied with the ADA by providing accommodations to wheelchair bound inmates).

As another example, Defendant's contention that IDOC accommodates hearing impaired offenders "when necessary" during disciplinary hearings, (SJ Mem. at 10), is also disputed and insufficiently supported at this stage.  The ADA Directive simply provides that Communication Plans "may include" accommodations for due process and disciplinary hearings.  The only other evidence that Defendant cites are three instances where Plaintiffs did not have the assistance of ASL interpreters at disciplinary hearings and were nonetheless not disciplined.  (*Id.*)  He argues the fact Plaintiffs were not disciplined proves that sufficient hearing accommodations were provided.  (*Id.*)  Contrarily, Plaintiffs cite numerous instances were IDOC denied inmates requested hearing accommodations during disciplinary hearings, many that did result in discipline.  (SJ Resp. at 8.)

Defendant's argument fails on a number of grounds.  First, we are not convinced that failure to discipline equates to sufficient hearing accommodation under the ADA as a matter of law.  But even if we assumed Plaintiffs received adequate accommodation in those three instances, three anecdotal examples does not prove, or disprove, widespread practice across all

IDOC facilities—particularly in light of the countervailing evidence cited by Plaintiffs. Viewing the evidence in a light most favorable to Plaintiffs, critical questions of fact thus remain, including whether IDOC has a practice of providing hearing accommodations during disciplinary proceedings and whether any such accommodations are effective. *See Argenyi v. Creighton Univ.*, 703 F.3d 441, 451 (8th Cir. 2013) (finding a genuine issue of material fact as to whether defendant failed to provide deaf student with reasonable accommodations in the classroom); *Chisolm*, 275 F.3d at 327–32 (finding numerous issues of fact, including whether accommodations provided to deaf inmate were effective, precluded summary judgment); *Gallagher v. Allegheny Cty.*, 9 C 103, 2011 WL 284128, at *9 (W.D. Penn. Jan. 25, 2011) (denying summary judgment where the plaintiff demonstrated "a genuine issue of material fact with respect to whether the [d]efendants' efforts to accommodate his hearing impairment were reasonable"). As with educational and vocational programs, these material questions of fact preclude summary judgment.

Our analysis is the same for the remaining programs and services at issue. Defendant consistently fails to support his conclusions that IDOC has, and employs system-wide, policies and practices to adequately accommodate its hearing impaired offenders such that they can effectively participate in the programs and services discussed. Rather than clear and undisputed evidence, we are presented with a spattering of anecdotal examples from each side that is vastly insufficient to reach, as a matter of law, the conclusions that Defendant propounds. Although it appears that IDOC has made some strides since 2012, the record presented to us is far too muddled and incomplete to determine the extent of those efforts and whether they are sufficient. These factual issues must be explored in more detail at trial and ultimately weighed by the

finder-of-fact.  Because we find this case is riddled with material factual disputes, Defendant's

motion for summary judgment on Plaintiffs' ADA and Rehabilitation Act claims is denied.

### B.    RLUIPA

In Count III, Plaintiffs allege that Defendant has imposed a substantial burden on their

right to freely exercise their religion under RLUIPA by failing to provide the hearing

accommodations that they need to effectively communicate during IDOC's worship services.

(Compl. ¶ 170; SJ Resp. at 9–10.)  Defendant argues summary judgment on this claim is

warranted because there is no evidence that IDOC has affirmatively barred any expression of

Plaintiffs' religion.  (SJ Mem. at 12.)

"Congress enacted RLUIPA, in part, to protect inmates and other institutionalized

persons from substantial burdens in freely practicing their religions."  *Charles v. Verhagen*, 348

F.3d 601, 606 (7th Cir. 2003).  The statute prevents a governmental entity from imposing a

"substantial burden on the religious exercise of a person residing in or confined to an

institution."[41]  24 U.S.C. § 2000cc-1(a); *Holt v. Hobbs*, 135 S. Ct. 853, 860 (2015).  According to

the Seventh Circuit, a substantial burden on religious exercise is one that "necessarily bears

direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively

impractical."  *Koger*, 523 F.3d at 79 (quoting *Civil Liberties for Urban Believers v. City of Chi.*,

342 F.3d 752, 761 (7th Cir. 2003)).  The protections under this statute apply even when the

burden "results from a rule of general applicability."  42 U.S.C. § 2000cc-1(a); *Koger*, 523 F.3d

at 796.  To avoid imposing substantial burdens on religious exercise under RLUIPA,

---

[41] If the plaintiff proves that the government has imposed a substantial burden on his exercise of
free religion, the defendant must demonstrate that the burden: "(1) is in furtherance of a
compelling government interest; and (2) is the least restrictive means of furthering that
compelling governmental interest."  *Id.*; *Koger v. Bryan*, 523 F.3d 789, 796 (7th Cir. 2008).
Since Defendant simply argues that it has not imposed any burden at all, this defense is not
implicated in our analysis.

governments may be required to make accommodations and incur expenses to their operations. 42 U.S.C. § 2000cc-3(c); *Holt*, 135 S. Ct. at 860. The Supreme Court recently explained that RLUIPA protects all forms of religious exercise; the fact that alternative means to practice an inmate's chosen religion may be available is irrelevant under the Act. *Holt*, 135 S. Ct. at 862.

Here, we find Plaintiffs have presented evidence that Defendant placed a substantial burden on their religious exercise by denying the hearing accommodations needed for them to effectively participate in religious services. Material questions of fact exist as to whether IDOC employs a consistent and widespread practice of denying hearing accommodations to offenders for religious purposes. Principally, the record contains extensive evidence that IDOC has denied or ignored specific requests for ASL interpreters for religious services and programs. (*See* Senor Dep. at 159–60; Holmes Dep. at 96; Wright Dep. at 65–66; Winfert Dep. at 42–44; Foster Dep. at 40–41.) If proven, this widespread practice would impose a substantial burden on Plaintiffs' ability to attend religious services of their choice. Therefore, we reject Defendant's argument and deny his motion as to Plaintiffs' RLUIPA claim.

### C.     Constitutional Claims

Counts IV through VIII assert violations of Plaintiffs' constitutional right to free speech (Count IV), free religion (Count V), freedom from cruel and unusual punishment (Count VI), equal protection (Count VII) and due process (Count VIII). Plaintiffs bring these claims pursuant to 42 U.S.C. § 1983, which provides a private right of action for individuals to sue government actors in their official capacity for alleged deprivations of federal law. Defendant first argues that each of these counts should be dismissed because the ADA's enforcement scheme precludes § 1983 constitutional claims based on the same conduct. He then makes

substantive arguments against each claim individually. Since Defendant's preclusion argument presents a threshold issue, we will address that first.

i.    ADA and § 1983 Constitutional Claims

Although § 1983 typically allows private citizens to enforce violations of the Constitution and federal statute by state actors, there are exceptions to its application. Relevant here, a comprehensive remedial scheme set forth by Congress may preclude § 1983 relief to remedy violations of the statute. *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20, 101 S. Ct. 2615, 2626 (1981); *Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 281 (7th Cir. 2003). Courts impose this limitation to prevent plaintiffs from bypassing specific statutory enforcement procedures and remedies outlined by Congress in the relevant federal statute by bringing suit directly under § 1983. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 254–55, 129 S. Ct. 788, 795 (2009); *Middlesex*, 453 U.S. at 20, 101 S. Ct. at 2626.

The Seventh Circuit has not squarely decided whether the ADA or Rehabilitation Act preclude § 1983 claims for violations of those statutes, although other circuits and district courts in this circuit have found that they do. *See, e.g.*, *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002); *Lollar v. Baker*, 196 F.3d 603, 610 (5th Cir. 1999); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1011 (8th Cir. 1999); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1531 (11th Cir. 1997); *Mulligan v. Vill. of Riverside*, 11 C 8200, 2013 WL 2422639, at *9 (N.D. Ill. June 3, 2013). Consistent with this authority, we find it exceedingly likely that plaintiffs may not employ § 1983 to assert statutory violations of the ADA or Rehabilitation Act. Here, however, the question is more complicated because Plaintiffs' § 1983 claims allege *constitutional* violations, not violations of the statutes themselves. Defendant argues that Plaintiffs' constitutional claims are still precluded by the ADA's remedial scheme because they

are based on the same conduct as their ADA claims. (SJ Mem. at 12.) Plaintiffs do not directly

deny that their constitutional and ADA claims are based on similar conduct, but they argue that

preclusion simply does not apply to § 1983 constitutional claims. (SJ Resp. at 10.)

To support his theory, Defendant cites *Grey v. Wilburn*, in which the Eighth Circuit

determined that the ADA precluded the plaintiff's § 1983 equal protection claim because it was

based on the same facts as his statutory claims. 270 F.3d 607, 610 (8th Cir. 2001); *see also*

*Hennagir v. Utah Dep't of Corr.*, 5 C 1043, 2006 WL 1579611, at *7–8 (D. Utah May 31, 2006).

The Seventh Circuit, however, has generally treated preclusion of § 1983 constitutional claims

more cautiously. In *Discovery House*, the Seventh Circuit recognized *Grey* but distinguished its

own precedent by explaining that it "has consistently declined to find that other similar statutes

preclude § 1983 relief when the § 1983 claim is based directly on a constitutional violation, not a

statutory one." *Discovery House*, 319 F.3d at 281 (citing *Trigg v. Fort Wayne Cmty. Sch.*,

766 F.2d 299 (7th Cir. 1985)); *see Levin v. Madigan*, 692 F.3d 607, 617 (7th Cir. 2012)

(disagreeing with the weight of other circuits and finding that the ADEA does not preclude

constitutional claims despite its "rather comprehensive remedial scheme").

In deciding whether a statutory scheme precludes § 1983 remedies, the critical

consideration is whether Congress intended the statute to preclude the alternative relief sought.

*Fitzgerald*, 555 U.S. at 252, 129 S. Ct. at 793–94; *Levin*, 692 F.3d at 615. In the Seventh Circuit,

where the § 1983 claim alleges a constitutional violation, "more is required than a

comprehensive statutory scheme" to glean Congress's intent. *Levin*, 692 F.3d at 619. Absent

"clear or manifest congressional intent in either the language of the statute or the legislative

history," we must compare the rights and protections of the statute and the Constitution.

*Id.* at 621. "Where the contours of such rights and protections diverge in significant ways, it is

not likely that Congress intended to displace § 1983 suits enforcing constitutional rights." *Fitzgerald*, 555 U.S. at 252–53, 129 S. Ct. at 794.

First, we find neither the statutory text nor the legislative history of the ADA or the Rehabilitation Act contain clear or manifest Congressional intent to preclude simultaneous constitutional claims. To the contrary, the sound analysis conducted by Magistrate Judge Denlow in *Baumgardner v. County of Cook*, indicates that Congress did *not* intend for ADA claims to limit a disabled individual's constitutional protections.[42] 108 F. Supp. 2d 1041, 1053 (N.D. Ill. 2000); *Yates ex rel. Estate of Yates v. Beck*, 3 C 10, 2003 WL 22231260, at *5 (W.D.N.C. Aug. 22, 2003) (finding that ADA's "legislative history evidences an intent . . . to supplement, not preempt, other federal and state laws protecting disabled individuals from discrimination").

Turning to the next step in our analysis, the protections available under the ADA and the constitutional claims alleged vary in material respects. To prove their claims under the ADA, the Plaintiffs must establish that they were qualified individuals with a disability and were excluded from participating in the programs and services challenged because of that disability. *Wagoner*, 778 F.3d at 592; *Love*, 103 F.3d at 560. To prove their equal protection claim, however, Plaintiffs must show that Defendant acted with discriminatory intent. *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 919 (7th Cir. 2015). And, as another example, to prove their Eighth Amendment inadequate medical treatment claim, Plaintiffs must establish that Defendant was deliberately indifferent to their serious medical needs. *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015). The elements of these and the other constitutional claims alleged vary from the

---

[42] For example, the statute expressly provides: "[n]othing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any Federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter." 42 U.S.C. § 12201(b).

standard of proof under the ADA, evidencing a lack of Congressional intent that the ADA

preclude separate enforcement of disabled individuals' constitutional rights. *See Yates ex rel.*,

2003 WL 22231260, at \*5 (permitting a § 1983 constitutional claim in ADA case and

distinguishing between the substantive standards for ADA and equal protection claims).

Our conclusion is further supported by the similarities between the ADA and Title VII of

the Civil Rights Act and the ADEA, the latter two of which the Seventh Circuit has found do not

preclude constitutional remedies. *Levin*, 692 F.3d at 617 (ADEA); *Trigg*, 766 F.2d at 302

(Title VII). Not only are the purposes and enforcement procedures of these statutes similar.

*See Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 844 (7th Cir. 2005) (stating the ADA,

Title VII, and the ADEA contain similar statements of congressional purpose); *Berryhill v. Ill.*

*State Toll Highway*, 12 C 6119, 2013 WL 2241965, at \*2 (N.D. Ill. May 21, 2013) (explaining

that the "ADA's enforcement provision expressly incorporates the enforcement provisions of

Title VII"). But in addition, the standards, elements of proof, and available remedies are similar

as well. *See Majors v. Gen. Elec. Co.*, 714 F.3d 527, 536 (7th Cir. 2013) (stating that the

standards and elements of retaliation claims are similar under the ADA and Title VII); *Pavlovic*

*v. Bd. of Educ. for City of Chi.*, 11 C 00830, 2012 WL 4361432, at \*5 (N.D. Ill. Sept. 21, 2012)

("[A]ge discrimination claims under the ADEA and disability discrimination claims under the

ADA are analyzed in a similar manner as national origin discrimination claims brought under

Title VII."); *Nawrot v. CPC Int'l*, 259 F. Supp. 2d 716, 724 (N.D. Ill. 2003) ("ADA reasonable

accommodation claims are nearly identical to the corresponding Title VII section.");

*Baumgardner*, 108 F. Supp. 2d at 1044–45 ("[T]he ADA incorporates by reference many of the

definitions, powers, procedures, and remedies set forth in specified sections of Title VII.").

In light of the similarities between these statutes, we find it highly likely that the Seventh Circuit would find the ADA does not preclude § 1983 claims alleging constitutional violations.

Indeed, numerous district courts in this circuit have permitted simultaneous ADA and constitutional claims.[43] *Hale v. Pace*, 9 C 5131, 2011 WL 1303369, at *9 (N.D. Ill. Mar. 31, 2011) (dismissing § 1983 claim based "solely on a violation of the ADA and the Rehabilitation Act," but expressly allowing § 1983 equal protection claims); *Chalk v. S. Dearborn Cmty. Sch. Corp.*, 5 C 72, 2005 WL 4889192, at *2 (S.D. Ind. Aug. 18, 2005) ("In other words, at the pleading stage there is more alleged against the defendants than merely the denial of rights established by the ADA or Rehabilitation Act and there are circumstances imaginable which could support an independent claim on behalf of [plaintiff] for denial of constitutionally protected rights under § 1983."); *Baumgardner*, 108 F. Supp. 2d at 1053 ("[I]t was not the intent of Congress that individuals must lay down their constitutional rights to equal protection at the door of the courthouse when they file an ADA claim."); *see also Jones v. Reg'l Transp. Auth.*, 11 C 4924, 2012 WL 2905797, at *6 (N.D. Ill. July 16, 2012) (dismissing § 1983 claims in ADA case in part because "no constitutional-right violation [was] alleged"); *Baumgardt v. Wausau Sch. Dist. Bd. of Educ.*, 475 F. Supp. 2d 800, 805 (W.D. Wis. 2007) (explaining that the Seventh Circuit has suggested that the ADA does not preempt equal protection claims).

---

[43] Courts in other jurisdictions have permitted these claims as well. *See Damron v. Butler Cty. Children's Servs.*, 8 C 257, 2009 WL 5217086, at *16 (S.D. Ohio Dec. 30, 2009) ("[A]lthough Damron based her § 1983 [constitutional] and statutory discrimination claims on the same core set of facts, her § 1983 claims are not barred."); *Mork v. Salt Lake Cty.*, 3 C 686, 2005 WL 3050990, at *3 (D. Utah Nov. 15, 2005); *Cisneros v. Colorado*, 3 C 2122W, 2005 WL 1719755, at *10 (D. Colo. July 22, 2005); *Pathways Psychosocial v. Town of Leonardtown, MD*, 223 F. Supp. 2d 699, 709 (D. Md. 2002) ("Plaintiffs' equal protection claims brought under § 1983 are not preempted by the ADA even though based on the same facts and circumstances as the ADA claims.").

Accordingly, we find that Plaintiffs' § 1983 constitutional claims are not barred by the remedial statutory schemes of the ADA or Rehabilitation Act. We now move on to address Defendant's substantive arguments as to each constitutional claim.

ii.     First Amendment Right to Free Speech

In Count IV Plaintiffs allege that Defendant has deprived them of their constitutional right to free speech by denying them access to TTY phones and forcing them to rely on unqualified interpreters who are not bound by professional confidentiality standards during medical appointments and disciplinary hearings. (SJ Resp. at 11–12.) Defendant describes these allegations as complaints that IDOC has not aided them in exercising their speech. (SJ Mem. at 13.) He argues that the First Amendment does not require state actors to affirmatively assist inmates in their exercise of speech; rather, it simply bars the government from enacting a rule or law that restricts inmates from doing so. (*Id.*)

We start our analysis with the alleged denial of qualified interpreters. Despite the fact that Plaintiffs discuss the use of unqualified ASL interpreters under the free speech subject heading, they describe this conduct as violating their constitutional right to privacy. (SJ Resp. at 11–12.) Violations of the right to privacy present distinct claims from violations of the right to free speech. As Defendant points out, Plaintiffs did not allege a violation of their right to privacy in their complaint. "[A] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (quoting *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002)); *accord Outlaw v. Regis Corp.*, 525 F. App'x 501, 503 (7th Cir. 2013). By the summary judgment stage it is typically too late to permit plaintiffs to amend their complaint, thus courts routinely refuse to consider claims raised for the first time during summary judgment. *See, e.g., Anderson*, 699 F.3d

at 997 (finding district court did not err by rejecting claims first asserted at summary judgment); *Messner v. Calderone*, 407 F. App'x 972, 974 (7th Cir. 2011) (holding "the district court properly declined to consider [a] new theory at summary judgment"); *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676 (N.D. Ill. 2015) ("New claims cannot be introduced at the summary judgment stage."). Thus, we will not consider Plaintiffs' privacy arguments.

Plaintiffs' only other free speech claim alleges that IDOC denied them access to TTY phones, thereby preventing them from communicating with family and friends. (SJ Resp. at 11.) We recognize that some circuits have held that inmates have a First Amendment right to use telephones to communicate with friends and family. *See Johnson v. State of Cal.*, 207 F.3d 650, 656 (9th Cir. 2000) ("[P]risoner's have a First Amendment right to telephone access."); *Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir. 1994). The Seventh Circuit, however, has expressed doubt, stating "[n]ot to allow [inmates] access to a telephone might be questionable on other grounds, but to suppose that it would infringe the First Amendment would be doctrinaire in the extreme." *Arsberry v. Illinois*, 244 F.3d 558, 564–65 (7th Cir. 2001); *see also Boriboune v. Litscher*, 91 F. App'x 498, 499 (7th Cir. 2003) ("But though prisoners have a right under the First Amendment to communicate with others outside the prison, we have expressed doubt that this amounts to an unqualified right for a prisoner to have access to a telephone." (citation omitted)). Even courts that hold inmates do have a First Amendment right to telephone access agree that this "right may be limited as long as the regulation is reasonably related to a legitimate penological interest." *Boriboune*, 91 Fed. App'x at 499; *see Israel v. Cohn*, 6 F. App'x 348, 350 (7th Cir. 2001) ("Regulations limiting telephone use by inmates . . . have been sustained routinely as reasonable.").

Plaintiffs do not support their argument that IDOC denied them access to TTYs with any citation to the record. We will, however, give them the benefit of the doubt and consider the evidence identified in their statement of facts. Although Plaintiffs identify a handful of instances where IDOC denied TTY access, (*see* Pls' SOF ¶ 29(A)), the vast majority of Plaintiffs' complaints focus on the timeliness and frequency at which they have access to the devices, (*id.* ¶¶ 29(C)–30(D)). The evidence presented might support a claim under the ADA, but it does not establish a constitutional violation. *Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996) *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998) (affirming summary judgment where the plaintiff did not allege that he was denied telephone access when he had an emergency or specific need to speak with his lawyer); *Heyer v. U.S. Bureau of Prisons*, 11 C 3118, 2015 WL 1470877, at *13 (E.D.N.C. Mar. 31, 2015) (granting summary judgment because isolated instances of TTY unavailability in prisons did not violate the Constitution). Since no reasonable trier of fact could conclude that IDOC has violated Plaintiffs' constitutional right to free speech based on the record presented, Count IV is dismissed.

### iii.    First Amendment Right to Free Exercise of Religion

Count V contends that IDOC burdened Plaintiffs' exercise of free religion by not making "reasonable efforts" to provide them with opportunities to practice their religions. (*Id.* at 12.) As with Plaintiffs' free speech claim, Defendant argues that the free exercise clause does not require IDOC to affirmatively assist Plaintiffs in practicing their religions, as long as it does not enact a rule or law preventing them from doing so. (SJ Mem. at 13.) The free exercise clause prohibits the government from making decisions, rules or laws that selectively burdens the free exercise of religion. *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 743 (7th Cir. 2015) (stating the free exercise clause prohibits states from selectively imposing

burdens "only on conduct motivated by religious belief" (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543, 113 S. Ct. 2217, 2232 (1993))); *C.L.U.B. v. City of Chi.*, 157 F. Supp. 2d 903, 914 (N.D. Ill. 2001); *see Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013). A burden exists when the defendant has pressured the plaintiff to change his behavior and violate his beliefs. *C.L.U.B.*, 157 F. Supp. 2d at 914. "[A] burden must be more than a mere inconvenience to rise to the level of a constitutional injury; it must place 'significant pressure' on [the plaintiff] to 'forego religious precepts' or to engage in 'religious conduct.'" *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 999 (7th Cir. 2006). Examples of religious burdens include "discriminating against [a plaintiff] because of her religious belief, inhibiting her dissemination of particular religious views or pressuring her to forgo a religious practice." *C.L.U.B.*, 157 F. Supp. 2d at 914.

Plaintiffs' widespread policy and practice allegation essentially contends that IDOC has a rule not to offer ASL interpreters or other hearing accommodations for religious services, which restricts Plaintiffs from participating in those services. Inmates have a First Amendment right to attend religious services that are offered to other inmates. *See O'Lone v. Shabazz*, 482 U.S. 342, 347, 107 S. Ct. 2400, 2403 (1987); *Burgess v. Goord*, 98 C 2077, 1999 WL 33458, at *6 (S.D.N.Y. Jan. 26, 1999). Contrary to Defendant's argument, the alleged systemic failure to reasonably accommodate Plaintiffs' hearing impairments such that they can attend these services would, if proved, burden this Constitutional right. *See Hernandez*, 2015 WL 3868036, at *13 (finding the exclusion of inmates with disabilities from religious services violated the free exercise clause); *Cooke v. U.S. Bureau of Prisons*, 926 F. Supp. 2d 720, 736 (E.D.N.C. 2013) (finding wheelchair bound detainees stated a First Amendment claim by alleging prison denied them, unlike detainees without disabilities, access to the religious library and outdoor pagan

worship area); *Burgess*, 1999 WL 33458, at *6 (refusing to dismiss free exercise claim based on the defendant's alleged failure to provide walking impaired inmates with accommodations to attend religious services). Since disputed issues of fact remain as to whether IDOC's policies and practices fail to accommodate hearing impaired offenders' religious needs, we cannot find as a matter of law that Defendant has not burdened Plaintiffs' religious freedoms.

At trial, the fact-finder's analysis may not end with a determination of whether Plaintiffs' free exercise right was infringed because not all burdens on an inmate's religious freedoms violate the equal protection clause.[44] But because Defendant did not raise other arguments or present any justifications for the alleged infringement, we will stop here and deny his motion as to Plaintiffs' free exercise claim.

    iv.    Eighth Amendment Protection from Cruel and Unusual Punishment

The Eighth Amendment prohibits governments from inflicting cruel and unusual punishment. U.S. CONST. amend VIII. In Count VI, Plaintiffs assert three types of claims under

---

[44] In most cases, if a burden on an individual's religious freedom is unintentional and caused by a rule that is neutral and generally applicable, it will not violate the First Amendment. *Holt*, 135 S. Ct. at 859 (citing *Emp't Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 882, 110 S. Ct. 1595, 1602 (1990)); *Listecki*, 780 F.3d at 745 ("We read the Court's statement that a general and neutral law will be upheld even if it has the 'incidental effect of burdening' religion to mean the law will be upheld as long as it only unintentionally burdens religion."). And even if a rule is not of general and neutral applicability, a resulting religious burden may be justified by a compelling governmental interest that is narrowly tailored to advance that interest. *Listecki*, 780, F.3d at 743. To complicate matters even more, in the prison context, whether prisons are required to make exceptions to neutral and generally applicable rules in order to reasonably accommodate inmates' religious beliefs is currently an open question. *See Lewis v. Sternes*, 712 F.3d 1083, 1085 (7th Cir. 2013); *Grayson v. Schuler*, 666 F.3d 450, 452–53 (7th Cir. 2012). In *O'Lone v. Shabazz*, the Supreme Court found that under the First Amendment, prison authorities are required to accommodate religious preferences if consistent with penological concerns. 482 U.S. at 348–49, 107 S. Ct. at 2403–04; *see Grayson*, 666 F.3d at 453; *Maddox*, 655 F.3d at 719 ("Prisons must permit inmates the reasonable opportunity to exercise religious freedom."). Although the Seventh Circuit has expressed doubt that the Supreme Court would uphold that rule today, it has yet to be expressly overturned. *Lewis*, 712 F.3d at 1085; *Grayson*, 666 F.3d 452–53.

this clause: (1) cruel and unusual conditions of confinement; (2) inadequate medical treatment; and (3) other exposure to substantial risk of harm.  (SJ Resp. at 12–14.)  Defendant argues that the record does not support a finding that any of these allegations rise to the level of a constitutional violation.  (SJ Reply at 13.)

First, Plaintiffs assert that by limiting their ability to effectively communicate, IDOC placed them in "communicative isolation" akin to segregation throughout the duration of their incarceration.  (SJ Resp. on 12–13.)  This isolation, they claim, amounts to a cruel and unusual condition of confinement.  To establish a condition of confinement claim, plaintiffs must show that the defendant acted with deliberate indifference in depriving him of the "minimal civilized measure of life's necessities." *Townsend v. Cooper*, 759 F.3d 678, 687 (7th Cir. 2014); *Jaros*, 684 F.3d at 670.  Courts have found that life's necessities include things like shelter, heat, hygiene, clothing, personal safety and medical care.  *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994); *Townsend*, 759 F.3d at 687; *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006).  Although the record creates an issue of fact as to whether Plaintiffs are able to communicate as effectively as hearing-abled inmates, taking the evidence in a light most favorable to Plaintiffs, the communication barriers described did not render them so isolated that they were deprived of life's basic necessities.  No Plaintiff alleged that they were entirely unable to communicate; at a minimum they interacted with IDOC staff and other inmates through gestures, written notes, or reading lips, and many could even speak and understand at least some English.  Moreover, Plaintiffs were not actually segregated from the general population—barring any temporary disciplinary action—and were regularly exposed to other day-to-day human interactions.  Thus, Plaintiffs' cruel and unusual punishment claim fails on this ground.

Next, Plaintiffs assert that Defendant placed them at substantial risk of serious harm by failing to provide visual notification systems for daily and emergency events such as meals, yard time, visitors, and fire evacuations. (SJ Resp. at 13.) Defendant responds that Plaintiffs fail to explain how flashing lights would be helpful in these situations, and contends that IDOC provides other accommodations such as vibrating watches and individual notifications from IDOC staff. (SJ Reply at 14.) To prove their claim, Plaintiffs must establish that they were exposed to a substantial risk of serious harm, that Defendant knew about that risk of harm, and that he disregarded that risk by failing to take reasonable measures to prevent it. *O'Brien v. Indiana Dep't of Corr. ex rel. Turner*, 495 F.3d 505, 508 (7th Cir. 2007) (quoting *Farmer*, 511 U.S. at 847, 114 S. Ct. at 1984). We already found in our summary judgment analysis on the ADA claim that whether IDOC provides consistent notifications of daily events and emergencies to hearing impaired inmates—*i.e.*, whether Defendant took reasonable measures to prevent the alleged risk of harm—is a disputed issue of fact for trial. Whether Plaintiffs were in fact exposed to a substantial risk of harm, however, still needs to be addressed.

Weighing all disputed issues in favor of Plaintiff, failing to notify Plaintiffs of daily events like meals, showers, and gym time did not expose them to a substantial risk of serious harm. Although numerous Plaintiffs testified that they have missed meals, showers, visitors, etc. because they could not hear the audio announcements, they did not claim that these missed opportunities endangered their health. Courts have found that occasionally missing events like meals and showers do not rise to the level of a constitutional deprivation. *See, e.g.*, *Vasquez v. Braemer*, 586 F. App'x 224, 228 (7th Cir. 2014) ("Allowing inmates only two showers and four hours of outside recreation each week does not violate the Eighth Amendment."); *Jaros*, 684 F.3d at 671 (finding that occasionally missing a morning meal did not amount to cruel and

unusual punishment); *Myrick v. Anglin*, 496 F. App'x 670, 675 (7th Cir. 2012) (noting that limiting inmates to weekly showers does not violate the Eighth Amendment); *Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (finding that only two meals per day on "regular, permanent basis" would not violate the Eighth Amendment if nutritionally adequate). Thus, we find as a matter of law that the alleged failure to notify Plaintiffs of non-emergency events does not violate the Eighth Amendment.

On the other hand, widespread failure to alert hearing impaired Plaintiffs to emergency situations could place them at substantial risk of serious harm. At least three Plaintiffs testified that they were evacuated late or not at all during emergency drills. Plaintiff Lancaster stated that during the last evacuation an officer did not notify him until "everyone else had left." (Lancaster Dep. at 41–43.) Plaintiff Lord testified that officers have sometime forgotten to alert him to fire drills preventing him from evacuating as quickly as other inmates. (Lord Dep. at 35–36.) And Plaintiff Childress explained that during multiple fire and tornado drills he did not evacuate with the other inmates because he could not hear the alarms. (Childress Dep. at 20–21.) In a real emergency situation, such as a fire or tornado, late or non-existent notification would place Plaintiffs at a substantial risk of bodily harm or even death. We also find there is at least a disputed issue as to whether Defendant knew about this risk, since the ADA Directive itself requires facilities to have emergency evacuation plans for ADA inmates and at least some facilities do have flashing alerts. (Pls' SOF ¶ 37(A); Pls' SOF ¶¶ 35(B)–35(D); Halterman Dep. at 41–42; Butler Dep. at 82.) Defendant argues that Plaintiffs have not shown how flashing lights would alleviate this risk, but we find this fairly obvious and, in any event, it is an issue of fact not appropriate for resolution on summary judgment. Although we found that the absence of non-emergency notifications does not support a cruel and unusual punishment violation, the

evidence presented regarding emergency notifications could. Therefore, summary judgment is not warranted on the emergency notification aspect of this claim.

Finally, Plaintiffs third Eighth Amendment claim alleges that IDOC provides inadequate medical care to hearing impaired inmates by failing to enable inmates to communicate effectively with medical staff. To establish an Eighth Amendment violation on these grounds, Plaintiffs must show IDOC's practice of not providing effective communication for hearing impaired inmates resulted in deliberate indifference to objectively serious medical conditions. *Perez*, 792 F.3d at 776; *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1072 (7th Cir. 2012); *see Thomas v. Sheahan*, 499 F. Supp. 2d 1062, 1095 (N.D. Ill. 2007). Mere negligence or gross negligence is not sufficient; Defendant must be deliberately indifferent. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). Deliberate indifference to a known medical condition can be displayed through inaction, persisting with inappropriate treatment, acting in a manner inconsistent with the recognized standard of care, or delaying necessary treatment and thus aggravating the injury or needlessly prolonging pain. *See Gaston v. Ghosh*, 498 F. App'x 629, 631–32 (7th Cir. 2012); *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1039–40 (7th Cir. 2012); *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011); *McGowan*, 612 F.3d at 640.

Certain Plaintiffs testified that they suffer from medical conditions such as diabetes, kidney disease, a broken finger, and persistent migraines. (Pls' SOF ¶¶ 26(B)–26(D).) Defendant does not dispute these conditions, which we find are objectively serious. These Plaintiffs further claim that ineffective communication with medical staff—a result of IDOC's systemic failure to provide effective communication resources for hearing impaired inmates—

has led to inappropriate treatment, prolonged pain, and aggravation to their injury or illness.[45]

(*Id.*)  In addition, Plaintiffs testified that when being treated for these conditions they requested the use of VRI equipment and/or ASL interpreters, alerting IDOC staff to the communication barriers.  (Childress Dep. at 11–15, 33; Wright Interrog. No. 6.)  This evidence establishes triable issues of fact as to whether Defendant employs a widespread practice of deliberate indifference to hearing impaired inmates serious medical needs.  Accordingly, summary judgment is denied as to Plaintiffs' Eighth Amendment claim of inadequate medical care.

v.       Fourteenth Amendment Right to Equal Protection

The Fourteenth Amendment prohibits states from denying individuals equal protection of the law.  *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254 (1985).  Count VII contends that Defendant has deprived Plaintiffs of equal protection under the law by denying them equal access to IDOC's programs and services.  (Compl. ¶¶ 187–190; SJ Resp. at 14.)  To prove this claim, Plaintiffs must show that Defendant: (1) "treated [them] differently from others who were similarly situated, (2) intentionally treated [them] differently because of [their] membership in the class to which [they] belonged (i.e., [hearing disabled]), and (3) because [the disabled] do not enjoy any heightened protection under the Constitution, . . . that the discriminatory intent was not rationally related to a legitimate state interest."  *Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 950–51 (7th Cir. 2002);  *Cleburne*, 473 U.S. at 442, 105 S. Ct. at 3255–56; *Anderson v. Cornejo*, 284 F. Supp. 2d 1008, 1037–38 (N.D. Ill. 2003).  As the

---

[45] Defendant's suggestion that expert testimony is required to show lack of effective communication exacerbated their conditions, (SJ Reply at 14 n.4), is incorrect.  The Seventh Circuit has held that expert testimony is not required to prove an Eighth Amendment inadequate medical treatment claim.  *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) ("[A] non-trivial delay in treating serious pain can be actionable even without expert medical testimony showing that the delay aggravated the underlying condition."); *Kennedy v. Huibregtse*, 13 C 4, 2014 WL 4924662, at *11 (E.D. Wis. Sept. 30, 2014) (finding expert testimony was not needed to show delay in medical treatment caused additional pain and suffering).

parties seem to agree, a showing of intentional discrimination is critical to proving this claim. *Bohen v. City of Chi.*, 799 F.2d 1180, 1186–87 (7th Cir. 1986); *Chavez*, 251 F.3d at 645; *Doe*, 782 F.3d at 919.

Defendant argues that Plaintiffs' equal protection claim must be dismissed because there is no evidence of discriminatory intent against hearing impaired inmates. (SJ Mem. at 15.) Plaintiffs respond that they can establish intent through the circumstantial evidence of "ongoing knowledge of the disparity in treatment." (SJ Resp. at 15 (citing *Flynn v. Doyle*, 672 F. Supp. 2d 858, 877 (E.D. Wis. 2009)).) In other words, Plaintiffs suggest that simply because IDOC has treated hearing impaired inmates differently from hearing-abled inmates for an extended period of time, the fact finder can reasonably conclude that the disparity in treatment was based on their disability. We agree that discriminatory purpose can be proved through direct or circumstantial evidence. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S. Ct. 555, 564, (1977); *Williams v. Sheriff*, 342 F.3d 774, 788 (7th Cir. 2003); *Kaupas v. Vill. of Univ. Park*, 2 C 3674, 2003 WL 22048173, at *5 (N.D. Ill. Sept. 2, 2003). "Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group." *Nabozny*, 92 F.3d at 453–54 (internal quotation omitted); *see Chavez*, 251 F.3d at 645; *Anderson*, 284 F. Supp. 2d at 1038. Plaintiffs cannot succeed with proof merely that Defendant was negligent or even that he was aware of the consequences of IDOC's actions. *Nabozny*, 92 F.3d at 453–54 (internal quotation omitted); *Chavez*, 251 F.3d at 645. We do not agree that ongoing disparate treatment alone is sufficient to infer discriminatory intent under these standards. Since Plaintiffs have not presented evidence on which a reasonable trier of fact could

find that Defendant intentionally discriminated against Plaintiffs based on their hearing disabilities, Plaintiffs' equal protection claim is dismissed.

vi.      Fourteenth Amendment Right to Due Process

Finally, in Count VIII Plaintiffs allege that IDOC deprived them of their right to due process under the Fourteenth Amendment by not providing ASL interpreters during disciplinary investigations and hearings.  (Compl. ¶ 194; SJ Resp. at 15.)  A prisoner who alleges he was denied due process during disciplinary proceedings must establish that: "(1) he has a liberty or property interest that the state has interfered with; and (2) the procedures he was afforded upon that deprivation were constitutionally deficient."  *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S. Ct. 1904, 1908 (1989)).  Defendant does not seem to dispute, at least for the purposes of summary judgment, that Plaintiffs can establish a liberty interest.  Indeed, the Seventh Circuit has held that inmates have a liberty interest in good-time credits, which are often at issue in disciplinary hearings. *Scruggs*, 485 F.3d at 939; *Montgomery v. Anderson*, 262 F.3d 641, 644–54 (7th Cir. 2001).

Instead, Defendant contends that the record does not support a finding that IDOC systemically denies hearing accommodations in these settings.  (SJ Mem. at 15; SJ Reply at 15.) In other words, Defendant argues that the procedures IDOC affords to hearing impaired inmates are constitutionally sufficient.  Due process requires that prisoners in disciplinary proceedings be given the opportunity to be heard by an impartial decision maker, advance notice of the disciplinary charges against them, an opportunity to call witnesses and present evidence, and a written statement of the evidence relied on and the reasons for the disciplinary action.  *Scruggs*, 485 F.3d at 939; *Burton v. Davis*, 41 F. App'x 841, 843–44 (7th Cir. 2002).  In addition, the Seventh Circuit has held that in a criminal proceeding, due process is denied when a defendant is

unable to comprehend the proceedings because of language barriers. *United States v. Johnson*, 248 F.3d 655, 663 (7th Cir. 2001). Numerous district courts have extended this principle to inmates in disciplinary hearings on the theory that their liberty interest is akin to that of criminal defendants. *See Sandoval v. Holinka*, 9 C 33, 2009 WL 499110, at *3 (W.D. Wis. Feb. 27, 2009); *Clarkson*, 898 F. Supp. at 1049–50 (finding prison's failure to provide hearing accommodations to deaf inmates disciplinary, grievance and parole hearings constituted denial of due process); *Bonner v. Arizona Dept. of Corr.*, 714 F. Supp. 420, 425 (D. Ariz. 1989) (determining that deaf inmate had a due process liberty interest in a qualified sign language interpreter during disciplinary hearing proceedings); *see also Jacobo v. Holder*, 15 C 703, 2015 WL 4651525, at *3 (S.D. Ill. Aug. 5, 2015) (stating that the denial of a Spanish-English interpreter at a prison disciplinary hearing raised due process concerns).

We agree with these district courts and hold that hearing impaired inmates who are not fluent in English may have a due process right to a qualified interpreter at prison disciplinary hearings. Although Plaintiffs again fail to cite to the record to support their contention that IDOC systemically denies ASL interpreters during disciplinary hearings, we will give them the benefit of the doubt and refer to their statement of facts.

First, we are skeptical as to whether IDOC's process for determining whether an inmate needs an ASL interpreter to be adequately heard is sufficient. Mr. Graham, IDOC's Adjustment Committee Chairman, testified that when an offender at a disciplinary hearing indicates that he is hearing impaired, the Adjustment Committee makes an impromptu determination as to whether he can communicate sufficiently. (Pls' SOF ¶ 32(C); Graham Dep. at 67–69, 74–75.) Mr. Graham himself has never received ADA training specific to this role. (Graham Dep. at 73.) According to Plaintiffs' expert Professor Cokely, deaf individuals' communication capabilities

are often misunderstood by the hearing-abled community.  (*See* Cokely Rpt. at 18–23.)  Thus, we find it possible that quick and ill-educated judgments could very easily lead a hearing officer to improperly conclude that an inmate can adequately communicate when in fact he cannot.

Moreover, the record is scattered with incidents of hearing impaired offenders being denied hearing accommodations during disciplinary proceedings, both before and after the 2012 ADA Directive.  As cited in our recitation of the facts, a number of Plaintiffs testified that they were not able to fully understand the proceedings, and many were disciplined as a result.  For example, IDOC denied Plaintiff Johnson's request for an ASL interpreter at his May 13, 2014 disciplinary hearing.  (Johnson Suppl. Interrog. No. 6.)  Johnson testified that he did not fully understand the hearing, and did not understand why IDOC denied his request to have two officers testify as witnesses.  (*Id.*)  Johnson also recalls a separate disciplinary hearing where he did not have an ASL interpreter present and his hands were handcuffed behind his back preventing him from using gestures to communicate.  (Johnson Interrog. No. 7.)  In the presence of this evidence, we cannot conclude that IDOC's policies and practices regarding hearing accommodations at disciplinary hearings afford hearing impaired inmates sufficient due process as a matter of law.  There are at least disputed issues of fact as to whether IDOC's procedure for determining whether an ASL interpreter is needed is sufficient to protect inmates' due process rights, and whether this process has in fact led to deprivations of hearing impaired inmates' liberty interests.  Accordingly, Defendant's motion on Count VIII is denied.

## CONCLUSION

As explained herein, Defendant's motion to exclude the expert testimony Elizabeth Stanosheck as unreliable is denied with prejudice and his motion to exclude her testimony as cumulative is denied without prejudice.

In addition, we find that Plaintiffs have satisfied the class certification requirements of Rules 23(a) and 23(b)(2). Daniel Baxter and Curtis Foster, however, are inadequate class representatives and are dismissed from the case. Plaintiffs' motion for class certification is granted with our modification to the class definition as stated in Section II(B) of our discussion.

Finally, Defendant's motion for summary judgment is denied in part and granted in part. Summary Judgment is denied as to Counts I (ADA), II (Rehabilitation Act), III (RLUIPA), V (free exercise), and VIII (due process), and is granted as to Counts IV (free speech) and VII (equal protection). As for Count VI (cruel and unusual punishment), summary judgment is granted to the extent the claim is based on Plaintiffs' allegations that IDOC placed them in communicative isolation and failed to notify them of non-emergency events, and is denied as to Plaintiffs' allegations that IDOC failed to notify them of emergency events and to provide adequate medical care.

Accordingly, Counts IV and VII are dismissed, as are the aspects of Count VI related to communicative isolation and non-emergency notifications. The case will proceed as a class action on Counts I, II, III, V, VIII, and the remaining aspects of Count VI.


It is so ordered.


_____
Marvin E. Aspen
United States District Judge


Dated: October 8, 2015
      Chicago, IL