**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RALPH HOLMES, *et al.,* on behalf of themselves and all others similarly situated, ) ) ) | |
| Plaintiffs, ) | Case No. 11 C 2961 |
| ) | |
| v. ) | Magistrate Judge Young B. Kim |
| ) | |
| ROB JEFFREYS, Director of the Illinois Department of Corrections, ) ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' RENEWED**
**ENFORCEMENT MOTION REGARDING AUDIOLOGICAL EVALUATIONS**

Plaintiffs fail to understand the Seventh Circuit's ruling on the issue of the timing of audiological evaluations. More specifically, they fail to understand what the Seventh Circuit meant by "best efforts." This failure renders meaningless the core of Plaintiffs' argument, and as a result the rest of Plaintiffs' renewed enforcement motion focuses on the wrong standard to assess Defendant's actions.

**ARGUMENT**

**I.** **Plaintiffs' principal error is that they do not understand the Seventh Circuit's ruling on the timeliness issue.**

Plaintiffs originally asked this Court to read into the settlement agreement a 60-day deadline for evaluations to take place, [ECF No. 539, Pls.' 1st Mot. at 2], and at first Plaintiffs succeeded in obtaining a 90-day deadline. [ECF No. 573, Order of June 8, 2020, at 11.] However, the Seventh Circuit's ruling on the timeliness issue must guide the outcome on remand. The panel stated that courts should not re-write contracts, such as settlement agreements or consent decrees, to add terms that "easily could have been included in the contract but were not." *Holmes v. Godinez,* 991 F.3d 775, 780 (7th Cir. 2021).

In reversing this Court's 90-day deadline, the panel expressly found that there is no timeliness component to the requirement for those in the custody of IDOC to see an audiologist for evaluation. *Id.* at 782 (determination that evaluations had to be completed "within a specific timeframe" was "a bridge too far" because IDOC did not agree to that requirement). The panel was equally clear about what IDOC's actual obligation is regarding the provision to refer individuals to audiologists: "it must use its best efforts to actually 'send' its inmates in need to an audiologist so that the evaluations can be performed." *Id.* Because the panel found that there is no timeframe attached to this requirement, this means that IDOC must ensure that individuals in custody who fail a hearing screening are in fact sent to an audiologist for an evaluation (but not within any specific deadline).

The panel was also clear about what it meant by "best efforts." It likened the term to the "exercise of good faith implied in all contracts" under Illinois law. *Id.* Thus, it is important in this case for this contract term to be properly understood. It is an implied covenant of every contract (unless disavowed by the parties) that "requires a party vested with broad discretion to act reasonably and not arbitrarily or in a manner inconsistent with the reasonable expectations of the parties." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 395 (7th Cir. 2003); *see also Gore v. Indiana Ins. Co.*, 376 Ill. App. 3d 282, 286 (1st Dist. 2007) (setting forth same definition of covenant). A good illustration of this covenant can be found in *McCleary v. Wells Fargo Securities, L.L.C.*, 2015 IL App (1st) 141287, ¶ 22 (2015), where the court reversed the dismissal of a contract claim because the plaintiff-employee might have been able to prove that the defendant-employer abused its discretion to deny the plaintiff a bonus despite his satisfying all the bonus requirements actually set forth in the contract.

Yet, the covenant of good faith "does not allow a party to read an obligation into a contract that does not exist." *Suburban Ins. Services, Inc. v. Virginia Surety Co., Inc.*, 322 Ill. App. 3d 688, 693 (1st Dist. 2001) (rejecting argument that failure to pay renewed commission violated covenant of good faith, where contract contained no obligation for such payment). As such, the question here is whether IDOC has exercised "best efforts" to perform its obligation under the agreement to refer inmates for audiological evaluations, which, as the Seventh Circuit held, does not include ensuring that the evaluations "are completed within a specific time frame." *Holmes*, 991 F.3d at 782.

What, then, is within IDOC's discretion under the settlement agreement with respect to the audiological evaluations? It is not the 30- or 45-day timeframe to make the referrals – neither side disputes that this is a hard deadline. It is also not the requirement to make referrals at all – neither side disputes that IDOC must make referrals to audiologists when an individual in custody fails a hearing screening. Rather, the discretion is in "'send[ing]' its inmates in need to an audiologist so that the evaluations can be performed," *id.*—that is, turning the referrals into actual appointments that take place because individuals in custody obviously cannot take themselves.

The panel provided a definition of a "referral" that helps to some extent here. It cited *Merriam-Webster* dictionary for the definition of referral as "to send or direct for treatment." *Holmes*, 991 F.3d at 782. However, this does not provide the parties or this Court with an answer as to when a referral takes place. A referral cannot mean when the patient is physically taken to the audiologist's office. The settlement agreement says the referral must be 30 or 45 days after a failed hearing screening, and the panel plainly did not say that the appointment must take place within these timeframes. Another recent Seventh Circuit case provides more guidance. In *Stop Ill. Health Care Fraud, LLC v. Sayeed*, the court explained that the definition of referral is broad and

can encompass the point where a doctor approves a patient for services to be performed by another doctor. 957 F.3d 743, 749-50 (7th Cir. 2020); *see also United States v. Patel*, 778 F.3d 607, 613-14 (7th Cir. 2015) (a referral happens when a doctor approves a patient for additional care from some other doctor as part of a gatekeeping role).

IDOC's Rule 30(b)(6) witness testified that a referral for an audiological evaluation is made at the time that a Wexford doctor signs off on the need for an evaluation. *See* Exhibit A, Deposition of Ryan Nottingham, at 141:4-145:15. That position is undoubtedly correct in light of the case law set forth above. Nottingham also testified as to various steps that occur once a Wexford doctor makes a referral: the referral form is transmitted to "WexCare", the central database for Wexford, a tracking number is attached to the referral, and then a scheduler at the relevant facility contacts an audiologist or multiple audiologists until an appointment is secured for some date certain in the future. *Id.*, at 135:11-141:3. The timeframe for all these steps varies, but Nottingham testified that, in general, it might take between one and three days for a referral to be entered into the system to get a tracking number, and then it typically takes between one and four additional days for the actual appointment to be booked with a willing audiologist. *Id.*, at 138:4-10; 139:20-141:3. There is no dispute that all that is left at that point is for IDOC to physically transport the individual in custody to the audiologist on the scheduled date.

IDOC and Wexford are clear that they have no interest in delaying the dates of audiological evaluations, and IDOC's interrogatory answers include information received from Wexford that it makes appointments with whichever audiologist can see an individual in custody the soonest. *See* Exhibit B, Defs' Am. Answers to Pls' Rogs., ¶ 25. Moreover, Defendant will discuss below some of IDOC and Wexford's ongoing improvement efforts that have yielded very positive developments including significantly lowering wait times. These improvements go beyond the

requirements in the settlement agreement and help ensure that patients are seen as soon as possible. Ultimately, there is no specific timeframe in the settlement agreement within which patients must be seen by an audiologist after a referral is made. The Seventh Circuit panel in this case found that IDOC's obligation is to use its best efforts to turn referrals into actual appointments. However, the panel notably stopped short of articulating a specific timeframe. Instead, the Seventh Circuit stated that IDOC could not "sit on its hands." *Holmes*, 991 F.3d at 783 ("we've already determined that IDOC's obligation to refer inmates in need carries with it a correlating obligation to use its best efforts to see that the inmate is actually sent to an audiologist for an evaluation. So IDOC can't sit on its hands as Plaintiffs fear."). As noted above, that determination did not involve any sort of timeframe. *Id.* at 782 (finding that IDOC did not agree to have evaluations completed "*within a defined period*") (emphasis added).

**II.    Plaintiffs fail to present any evidence that IDOC is violating its "best efforts" obligation as the Seventh Circuit defines that term.**

Based on the Seventh Circuit's ruling, IDOC would be "sitting on its hands" only if it failed, on a systemic basis, to ever physically bring individuals in custody to see audiologists. That would be the abuse of discretion. *See id*. at 783 (acknowledging that IDOC's interpretation of the agreement would only lead to an absurd result if it allowed IDOC to make referrals but never actually turn the referrals into actual visits). The evidence to show this failure could include some or all of the following, for example: that Wexford doctors are filling out referral forms but no one is bothering to do anything else with them; that referral forms are given numbers and sent to the schedulers, but the schedulers refuse to make calls; or that the schedulers are making appointments but facilities as a matter of practice are refusing to take patients to these appointments.

Plaintiffs did not, and cannot, produce any evidence that IDOC and Wexford are doing any of these things or are otherwise acting in bad faith in sending any individual in custody to

audiological evaluations, or will act in bad faith for any individual in custody currently on the wait list for an evaluation, let alone that it is doing so on a systemic basis. In their original motion, Plaintiffs simply complained that certain facilities had wait times that exceeded three months. [Pls' 1st Mot. at 8-9 (citing wait times of seven to eight months at five facilities and three to five months at three facilities).] The Seventh Circuit even noted that the record before it contained nothing to "show[] that IDOC has engaged in the conduct that Plaintiffs complain might one day occur." *Id.* at 783-84.

In their renewed motion, Plaintiffs have not pointed to any evidence that IDOC failed to send any individual in custody to see an audiologist or otherwise interfered with this process. To the contrary, Plaintiffs' own Exhibit A establishes that IDOC is indeed sending (or will send) every eligible individual in custody to an audiologist. Although Plaintiffs obviously use this exhibit to demonstrate wait times they deem excessive, the document instead demonstrates IDOC's clear compliance with the requirements of the settlement agreement. [ECF No. 701-2, Pls. Renewed Mot., Ex. A.]

Plaintiffs could not have been surprised when preparing Exhibit A, given that they have been receiving periodic reports from IDOC showing that individuals in custody have been scheduled for evaluations and are being taken to these evaluations, notwithstanding a global pandemic that has delayed the provision of medical care. [ECF Nos. 546, 592, 640, 654, and 691, Status Reports of April 2020, July 2020, December 2020, March 2021, and August 2021,[1] each reflecting that IDOC separately transmitted a large volume of documentation to Plaintiffs, including information on when evaluations are scheduled and when they took place.] Further,

---

[1] These are just the status reports that Defendant filed since Plaintiff's first motion. Defendant filed four previous status reports that also reflected the eventual occurrence of evaluations.

Plaintiffs' motion contains no evidence to suggest that individuals in custody currently waiting for their appointments will be denied an appointment.

Defendant's December 2021 status report further underscores this point. Exhibit E of the report (not filed, only produced to Plaintiffs, and so attached here as Exhibit C), states that between the August 2021 report and this latest report, IDOC slashed the number of those waiting for audiology appointments from 312 individuals in custody to 205 individuals in custody. Additionally, as of December 1, 2021, only 29 individuals in custody have been waiting longer than 90 days. *See* Exhibit C. These numbers certainly align with the average wait time numbers that Plaintiffs compiled from Defendant's August 2021 report. [Pls. Renewed Mot., Ex. A, reflecting that the average system-wide wait time fell below two months by April 2021 and was just over a month by June 2021.]

Thus, Plaintiffs have failed to show any evidence that IDOC has "sat on its hands." Rather, the evidence overwhelmingly shows that IDOC has made significant and demonstrable improvements in efficiently turning audiology referrals into appointments.

## III. Plaintiffs' focus on potential changes to the evaluation process do not align with the settlement agreement or the Seventh Circuit's ruling.

Plaintiffs' interpretation of IDOC's "best efforts" obligation is completely unmoored from the Seventh Circuit's decision and principles of contract law. They believe that IDOC must go beyond the settlement agreement and take every conceivable action to actually increase the number of audiologists willing to see individuals in custody such that wait times for evaluations are in fact brought down to, or as close to as possible, their preferred, but arbitrary, deadline. As explained above, this is simply a back door attempt to have the previously requested but denied 60-day deadline re-inserted into the settlement agreement. The Seventh Circuit has already made clear why this is improper.

Plaintiffs argue in their renewed motion that IDOC was required to either hire an employee audiologist or bring audiologists onsite to prisons at the earliest possible point in time. [ECF No. 703, Pls. Renewed Mem. at 16-22.] These possible steps are irrelevant. The dispute here concerns one sentence in the settlement agreement: IDOC has to make referrals after failed hearing screenings. The Seventh Circuit added, as noted above, that when a prison makes a referral it must actually send the individual in custody to an outside audiologist following the referral. IDOC did not agree to hire an audiologist to supplement the ranks of its outside vendors, and it did not agree to re-envision the evaluation process by having some or all evaluations done inside prisons (though IDOC has, independent of the settlement agreement, started doing some onsite evaluations with very positive results discussed below). The agreement plainly states that IDOC will send individuals in custody to see audiologists, and there is no other way to read this other than this will be done pursuant to IDOC's existing practice of using willing audiologists that Wexford is able to locate in the normal course of business (i.e. there is no provision for any sort of change in existing procedures). [*See* ECF No. 446-2, Settlement Agreement, ¶ 36.] What Plaintiffs couch as "best efforts" is, in reality, an attempt to, yet again, insert terms into the settlement agreement that were not negotiated, but could have been.

An additional note needs to be made about the employee-audiologist issue. There has been some testimony regarding a widespread practice in the audiological community of receiving compensation from hearing aid companies for selecting them to supply the hearing aid devices (*see, e.g.,* Exhibit D, Deposition of Kathleen Ohleger, at 163:16-164:22), but the parties have not spent much time trying to establish whether or to what extent this is true. As Defendant stated in his interrogatory answers, IDOC cannot employ an audiologist, or knowingly let its vendor employ an audiologist, who takes money from a hearing aid supplier. It is Defendant's position that this

would potentially place IDOC in the position of facilitating a violation of the gift ban included in the Illinois State Officials and Employees Ethics Act, 5 ILCS 430/10-10. *See* Exhibit B, ¶ 20.

However, Defendant does not believe that this Court needs to address this issue for the reasons outlined above. Instead of having negotiated terms such as hiring an on-site audiologist during the proper period, Plaintiffs are trying to insert these terms now, after the settlement agreement has been entered and agreed upon by all parties. The plain language of the agreement has no requirement that IDOC hire an on-site audiologist, thus Plaintiff's attempt to add such a term at this stage (as well as Plaintiff's attempt to cloak an additional term as enforcement of an existing agreement) is inappropriate.

**IV.   IDOC and Wexford have engaged in reasonable efforts since 2018 to locate willing audiologists to see the individuals in custody.**

The evidence in this case overwhelmingly establishes that IDOC and Wexford have exceeded IDOC's obligation regarding audiological evaluations under the settlement agreement (principally because the obligation was simply to make sure that offsite evaluations in fact happen without regard to a time frame). The evidence discussed below should be examined through the lens of IDOC's and Wexford's interest in finding as many audiology appointments as possible simply because it was a laudable penological goal and not because it was a requirement of the settlement agreement. IDOC believes it would be most helpful to this Court to break the relevant timeline into three parts: (1) from the start of the settlement agreement in July 2018 until the LHID use came to light one year later; (2) from July 2019 until the Fall of 2020; and (3) from the Fall of 2020 to the present.

**A.   First Year of Settlement Agreement**

The first year after the settlement agreement does not require much attention. The agreement contains no terms about immediate efforts to increase the supply of outside audiologists.

The agreement established a new procedure guaranteeing audiological evaluations for a category of individuals in custody. Thus, the Parties were plainly on notice that *some* increase in demand for such a service would be seen. Nevertheless, as argued above, this Court cannot add a term to the contract requiring any efforts to expand the list of outside audiologists. To do so here would be reversible error.

Plaintiff's Exhibit B reflects that there were nine audiological groups throughout the state that stood ready to handle audiological evaluations. [Pls.' Renewed Mot., Ex. B.] Defendant would have had no reason to intervene during the first year, as it had no notice that Plaintiffs had any problems with the timing of evaluations. Notably, Defendant submitted required status reports to Plaintiffs and this Court that included information on audiological evaluations. [ECF Nos. 459 (November 2019 Report), 481 (March 2019 Report), and 495 (July 2019 Report).]

By default, it was Defendant's understanding that Wexford would continue to handle provider contracting as it had already been doing for each and every medical and mental health service under its contract with IDOC. Wexford previously provided Defendant with a declaration stating that Wexford staff had contacted almost 100 audiologists over a roughly two-year period with some limited success [ECF No. 548-1, ¶¶ 7-11].[2] As Wexford's 2020 declaration and Plaintiff's Exhibit B state, Wexford was able to identify two additional providers shortly after the settlement agreement went into effect, both of which were located downstate (more on the importance of geographical location is discussed below).

---

[2] Defendant is a little unclear about Wexford's timeframe. The declaration, written in April 2020, discusses efforts starting in the Fall of 2018. However, it also mentions success in signing up some practices that Wexford reported were available as of the date the settlement agreement was executed. [*See* Pls.' Renewed Mot., Ex. B.] Defendant does not think this uncertainty is material. The important point is that Wexford was not sitting on its hands and in fact reported that its "stepped up" efforts to do outreach to providers had some modest results. And, indeed, former contracting specialist Katie Smith testified that she was looking for more audiologists even before the settlement agreement. Exhibit E at 34:13-22.

Two email chains produced in discovery reflect that IDOC and Wexford continued to look into expanding the ranks of audiologists beyond the two new additions (again, not to satisfy any obligation under the settlement agreement in this case, but simply to improve the timing for efficiency reasons). On February 8, 2019, contracting specialist Katie Smith noted to her colleagues that providers were seeing a volume increase across the state and were doing what they could to keep up. *See* Exhibit F. Her supervisor, Kathleen Ohleger, responded that providers all have limits on how many appointments to offer and that Wexford was "doing the best that we can to identify providers that are willing to see these inmates." *Id.* On February 11, 2019, an IDOC facility health care unit administrator emailed Karen Jaimet, IDOC's agency ADA coordinator, to discuss a downstate provider's recent limitation on how many individuals in custody it would see. The administrator relayed some advice that Wexford was providing to the facility, and then he asked Jaimet "[i]s there anything else we can do to try to get these guys scheduled?" *See* Exhibit G.

It is not even clear that IDOC should have been on notice of a problem during the first year of the agreement. Smith, Plaintiffs' witness, testified that the use of LHIDs meant that the scheduling situation for evaluations did not seem alarming[3] during this time period (Exhibit E at 181:8-19), and Plaintiffs' Exhibit A reflects that the average wait time across the IDOC system was four and a half months [Pls.' Renewed Mot., Ex. A] – not much longer than the deadline that this Court originally imposed. As noted above, Plaintiffs did not complain about timeliness until the second year of the agreement.

---

[3] Obviously, once the use of LHIDs came to light later, the situation would indeed seem quite different.

### B.     Second Year of Settlement Agreement

Plaintiffs' Exhibit B also reflects some success in the second year after the settlement agreement. Three additional willing practices were located and formally brought on board – one in August 2019, one in January 2020, and one in May 2020. [Pls. Renewed Mot., Ex B.] These additions were the result of Katie Smith's continued efforts to locate providers. On July 25, 2019, after the LHID issue came to light, Smith contacted IDOC facility staff state-wide and informed them that she would be reaching out to audiologists on a comprehensive basis across the state and wanted the assistance of all facilities. *See* Exhibit H. Her email states that she wanted everyone to hold off with immediate responses so that she could contact everyone directly, but the responses that she received the same day anyway reflect that this issue was top of mind for several facilities. *Id.* One facility staff member responded a few days later with a report that she had contacted five possible audiologists in the southern region, and four would either not respond or stated they would not take individuals in custody (there was no indication that the fifth made any commitment to see individuals in custody at that time). *Id.*

Email exchanges among IDOC facility and Wexford staff from August 2019 describe how facilities at the southern end of the state were faced with no willing audiologists closer than the St. Louis area. Katie Smith replied to a colleague, "[t]here are no additional providers to add this list at this time, despite my numerous calls and inquiries." *See* Exhibit I. An email from August 23, 2019, reflects that IDOC understood the pressing need for more audiologists. *See* Exhibit J (IDOC Medical Director stated that "[t]his is on the radar at the highest levels of IDOC. Hopefully, we can get this sorted out soon.")

Smith's efforts paid off to some degree. She had some success even in September 2019, and one email notes that she was able to sign up a provider who would provide services to Menard

Correctional Center. Exhibit K (from looking at Plaintiffs' Exhibit B, it appears that this was a reference to Advanced Hearing Systems, which formally came on board as a provider in January of the following year). Smith was trying to reach Carle Richland Audiology in Olney, Illinois, in November 2019 to help with certain downstate facilities and finally had success getting this practice into the fold. Exhibit L (from looking at Exhibit B it appears that this was a reference to Richland Memorial Hospital, which formally came on board as a provider in May of the following year).

Wexford also engaged in efforts that did not yield success, but that was to be expected. For instance, in December 2019 someone from a facility passed along a recommendation to contact an audiologist named Dr. Lane (though no Dr. Lane was ever signed up). *See* Exhibit M. Even into January 2020, Smith was still working with facilities and reaching out to possible providers in the applicable areas. For instance, Pinckneyville staff supplied ten possible providers, and Smith eventually sent back her notes containing the results of her efforts: there were no new prospects – the providers were either uninterested, could not be reached, or were only LHIDs. *See* Exhibit N.

More importantly, there is no evidence that individuals in custody were not being added to the line to see audiologists or that individuals in custody were not in fact seeing audiologists when their turn in line came. When Plaintiffs brought their motion to enforce in March 2020, they only complained about the use of LHIDs and the length of time it was taking to get individuals in custody to their evaluations. They did not allege that IDOC was refusing or unable to send individuals in custody to the evaluations at all.

## C.    Third and Fourth Years of the Settlement Agreement

Plaintiffs are critical of the timing of Wexford's main project in the third year after the settlement agreement – the substantial, all-hands-on-deck effort by the contracting team to attempt

to contact every audiologist in Illinois and invite them to work with IDOC's individuals in custody. It is clear that Plaintiffs do not understand the genesis of this project or what its results mean.

Plaintiffs are very focused on why the project only started in the Fall of 2020 and not earlier. [Pls. Renewed Mem. at 31.] It is plainly their view that IDOC was obligated to contact every audiologist in the state promptly in mid-2018 and that the failure to do so constitutes an automatic violation of the settlement agreement. This is absurd. Defendant is not aware of any legal authority in any jurisdiction holding that a state correctional agency must locate and make attempts to contact every specialist practicing in that state in order to fulfill an obligation to send individuals in custody out for a particular evaluation without regard to any set time frame. Stated differently, there is no such legal or contractual authority for this argument.

Wexford's state-wide effort was an extraordinary undertaking, and it was performed in direct response to the sweeping statement Plaintiff's expert made about what IDOC and Wexford should be doing. Dr. Cavitt dismissed the previous effort to contact only a portion of audiologists as insufficient and opined that all 871 audiologists statewide needed to be contacted. [ECF 539-1, Declaration of Dr. Kim Cavitt, Ex. A, ¶ 26.] As noted above, Wexford previously reported in April 2020 that it had reached out to nearly 100 audiologists since 2018 with very limited success. It was the conclusion of IDOC counsel that Defendant should direct Wexford to follow Dr. Cavitt's opinion in order to see whether there was any wisdom in her pronouncement.

As it turned out, the answer was that there was not much wisdom. However, it must be noted that the record is clear that Wexford engaged in extraordinary efforts anyway to do more than what was required by the settlement agreement. The job of finding specialists in Illinois has typically been handled by one person. *See* Exhibit O, ¶¶ 6-11. Starting in the Fall of 2020, Wexford added its entire contracting team (four additional individuals) to this special project. *Id.* Testimony

in this case has demonstrated that these contracting specialists (1) obtained a list of all audiologists licensed to practice in the state from the state licensing board, (2) isolated the name of providers who were actually located in the state; (3) conducted research to see which providers were actually still practicing, (4) called every audiologist who was still practicing in this state, and (5) ultimately turned over information on potentially interested providers to Smith (and ultimately to Ohleger, the Wexford official responsible for finalizing outside provider hiring). [Pls Renewed Mem. at 30-31.] Plaintiffs' Exhibits G9 and G82 are the consolidated excel spreadsheets that contain the team's notes taken for every contact. Even at the initial contact step, the team encountered numerous instances of providers who could not be reached, were not taking new patients at all, were not interested in working with individuals in custody specifically, or who were engaged in a specific type of employment that did not allow them to see patients. [*See, e.g.,* Pls. Renewed Mot., Ex. G9 at 25-34, Lines 3, 10-13, 28-29, 30-31, 34-35, 37 (pediatric audiology only); Lines 32, 65 (veterans audiology only); Lines 6-9, 14, 44, 48-51, 53, 55-59, 61, 64, 74, 93 (no interest in serving individuals in custody); Lines 40, 86-87 (academic or research employment only).]

Plaintiffs' Exhibit B provides the ultimate answer to the success of this project, which resulted in eleven[4] new provider groups.[5] [Pls.' Renewed Mot., Exhibit B.] Yet, it is important to focus here on the fact that long wait times have always been mainly a problem affecting downstate facilities. Plaintiffs' Group Exhibit D (filed under seal) reveals that wait times over the length of the post-settlement agreement period have been an issue in eleven facilities in the central and

---

[4] Plaintiffs' Exhibit B has twelve new entries for the third year after the settlement agreement, but one entry has no connection to the state-wide project, as discussed below.

[5] Plaintiffs mention that a third of all audiologists contacted in the Fall of 2020 expressed some interest in working with Wexford, but interest stated on one phone call, possibly by an employee who does not have decision-making authority, has little relevance here. It is only the provider groups that actually agreed to be used that matter.

southern portion of the state. [*See* Exs. D-1 (Big Muddy), D-2 (Danville), D-7 (Graham), D-8 (Hill), D-9 (Illinois River), D-13 (Lawrence), D-14 (Lincoln), D-16 (Menard), D-18 (Pinckneyville), D-21 (Shawnee), and D-27 (Vienna).] Two facilities in the northern region also have had wait time issues, but it is critical to note that as of the time the state-wide project began, Dixon's wait time had already fallen from 331 days in February 2020 (right before the Covid-19 pandemic cancelled specialist appointments for the general public in addition to individuals in custody) to 165 days in October 2021, and Stateville's wait time had fallen steadily from a high of over 324 days in October 2019 to under 61 days in October 2020. [*Id.*, D-4, D-24.] In other words, when Wexford began this extraordinary effort to satisfy the demands of Plaintiffs' expert, the wait time issue was truly a downstate issue.

This is very relevant to Wexford's state-wide project because the team mainly reeled in providers who can do little to help at the downstate facilities. Plaintiffs' Exhibit B shows that Wexford signed up nine providers located no further south than Kankakee. [Pls.' Renewed Mot., Ex. B (reflecting entries for new providers in Oak Park, Gurnee, Libertyville, Chicago, Wheaton, Ottawa, Rock Island, Morris, and Streator).] That leaves just two downstate providers that were added through this substantial project: one in Peoria (central), and one in Greenville (southern). *Id.*

There is testimony in this case regarding general limitations that prison wardens place on the distance that individuals in custody can be sent for outpatient specialty care. Exhibit D, Deposition of Kathleen Ohleger, at 147:16-148:2; 151:9-152:152-18 (reflecting that Wexford typically tries to find specialists so that a round trip would be less than six hours and thus more reasonable in light of IDOC wardens' policies); *see* also Exhibit O, ¶ 28. The settlement agreement does not contain any provision concerning any obligation to deviate from a general policy to keep

trips involving individuals in custody to a reasonable distance. This policy, which is based on obvious staffing and security issues, cannot be upended by reading into the settlement agreement a requirement to send individuals in custody on trips that could take anywhere from six to ten hours.

This state-wide project yielded just two downstate providers that could potentially address wait time issues. IDOC is grateful that Wexford and its contracting team undertook this project, but there is no reason to believe that Wexford would not have found two new providers over the course of the third year just by continuing to do what it normally did: rely on the assigned contracting specialist to reach out to providers in the relevant regions in the normal course of business. This is precisely what Katie Smith did for the first two years after the settlement agreement.

Finally, Defendant addresses the dispute between Smith and Ohleger in more detail in Section VI, but one aspect should be addressed here. Plaintiffs complain about how Ohleger apparently made a statement to her colleagues about how she hoped that no audiologists from Cook County were interested in working with Wexford. [Pls' Renewed Mot. at 33; ECF No. 701-73, Ex. G68.] However much Plaintiffs found this statement to be abrasive, there is nothing wrong with the sentiment considering everything explained in this section. Ohleger has been finding medical providers for IDOC for sixteen years, and she is aware of IDOC wardens' policies on reasonable time limits on the transportation of individuals in custody. As noted above, by the Fall of 2020, Stateville and Dixon were already enjoying dramatic improvements in wait times. The problem, to the extent it still existed, was entirely a downstate concern.

Further, the statewide project, designed to include Cook County, was not something that Ohleger had recommended (i.e. IDOC's litigation team wanted the entire state canvassed in direct

response to Plaintiffs' expert). Thus, it was completely reasonable for Ohleger to conclude that Cook County audiologists were of very little use to IDOC because the downstate wardens would not, and could not, transport individuals in custody to that county. In other words, who could blame the contracting expert for not wanting the valuable time of her entire team to be spent calling audiologists who could not address the specific area of need?

## V.     IDOC has substantially resolved the wait time issue.

It is interesting that Plaintiffs say very little about the current state of wait times, even though their exhibits plainly show that this issue has been substantially resolved. As noted above in Section II, Plaintiffs acknowledge that IDOC's system-wide average wait time as of June 2021 was just over one month. Their Group Exhibit D reveals that the wait times for 19 facilities [D1-7, 9-12, 15, 17, 19-20, 22, 24-26] as of that month were no higher than 72 days; that for five additional facilities (Hill [D8], Lincoln [D14], Menard [D16], Pinckneyville [D18], and Southwestern [D23]) the last calculated wait time was of limited significance because there were no reported evaluations needed after January 2021; and, that the wait times for the last four facilities (Lawrence [D13], Shawnee [D21], Vienna [D27], and Western Illinois [D28]) were similarly of limited significance because they covered a mere ten evaluations after January 2021.

Defendant's most recent status report, as referenced above, shows that the situation has only improved further. Exhibit E to that report notes how IDOC reduced its list of those waiting for audiology from 312 individuals in custody to 205 individuals in custody from June 2021 to December 2021, and that only 29 individuals in custody have been waiting more than 90 days. *See* Exhibit C. Notably, of the nine facilities that had the longest wait times as of June 2021, three facilities now have no individual who has been waiting more than 90 days. *Id.* (Southwestern, Vienna, and Western Illinois). The other six facilities now report between 1 and 7 individuals in

custody who have been waiting that long. *Id*. (Hill, Lawrence, Lincoln, Menard, Pinckneyville, and Shawnee).

There are two developments that are responsible for the dramatic improvement in wait times, and both involve efforts undertaken above and beyond IDOC's obligations under the settlement agreement.

First, the December 2021 status report provides this Court and Plaintiffs with an update on the use of onsite audiologists, whose willingness to travel to facilities (as opposed to requiring patients to be brought to them) eliminates any issue with limiting the number of individuals in custody who can be transported offsite at any given time. [ECF No. 707, December 2021 Status Report at 4.] Thus far, IDOC and Wexford have secured two audiology groups to work with. One was identified during the state-wide project, is based in Wheaton, and has agreed only to work at Dixon and Stateville in the northern region of the state. *See* Exhibit D, Deposition of Kathleen Ohleger, at 179:19-180:10; Pls.' Renewed Mot., Ex. B (reflecting that Wholistic Hearing Care in Wheaton only works at these two facilities). The second provider group is now working at all remaining facilities, including all central and southern facilities that had the most difficult time finding providers. As Plaintiffs' Exhibit B shows, that provider group is based out of New Jersey, and Kathleen Ohleger testified that she was able to convince them to supply an Illinois-based audiologist while working with them on a contract for a different state that Wexford services. *See* Exhibit D at 180:14-181:1. So, IDOC and Wexford (and the Class) benefitted from Wexford's efforts for another state's contracting needs. IDOC is pleased with the progress that onsite evaluations have achieved, but this has nothing to do with the one sentence in the settlement agreement that is relevant here.

Second, Plaintiffs' Group Exhibit D plainly shows that the number of needed evaluations has dramatically fallen across the entire IDOC system. The numbers below come from the specific form tied to eleven facilities (representative of where most of the wait time issue were) within this group exhibit, and they represent the number of failed screenings that required an evaluation for each of the first three years after the settlement agreement was reached (through June 2021 for the third year).

| Facility | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|
| Big Muddy | 139 | 70 | 2 |
| Dixon | 141 | 95 | 39 |
| Graham | 53 | 51 | 14 |
| Illinois River | 42 | 46 | 16 |
| Lawrence | 243 | 158 | 12 |
| Lincoln | 63 | 39 | 2 |
| Menard | 58 | 112 | 14 |
| Pinckneyville | 46 | 51 | 4 |
| Shawnee | 68 | 29 | 3 |
| Stateville | 64 | 122 | 19 |
| Vienna | 71 | 27 | 9 |

These numbers should not surprise anyone. The agreement provided the chance for a hearing screening not only to new individuals in custody upon intake, but to existing individuals in custody as well. Not surprisingly, the numbers above reflect that existing individuals in custody certainly made use of the benefits of the settlement agreement (i.e. the nearly 1,000 evaluations from this list alone did not result just from intake numbers). The numbers also strongly suggest that once IDOC worked through the pool of existing individuals in custody over the first two years,

all that remained to handle in the third year and going forward were new individuals in custody and perhaps a small segment of existing individuals in custody whose hearing started to fail only recently. Since there will not be a large pool of existing individuals in custody that request hearing screenings in the future, the current positive trend lines should only continue.

## VI. This Court should ignore all of Plaintiffs' arguments based on the unsupported and refuted testimony of former Wexford employee Katie Smith regarding her former boss.

Plaintiff's near total reliance on testimony from disgruntled former Wexford employee, Katie Smith, is notably peculiar. Wexford's counsel advised Defendant's counsel that Plaintiffs' counsel met twice with Smith, the former contracting specialist, prior to the Rule 30(b)(6) deposition of Wexford representative Kathleen Ohleger that took place on September 8, 2021. Yet, Plaintiffs' counsel did not ask Ohleger any questions about problems in the working relationship between her and Smith. *See* Exhibit D *generally* (Defendant represents to this Court that the 333-page transcript, covering about seven hours of testimony, contains nothing about such problems). Then, on September 17, 2021, Plaintiffs' counsel deposed Smith and asked her numerous questions about Smith's working relationship with Ohleger. Smith's answers are featured prominently throughout Plaintiffs' memorandum. [Pls. Renewed Mem. at 1-3, 22-29, 31-32, showcasing numerous statements by Smith that Ohleger overworked Smith, did not care about overworking her, retaliated against her for complaining about being overworked, did not care about finding audiologists, did not want to expand Wexford's efforts to find audiologists, did not believe that individuals in custody deserved free audiological services, did not believe that individuals in custody deserve any free medical care, and went so far as to sabotage Smith's efforts to find audiologists.]

There is no documented evidence to support anything that Smith said about Ohleger (beyond the out-of-context statements about Cook County audiologists explained above). When

Ohleger appeared for a follow up deposition (and sat for several hours, making her total time being deposed about ten hours), the undersigned counsel attempted to ask her a short series of questions to let her directly respond to the litany of allegations against her. Plaintiffs' counsel vigorously objected to this line of questioning and refused to let the deposition continue unless the Parties immediately contacted this Court. Plaintiffs' counsel also made it clear that even a short line of questioning about these statements must open the door to several more hours of deposition testimony on a third day. At that point, the undersigned counsel decided that this Court's time should not be wasted with this collateral matter and that Ohleger had spent enough being deposed after ten hours of questioning about calls made to audiologists.

Instead, Defendant simply attaches here an affidavit that Ohleger has provided in which she categorically denies Smith's allegations. *See* Exhibit O. It is only fair that a witness whose name and reputation were disparaged without a meaningful chance to respond should be able to at last have her voice heard in some way. To the extent that this Court wants to delve into a Wexford personnel dispute, it should at least have both sides of the story, despite Plaintiffs' counsel's attempt to prevent the same.

Defendant would like to highlight here a few points worth some discussion. Smith claimed that she made a formal complaint to Wexford's Human Resources Department about Ohleger's alleged statements and conduct. [Pls. Renewed Mem. at 25-26.] Yet, in response to Plaintiffs' subpoena, Wexford stated that is has no record of any such complaint by Smith. Exhibit P, at 2-3 (response notes that Wexford only had documents relating to Smith's resignation)[6]. Smith also claimed that Ohleger prevented her from bringing an audiology group into the fold for no reason other than apparently spite. *Id.* at 22. Ohleger's affidavit clears up what actually happened.

---

[6] Defendant has filed Wexford's actual document production under seal as Exhibit Q because these materials appear to be from Smith's personnel file and should therefore be treated as confidential.

Wexford had an existing contract with a company called Northland Hearing Center, and Northland bought a different company called Audibel. Exhibit O, ¶ 25. Both companies supplied LHIDs, and it was contemplated that a new contract could be reached with Audibel to supply audiologists. *Id.* However, Audibel was never able to locate any audiologists willing to work with Wexford. *Id.* Plaintiff's own memorandum acknowledges this point. [Pls. Renewed Mem. at 7 (noting that Northland/Audibel should not be included in the master list of audiologists because it never actually provided that service).]

Plaintiffs also make Smith's workload one of their centerpiece arguments. *Id.* at 23-27. Their argument is that Smith believed that it was too hard to handle provider contracting for Illinois all on her own, in addition to other work responsibilities, and so therefore it must be true that Defendant failed to ensure that Wexford was devoting enough resources to finding audiologists. It never occurred to Plaintiffs to inquire with anyone whether Smith had any reasonable basis for this belief. In reality, it was longstanding practice for one person to handle contracting for Illinois on a solo basis, in addition to sometimes handing other work responsibilities. Exhibit O, ¶¶ 5-15 (noting that Ohleger herself handled Illinois alone for six months, another contracting specialists handled Illinois alone for a year and a half, a third contracting specialist handled Illinois alone for six and a half years, and a fourth contracting specialist handled Illinois alone for over a year). Defendant never agreed to make changes in how its medical vendor staffed its contracting department when the settlement agreement was negotiated, so Smith's apparent disinterest in continuing to handle what others did for many years is completely irrelevant to this case.

Defendant must also note that Smith's testimony reveals an element of paranoia and conspiracy thinking. Smith testified that after she complained about Ohleger and her overall working conditions, someone at Wexford retaliated against her by dropping Smith's specific

asthma inhaler from the list of medications that Wexford covered for employees. Exhibit E at 49:9-51:7.

More fundamentally, the problem with the core of Smith's testimony is that Plaintiffs are asking this Court to believe that Ohleger, *whose entire job consists of helping to arrange medical care for individuals in custody* and has been doing this job successfully for sixteen years (Exhibit D at 20:18-22; 23:7-24:7, reflecting three promotions and no discipline), actually opposes the provision of medical care to individuals in custody and somehow decided after many years on the job to start wreaking havoc on just one specialty service out of countless forms of medical care and in just one state that Wexford covers.

In other words, Plaintiff's view of the Smith-Ohleger dispute relies on a diabolical scheme that involves a very specifically-targeted sabotage campaign, a phantom human resources complaint, and the need to trust a single witness who believes that her former employer was so enraged by a simple working conditions complaint that it cut off access to her medication. On the other hand, Defendant submits that the conflicting testimony here can be resolved by inferring that Smith was simply an employee who did not get along with her boss and decided to lash out with untruthful accusations. That Plaintiffs place so much emphasis on Smith's incredible testimony speaks volumes about the strength of their argument.

Finally, it must be noted that even if Ohleger made all the comments that Smith alleges, this entire issue is irrelevant. Whatever Ohleger personal beliefs are, the record is clear that Wexford has always maintained a list of willing audiologists in Illinois, that there has always been at least one contracting specialist dedicated to finding willing audiologists, that efforts were made to find willing audiologists throughout the course of the settlement agreement, and that Ohleger

spearheaded a tremendous state-wide effort that went above and beyond what the agreement required.

**VII.   Plaintiffs' complaint about IDOC oversight of Wexford is irrelevant, particularly with respect to the LHID issue.**

A sizable portion of the renewed motion consists of a complaint that IDOC failed to supervise Wexford's work in locating audiologists. [Pls. Renewed Mem. at 10-16.] For all the reasons set forth above, this complaint is meritless because IDOC was presented with no evidence that Wexford was acting in bad faith in conducting this process and, instead, has always known that individuals in custody are being sent to audiological appointments. Plaintiffs also know this fact as they have received status updates regarding the same since the settlement agreement was signed. Because, as illustrated above, IDOC has complied with the settlement agreement, Plaintiff's argument as to lack of oversight is irrelevant. It is also very clear that Wexford engaged in efforts, in the normal course of business, to locate new audiologists, in compliance with its extensive contract with IDOC. [ECF 701-26, Pls. Renewed Mot., Ex. G10, IDOC-Wexford Contract at 4 (noting that off-site audiological services are part of what IDOC is paying Wexford to provide to individuals in custody).] Because Wexford never violated the settlement agreement's provision on referring individuals who fail hearing screenings for audiological evaluations, there is no legitimate reason for this Court to fault IDOC for not duplicating Wexford's efforts in this area or providing the level of oversight Plaintiffs desire.

Plaintiffs also included a discussion of the LHID (licensed hearing implement dispenser) issue within this complaint. It appears that Plaintiffs are merely using Wexford's one-year use of LHIDs instead of audiologists to conduct evaluations as an example of IDOC's purported lack of oversight over Wexford. However, it is important to note that the LHID issue cannot form the basis of any finding against IDOC at this stage of the present dispute.

As this Court recalls, Plaintiffs' original motion raised two distinct issues: (1) IDOC's and Wexford's use of LHIDs instead of audiologists to perform numerous required evaluations for the first year after the settlement agreement's approval, and (2) the excessive wait times for class members at a few facilities to see audiologists as of March 2020. [Pls. 1st Mot. at 1-2.] Both issues related to whether IDOC substantially violated the agreement's requirement that individuals in custody who fail hearing screenings must be referred to audiologists.

IDOC previously reported to this Court that Wexford ended the practice of scheduling its patients to see LHIDs for evaluations as of August 2019, and Plaintiffs have never disputed this. [ECF No. 573, Order of June 8, 2020, at 3-4; ECF No. 548, Def's Resp. at 1-2, Ex. A, ¶ 3.] Nevertheless, over 18 months ago, this Court found that IDOC was previously in substantial non-compliance with the settlement agreement provision at issue for the year of the LHID usage, formally directed IDOC not to use LHIDs in place of audiologists going forward, ordered the re-evaluation of individuals in custody who saw LHIDs, and awarded attorneys' fees and costs as a sanction. [Order of June 8, 2020, at 8, 13 ("…the court finds that sanctions are warranted.").] IDOC appealed the award of attorneys' fees, but the Seventh Circuit affirmed this sanction. *Holmes v. Godinez*, 991 F.3d 775, 784-85 (7th Cir. 2021).

In other words, non-compliance with the relevant agreement provision with respect to the LHID issue has long been resolved. Defendants ended a practice that the court ultimately determined had violated the settlement agreement for a year, Plaintiffs then moved for sanctions as a punishment for the practice, this Court granted Plaintiffs' request for sanctions and an admonishment not to engage in the practice again, and the Seventh Circuit upheld this Court's award. Moreover, Plaintiffs do not, and cannot, argue that IDOC or Wexford have scheduled appointments with LHIDs since August 2019.

Regardless of how this Court rules on the renewed motion, the use of LHIDs should not be a factor. This would improperly conflate the two issues of the original motion. The first issue, as noted above, concerns whether IDOC sent individuals in custody to the wrong type of provider for a year. No one disputes that the answer was yes, and the Seventh Circuit confirmed that a sanction was warranted. When the Seventh Circuit said that IDOC had to use its "best efforts" to "actually send" individuals in custody to see audiologists, *see Holmes*, 991 F3d at 782, it clearly had already found that in using LHIDs instead of audiologists, Defendant violated its obligation to actually send some individuals in custody to the right provider for a year.

The second issue, by contrast, concerns the length of time it takes for individuals in custody to receive their evaluations. The <u>provider type</u> performing certain evaluations in 2018 and 2019 has no bearing on the <u>timeliness</u> of evaluations across the duration of the settlement agreement's enforcement period. The Seventh Circuit ruled that there is no timeliness component to IDOC's obligation, but it left open the question of whether there is evidence that individuals in custody are in fact being transported to their appointments. *Id.* at 782-83.

Moreover, any use of the LHID issue to impose additional sanctions on Defendant would run afoul of both the mandate rule and the related law-of-the-case doctrine. The former "requires a lower court to adhere to the commands of a higher court on remand." *Carmody v. Bd. of Trs. of the Univ. of Ill.*, 893 F.3d 397, 407 (7th Cir. 2018). Similarly, the law of the case doctrine prohibits a lower court from reconsidering on remand an issue expressly or impliedly decided by a higher court absent certain circumstances." *Id.* Although both these limitations can be overridden, there have to be compelling circumstances such as a change in the law or new facts brought to light. *Id.* at 407-08. There is no basis that should cause this Court to let Plaintiffs re-litigate the LHID use. Again, Defendant and Wexford erred, they admitted their error and tried to argue their proactive

efforts negated any need for sanctions, they lost that argument, and they will have to pay a monetary sanction in the form of attorneys' fees. Any further litigation of the LHID issue would be improper.

## VIII. The settlement agreement does not permit this Court to award money to class members with regard to audiological wait times.

This Court has expressed a willingness to consider awarding class members monetary damages as a sanction based on the length of time that they waited for an appointment. Such an award has no basis in the Settlement Agreement and would violate Defendant's Eleventh Amendment immunity. Any sanction must align with Section XX of the Agreement. Specifically, the Agreement grants this Court with the power to enter any order (including sanctions) "*necessary to ensure compliance with the terms*" of the Agreement. (ECF No. 446-2, Settlement Agreement, ¶ 93 (emphasis added). For the reasons set forth above, there is no order necessary to ensure compliance with the only relevant term here – that Defendant must in fact take individuals in custody who fail hearing screenings to see audiologists (i.e., there is no dispute that IDOC is taking these patients their appointments). To the extent that Defendant's obligations include some reduction in wait times, there is no dispute that by now IDOC has substantially worked through the inevitable list of those waiting to see an audiologist caused by the initial spike in demand and the ongoing Covid-19 global pandemic, that system-wide wait times are on average exactly where the class and this Court want them to be, and that only 29 individuals in custody have been waiting more than three months as of early December 2021. With the onsite audiologists in place, and the demand for hearing screenings dramatically reduced, all signs point to a complete, or near complete, reduction in wait times that exceed the (arbitrary) focus on three months.

In other words, there is nothing that this Court needs to order to ensure that individuals in custody get to their appointments. A cash award would simply be a backwards-looking grant of

damages to class members who cannot point to any provision in the Settlement Agreement that gives them a right to any cap on how long they wait for an appointment. The Eleventh Amendment bars this sort of damages award against an official capacity Defendant. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

## CONCLUSION

The Parties here each plainly wish that they could change at least one provision of the settlement agreement. Defendant regrets agreeing to use only audiologists for evaluations, and Plaintiffs regret not securing a timeframe for the evaluations to be performed. However, how each side has conducted itself since the agreement was reached is very telling. Defendant corrected the LHID issue when it came to light, admitted that using LHIDs was contrary to the settlement agreement, and never argued that the agreement as written should be read so as to allow LHID use. Rather, Defendant tried without success to have the agreement amended by negotiating with Plaintiffs on that issue. Later, Defendant resisted sanctions by asserting that IDOC's self-correction made such sanctions improper. Upon losing that argument before this Court and the Seventh Circuit, Defendant has not said another word in opposition to being sanctioned for that issue except to challenge Plaintiffs' efforts to relitigate the issue again.

By contrast, Plaintiffs have been trying for almost two years to unilaterally change the settlement agreement by first inserting a hard deadline and then, having lost that issue on appeal, by insisting that the agreement required IDOC to take various steps in order to at least try to achieve Plaintiff's preferred timeframe. Because IDOC has not accepted Plaintiffs' new terms, its compliance efforts have been labelled "outrageous," "appalling," "wholly inexcusable," "clueless," "grossly negligent," "miserabl[e]," and a "complete abdicat[ion]."

Plaintiffs' regret over their own settlement efforts is no excuse for this vitriol. For all the reasons set forth above, this Court should reject each and every argument in Plaintiffs' renewed motion, decline to change the settlement agreement over Defendant's objection, and deny the motion in its entirety.

Dated: January 14, 2022                              Respectfully submitted,

                                                     KWAME RAOUL
                                                     Illinois Attorney General

                                                     /s *Michael D. Arnold*
                                                     Michael D. Arnold
                                                     Assistant Attorney General
                                                     100 West Randolph Street, 13th Floor
                                                     Chicago, Illinois 60601
                                                     (312) 814-3720
                                                     Michael.Arnold@ilag.gov

                                                     *Counsel for Defendant*