**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RALPH HOLMES, *et al.,* on behalf of themselves and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 11 C 2961 |
| v. | ) ) | Magistrate Judge Young B. Kim |
| ROB JEFFREYS, Director, Illinois Department of Corrections, | ) ) ) | |
| Defendant. | ) | |

**DEFENDANT'S STATUS REPORT TO THE COURT**

Defendant Rob Jeffreys, Director of the Illinois Department of Corrections, by and through his attorney, Kwame Raoul, Attorney General for the State of Illinois, and pursuant to his continuing obligation under the Settlement Agreement, entered July 26, 2018 ("Agreement"), hereby submits the instant Status Report to the Court. This status report contains information and data collected regarding the Illinois Department of Corrections' ("IDOC") compliance with the Agreement during the months of October, November, December 2021 and January and February 2022.   Defendant states as follows:

**SECTION IV**

**IDENTIFYING DEAF AND HARD OF HEARING INMATES THROUGH HEARING SCREENING AND AUDIOLOGICAL EVALUATIONS**

The IDOC conducts a physical examination of all individuals in custody upon admission to a reception or classification center ("R&C"). The IDOC requires, in compliance with the Agreement, that upon admission to a Reception and Classification facility, each individual in custody shall, on the day of intake, be observed by trained staff for auditory ability. Staff shall document the findings on the Individual in Custody Medical History form (DOC0092). IDOC Administrative Directive No. 04.03.101 §§ II(G)(1)(c)(2)(d). Individuals in custody who self-report as deaf or hard of hearing or who have been determined to have hearing loss during their Intake Physical Examination are provided hearing screenings as required under the Agreement.

1

Individuals in custody can also request to receive a Hearing Screening at any time and, if they make such a request, the individual in custody is to receive such a screening within thirty (30) days of receipt of the request. IDOC has continually reminded all Health Care Unit Administrators of the thirty-day requirement for conducting hearing screenings. Notices regarding hearing screenings were prominently displayed in IDOC facility living units and medical units.

Over the current reporting period, the Covid-19 global pandemic has continued to impact every facility within the Department in a number of ways, including by, at times, limiting the ability of individuals in custody to move from their housing unit to the healthcare unit for a hearing screening or consultation. Most recently, the Department experienced significant rates of Covid-19 positive cases at each of the facilities, especially in December 2021 and January 2022. As the recent spike in Covid-19 infections subsides at all facilities, IDOC continues to move toward its previously high rates of compliance in this area. The variants of Covid-19 require monitoring and implementation of additional mitigation requirements whenever warranted. The issue is being monitored by IDOC Legal and the Statewide ADA Coordinator to ensure full compliance is returned as soon as feasible.

Further, the Department is required to refer a patient to an audiologist for an Audiological Evaluation within thirty (30) days of a failed hearing screening. The Department adopted procedures satisfy this requirement and has followed the issue closely, but the same COVID restrictions mentioned above have impacted full compliance. According to the ADA Reports provided in Exhibit A, during this reporting period there were 309[1] failed hearing screenings of which 261 (84%) were referred within the 30 days required with an average of being referred less than 10 days after the failed hearing screening (or at least 20 days earlier than the required timeframe) during each of the reporting months. Of the 48 failed hearing screenings not referred within the 30 days required, 8 were referred shortly after 30 days.[2] IDOC Legal

---

[1] This number obviously does not include individuals who passed their hearing screening, nor does it include individuals who transferred, paroled or discharged shortly after the failed hearing screening.

[2] One hearing screening at East Moline in October (38 days), one hearing screening at Illinois River in October (34 days), one hearing screening at Illinois River in December (33 days), one hearing screening at Lawrence in November (32 days), two hearing screenings at Sheridan in October (33 and 32 days), and two hearing screenings at Sheridan in November (38 and 38 days).

investigated the reasons for the delay or omission for each of the other 40 failed hearing screenings. The delays for each of the 40 not referred within 30 days or shortly thereafter, severe nursing and/or physician shortages and/or Covid-19 quarantine of the patient or the facility caused the delay.[3] Only one case was missed due to staff error.[4] These numbers demonstrate there is not a systemic issue in this area.

Just as is the case in the general public when a patient is seeing a specialist, there are steps that must take place to refer the patient to the specialist here. These steps include the requirement that the individual in custody see a physician after a failed hearing screening for the physician to authorize and generate the referral in order to obtain an identification number used to track and pay for the services being rendered. For the same reasons noted above, the Covid-19 pandemic has slowed appointments in the healthcare unit or limited movement and has had an impact on healthcare unit staff, resulting in some delays for the referral process. Once the patient sees the provider, the remainder of the process is streamlined. When there are delays in getting the individual to the provider, there are delays in generating a referral. This is not a step that can be skipped.

After the referral is generated, an appointment date is obtained for the audiology appointment. The Agreement does not provide a timeframe for when the appointment must take place. There were previously significant wait times for these appointments due to limited providers who have limited appointments and were majorly impacted by COVID-19 for a significant period of time. To address these issues, IDOC has continued working directly with Wexford on ways to reduce the wait times for audiology appointments, including reaching out to every licensed audiologist in the state of Illinois to determine whether there are any providers willing to provide services to individuals in custody. After Wexford attempted to reach every licensed audiologist in the state of Illinois, it contracted with or brought on board additional providers identified through this statewide survey. Presently, Wexford has contracted with two providers to provide

---

[3] This is the case for Big Muddy's one delayed referral from February 2022, Graham's two delayed referrals from January 2022, Hill's three delayed referrals from December 2021, Illinois River's ten delayed referrals from October, November, and December 2021, and February 2022, Jacksonville's one delayed referral from November 2021, Lincoln's six delayed referrals from November 2021, Menard's two delayed referrals from January 2022, and Sheridan's fourteen delayed referrals in October, November, and December 2021.

[4] This is the case for Western's one delayed referral from October 2021.

services in person at all of the facilities. This has drastically reduced wait times and the backlog because these providers are able to dedicate more time to the Department than other providers have ever been able to before. These providers also come on site which removes limitations on the number of individuals in custody a provider may allow in their public practice at one time and allows more efficiency in the individuals being seen. As a result, the number of those waiting for their first audiology appointment has been reduced by from where it was at the time of the last status report in December. The number of those waiting reported in the December 2021 status report was 205 individuals. As of April 20, 2022, there are 209 individuals waiting for their initial audiology appointment and only 28 have been waiting more than 90 days. The main reason the number of those waiting has not decreased during this reporting period is due to Covid-19 quarantines prevalent throughout the facilities in December 2021 through February 2022. Despite the total numbers being close to where they were in December, only 2 facilities have more than 20 people waiting to attend their initial audiology appointment. *See* Exhibit E. IDOC and Vendor continue to exhaust all avenues to decrease the list of those waiting for an appointment and decrease wait times and the efforts already undertaken have drastically reduced the wait times for audiology appointments.

IDOC documents and maintains in the individual in custody's medical file the results of all Hearing Screenings and Audiological Evaluations which include a record containing a description of the determination made as to the type, degree, and configuration of any hearing loss or hearing level. IDOC notes in Offender 360, its centralized database, which individuals in custody are classified as Deaf or Hard of Hearing. (Exhibit B). In addition, each facility documents the date of the hearing screening and the date of the request[5] in order for IDOC and class counsel to monitor compliance in this Section (Exhibit A). Prior to submission of the reports with each status report, IDOC Legal and the Statewide ADA Compliance Officer spend considerable time looking at every document and report provided to class counsel to ensure accuracy. If any information is missing at the time the report is submitted internally, the facility is contacted

---

[5] If the date of the request is available. At times, the individual in custody was screened for reasons other than a request, through a verbal request, and in other ways where those dates are not always readily apparent. Based on a review of records and attempts to fill in any missing dates, however, those individuals are typically seen for their screening right away, in compliance with the 30-day requirement. For example, the individual may be with a nurse at sick call when the nurse recommends a screening, and the screening takes place at the same time.

and every measure is taken not only to acquire any missing information but to resolve any reporting issues for future reports prior to reporting to class counsel. Therefore, to the extent there is missing information from the *current* areas of the reports when provided to class counsel, it is almost certain that IDOC staff have already made every attempt to provide the information before submission. In the case of missing referral dates, the only referral dates missing from the reports this reporting period are those where there is not yet a date to fill in for the reasons stated above.

**SECTION V**

**CREATION AND MAINTANCE OF A CENTRALIZED DATABASE OF DEAF AND HARD OF HEARING INMATES**

The IDOC maintains a centralized database for individuals in custody containing an entry for each Deaf or Hard of Hearing individual in custody, including the name of the individual and facility at which the Deaf and Hard of Hearing individual is housed, indicating compliance with paragraph 40 of this Section. Individuals in custody with a communication plan completed by the Chicago Hearing Society are entered into Offender 360 promptly and regularly and are then approved by the facility ADA Coordinators.

**SECTION VI**

**DEAF AND HARD OF HEARING INMATE IDENTIFICATION CARD**

All individuals in custody identified as Deaf or Hard of Hearing are offered the opportunity to have an IDOC-issued identification card that clearly indicates the individual in custody is Deaf or Hard of Hearing in compliance with this Section of the Agreement. The Deaf or Hard of Hearing designation is placed upon the back of the identification cards.

**SECTION VII**

**DEAF AND HARD OF HEARING INMATE AUXILIARY AIDS AND SERVICES ASSESSMENT**

The IDOC entered into a contract with the Chicago Hearing Society ("CHS") to retain one or more Qualified Specialists who will perform an Auxiliary Aids and Services Assessment for every individual in custody identified as Deaf or Hard of Hearing. The Qualified Specialists are completing Auxiliary Aids and Services Assessments for individuals in custody identified as Deaf or Hard of Hearing by an audiologist.

5

IDOC has also retained the CHS for purposes of retaining a Certified Deaf Interpreter ("CDI") for the Auxiliary Aids and Services Assessment when a Deaf or Hard of Hearing individual in custody has no proficiency in either English or American Sign Language, or when the Qualified Specialist determines that a CDI is necessary.

The Qualified Specialists from the CHS are asked to consult with the Facility ADA Coordinators and the Deaf or Hard of Hearing individuals in custody. The Qualified Specialists memorialize their determinations regarding the specific Auxiliary Aids and/or Services the individual in custody needs to communicate effectively. The determinations of the Qualified Specialists are documented in the individual in custody's Communication Plan. Further, the IDOC follows the determinations of the Qualified Specialists as required by the Agreement.

Because of the COVID-19 pandemic preventing CHS from conducting assessments in-person at the facilities for a considerable length of time, IDOC worked closely with the CHS during the beginning of the pandemic in order to establish a plan that would enable Qualified Specialists to effectively evaluate individuals in custody during this time of crisis. The contract with CHS was amended and virtual assessments began in September 2020. Virtual assessments allow CHS to evaluate individuals in custody without coming inside of the facility. From October through December 2021 and January through February 2022 IDOC and CHS completed 125 virtual assessments. See Exhibit D. Throughout the reporting period, individuals are able to see CHS within about 45 days.

In the meantime, all hearing-impaired individuals in custody have preliminary communication plans or some kind of documentation for their accommodations while awaiting an assessment by a Qualified Specialist. Over 2245 communication plans have been finalized and have been entered into the system. After a recent status report, the class raised concerns about the timing of the signatures on the communication plans, specifically that the ADA Coordinator did not sign the communication plan for some time after CHS completed it.[6] The Agreement requires that the Qualified Specialist memorialize the

___

[6] The class also raised an issue about the manner in which the Qualified Specialists fill out the forms. It appears the class also raised their concerns with Chicago Hearing Society and the Department defers to the Qualified Specialists.

determination of the aids and services needed; it does not require the signature of the ADA Coordinator even though the form does ask for it. Any delay in a signature on the form which is not required under the Agreement and lack of which does not prevent the aids and services from being provided is a red herring. The Agreement requires that the determinations of the Qualified Specialist are followed and implemented, which is what takes place.

**SECTION VIII**

**AUXILIARY AIDS AND SERVICES PRIOR TO THE AUXILIARY AIDS
AND SERVICES ASSESSMENT**

Prior to the completion of the Auxiliary Aids and Services Assessment for a Deaf or Hard of Hearing individual in custody, facilities provide preliminary accommodations as required by the Agreement. Preliminary accommodations for the Deaf and Hard of Hearing are identified through an interactive dialogue between the individual in custody and the Facility ADA Coordinator. Through this interactive dialogue, interim Communication Plans or other documentation is completed by the ADA Coordinators prior to the completion of an Auxiliary Aids and Services Assessment by CHS in order for any preliminary accommodations to be provided. Deaf or Hard of Hearing individuals in custody are not denied accommodations during the wait for a CHS appointment.

**SECTION IX**

**PROVISION AND MAINTENANCE OF AUXILIARY AIDS AND SERVICES TO DEAF AND
HARD OF HEARING INMATES AND IMPLEMENTATION OF COMMUNICATION PLAN**

The IDOC provides Deaf and Hard of Hearing individuals in custody, at no cost to the individual in custody and subject to the limitations of Paragraph 65 of the Agreement, the Auxiliary Aids and Services provided for in the individual in custody's Communication Plan. IDOC exercises reasonable efforts to secure, in a timely manner, hearing aids for those individuals in custody whose Auxiliary Aids and Services Assessment indicate they should be provided a hearing aid(s). The IDOC maintains an adequate supply of readily available hearing aid batteries.[7] Further, the IDOC continues to engage in the interactive process

---

[7] While class counsel routinely provides individual complaints from class members regarding the provision of hearing aid batteries, the issues are primarily related to the individual in custody not communicating with the ADA Coordinator or not following

7

with those individuals in custody identified as Deaf or Hard of Hearing for purposes of maintenance of Auxiliary Aids and Services.

Additional accommodations for individuals in custody who have hearing impairments may include, but are not limited to, the following: vibrating watches, over-the-ear headphones, American Sign Language interpreters, closed captioned television, tactile notification pagers, Video Relay Service phone calls, TTY phone calls, white boards, and, in select cases, a personal attendant.

Class counsel has previously raised issues regarding ASL interpreters. As reported to the Court previously, the Department takes this issue very seriously and is making every effort to try to provide interpreters to individuals in custody when interpreters are needed.  The Department previously evaluated each of the designated ASL users to determine whether transfers are possible to focus the need for interpreters at a handful of facilities. It has been determined that a reduction in the facilities at which interpreters are needed is not possible at this time due to transfer holds or other needs of the individuals in custody preventing their transfer. The Department has implemented the use of remote interpreting through Propio language services.

IDOC Legal and the Statewide ADA Compliance Officer continue to work closely with the facilities who house ASL users to ensure compliance and accurate reporting in this area. The Department has provided recent reports regarding its compliance with the requirement to provide ASL interpreters and will continue to work collaboratively with the plaintiffs to ensure compliance in this area. See the Department's update provided to counsel and the Court on April 8, 2022, for further information.

The Department also has some access to the "master contract" for ASL interpreting through the Department of Central Management Services. The Department has not utilized this master contract as the issues with Propio firewalls have been resolved and Propio is in place. As a reminder to staff, the

---

procedures for obtaining hearing aid batteries through nurse sick call or the Health Care Unit. Upon receipt of any such complaints, IDOC Legal and the Statewide ADA Compliance Officer communicate with the facility to determine the issue. Typically, these issues could easily be resolved without class counsel involvement if the individual in custody communicates any issues to facility staff.

Department again gave direction statewide that ASL users do not need to request interpreters for all high stakes interactions and that an interpreter should be automatically provided.

The IDOC has received reports of lost and stolen Auxiliary Aids and Services provided in the individual in custody's Communication Plan. Accommodations that are lost or stolen are replaced pursuant to the restrictions of Paragraph 65 of the Agreement.

## SECTION X

### IDOC STAFF TRAINING ON MATTERS REGARDING DEAF AND HARD OF HEARING INMATES

The IDOC Training Academy created and updated training materials addressing the topics required under the Agreement. The training materials (previously disclosed to Plaintiffs) are presented in annual Cycle Training, Pre-Service Orientation Training, ADA Coordinator Training and Cadet Training. During this reporting period, approximately 3118 employees received ADA training through "Cycle Training Day 2," 290 through Cadet Training, 22 through ADA Coordinator Training and 117 through Pre-Service Orientation Training.

## SECTION XI

### ORIENTATION

The facility orientation manuals were long-ago updated to include information about the rights of Deaf and Hard of Hearing individuals in custody. Individuals in custody attending orientation who are Deaf or Hard of Hearing are provided a subsequent orientation session. If the individual in custody communicates through American Sign Language, then during the second, separate orientation session, IDOC will provide a Qualified Interpreter to assist the individual in custody in understanding the orientation content provided orally.

## SECTION XII

### COMMUNICATION DEVICES/TECHNOLOGIES FOR DEAF AND HARD OF HEARING INMATES

Video Remote Interpretation (VRI) equipment and translation services are available in all IDOC facility healthcare units. Deaf or hard of hearing individuals in custody who need assistance interpreting

medical or mental health information have access to this service. In response to class counsel's concerns, the Department has reiterated this requirement for ASL users.

All IDOC facilities maintain a Video Relay Service (VRS) phone. In August 2020, class counsel expressed various concerns with using the Securus-based VRS systems for attorney calls due to some delays that occurred a few times in getting the attorney's number approved for the system to allow the call. As reported in early September 2020, Securus agreed to immediately process the requests for attorney number additions if they are submitted separately and clearly marked as an attorney number requiring rush processing. The Department also agreed to transition from Securus-based VRS back to the Sorenson VRS system for attorney calls only. The Sorenson system eliminates the requirement for approval of the phone number in advance. The installation of all facilities is now complete.

Facilities housing the Deaf and Hard of Hearing possess two TTY machines. The TTY equipment can access publicly available relay service numbers. The volume on all IDOC housing unit phones is set to 65 decibels or higher and background noise cancellation is activated on the phones. Individuals in custody utilizing TTY or VRS phones are given three times the amount of time usually allotted to non-hearing-impaired individuals in custody at no expense to the user. Data is being collected regarding TTY and VRS usage as required by the Settlement. See monthly facility reports contained in Exhibit A.

Class counsel has previously expressed concerns with video phones or TTY machines that are broken. Whenever equipment is broken, the facility works to replace it. Of course, replacements take time and the facility works to provide alternatives in the meantime. Class members should report any issues with equipment to the facility ADA Coordinator in order for the issues to be resolved as quickly as possible.

## SECTION XIII

### TELEVISION FOR DEAF AND HARD OF HEARING INMATES

Televisions purchased by IDOC or individuals in custody support open or closed captioning as required by the Agreement. Facilities ensure that closed captioning is activated on movies shown through the IDOC system and on televisions in common areas as required by the settlement. Facilities monitor the use of closed captioning during unscheduled inspections via IDOC form DOC0481. See monthly facility

reports attached as Exhibit A. If the inspection determines there is an issue with closed captioning, the issue is resolved or investigated further. To the extent an inspection report indicates the closed captioning was not functioning at the time of the inspection, IDOC reports that except where otherwise noted this is due to the televisions not being on and not due to this feature being inactive. Any issues with closed captioning at the time of an inspection are immediately addressed.

IDOC provides Deaf and Hard of Hearing individuals in custody over the ear headphones, free of charge, in accordance with the settlement agreement.

## SECTION XIV

## VISUAL AND TACTILE ALERT NOTIFICATIONS
## FOR DEAF AND HARD OF HEARING INMATES

The Agreement requires IDOC to begin making reasonable efforts to provide Deaf and Hard of Hearing individuals in custody with a safe and effective tactile notification system that will advise them of events such as the arrival of visitors, commencement of meals, showers, yard time, medical appointments, evacuations, and emergencies.

The IDOC has installed visual notification systems (strobe lights) for outdoor warning shots at all facilities that have the capability to fire warning shots. Additional facilities do not have the capability to fire warning shots and, therefore, strobes will not be installed. The strobes have been tested and are visible during daylight hours.

IDOC has taken a number of approaches to providing tactile notifications to individuals in custody. First, all Deaf and Hard of Hearing individuals in custody were offered a new tactile watch (VibraLite) that allows the individual in custody to set 8-12 separate alarms, depending on the version. This watch, coupled with readily available schedules, provides all individuals in custody who accepted it with a safe and effective tactile alert system for being notified of any appointments and programming as desired.

Additionally, another tactile notification pager system (MMCall) has been installed statewide. To operate the paging system, each facility was provided with standalone PCs and monitors. Each PC is able to send messages to watch "pagers" that individuals in custody wear. The watches both vibrate and send a

written message to indicate the reason for the page, such as "medical," "visitor," "yard," etc. All facilities report they have passed out the pagers and are utilizing the system when there is movement, except for the facilities that do not have deaf or hard of hearing individuals in custody or where all hard of hearing individuals in custody have refused the system.[8]

In its review, the Department previously noticed a range in the use of the system. In response, direction was (again) given to all facilities statewide of their obligations and that the MMCall pager systems must be utilized. Former Chief of Operations John Eilers directed the Wardens to ensure the system is used to its full capacity and ensure that officers are using the systems to page individuals for all announcements, appointments, etc. A memo outlining these expectations was read at roll call at all facilities for seven days. In order to ensure this direction is followed, the Warden in coordination with the ADA Coordinator is required to review the tactile pages completed every two weeks. Any discrepancies, including underutilization, must include a justification or corrective action outlining how the identified issue will be corrected the following week. A report is then compiled and sent to the respective Deputy Director every two weeks where it is reviewed and ultimately reported to the Chief of Operations, IDOC Legal, and the Statewide ADA Compliance Officer. This practice began in early November 2021 and has resulted in marked increase in use of the system. The Department recently provided detailed updates showing the improvements made in this area and the actions taken when there are issues. It is expected that the oversight of the Department has resolved past issues.

## SECTION XV

## EQUAL ACCESS TO PRISON EMPLOYMENT

IDOC does not deny assignment opportunities to an otherwise qualified Deaf or Hard of Hearing individual in custody unless, after conducting an individualized assessment, including consultation with the individual in custody, it is determined that the Deaf or Hard of Hearing individual in custody cannot perform the essential functions of the position with or without a reasonable accommodation. Facilities are required

---

[8] Crossroads ATC, Elgin Treatment Center, Fox Valley ATC, Kewanee Life Skills Re-Entry Center, North Lawndale ATC, Peoria ATC, Stateville-NRC, and Vandalia.

to log the reason for any assignment being denied to a Deaf or Hard of Hearing individual in custody. See monthly facility reports attached as Exhibit A.

## SECTION XVI

### HAND RESTRAINTS REGARDING DEAF AND HARD OF HEARING INMATES

On 9/21/2018 a directive was sent out to all facilities by the Chief of Operations regarding the use of hand restraints on deaf and hard of hearing individuals in custody. A copy of this directive was previously provided to plaintiffs' counsel.

## SECTION XVII.

### FACILITY AND CELL ASSIGNMENTS AND TRANSFERS OF DEAF AND HARD OF HEARING INMATES

Deaf and Hard of Hearing individuals in custody are not transferred solely because of their Deaf or Hard of Hearing status to a higher security prison, or to a prison which does not offer comparable programming. Direction was sent to all facilities by the Transfer Coordinator's Office regarding the requirements in this section related to the transfer of Deaf and Hard of Hearing individuals in custody. Further, requests by Deaf and Hard of Hearing individuals in custody to be housed with another Deaf or Hard of Hearing individual in custody are considered. IDOC previously tendered a copy of the direction provided by the Transfer Coordinator's Office.

## SECTION XVIII

### CREATION AND DISSEMINATION OF MATERIALS MEMORIALIZING DEAF AND HARD OF HEARING INMATES' RIGHTS

The facility orientation manuals were updated to include information about the rights of Deaf and Hard of Hearing individuals in custody.

## SECTION XIX

### MONITORING AND REPORTING

The Agreement requires reporting of compliance every 120 days. This report satisfies that requirement. Additionally, the attachments to this report contain additional information as noted below.

Exhibit A is one .zip drive, containing one folder for each October, November, December 2021 and January, February 2022 facility reports, with subfolders per facility. Included and organized within these folders are:

- Cover pages ("Cover")[9] listing the number of communication plans and the names of those who received them, the number of hearing screenings, the number of audiological evaluations, the number of grievances specific to this Agreement received and the names of those who wrote them, whether interpreters or VRI was utilized, whether TTY or VRS machines were utilized, whether individuals in custody were denied a hearing screening during a periodic physical examination, whether the facility denied employment to class members, and, for Reception and Classification Centers, the number of intakes in the reporting month;

- Communication Plans ("ComPlan") for all communication plans completed during the reporting month, both by CHS virtually and any interim plans completed by the facility;

- Hearing Screenings ("HearScn") for all hearing screenings completed during the reporting month;

- Audiological Evaluation results ("Audio") for all audiological evaluations completed during the reporting month, along with documentation for ENT appointments and hearing aid pick up;

- Grievances ("Griev") filed during the reporting month which, if true, would constitute a violation of the Agreement;[10]

- VRI/Interpreter Logs ("Interp") which log use of interpreters for high-stakes interactions whether through an in-person interpreter or VRI;

---

[9] Naming conventions utilized for all reports in Exhibit A are included in parentheticals.

[10] If a response to the grievance is not provided, there is typically a reason for the lack of response, such as the grievance not reaching the 2nd level for a response or a response being provided after the report is submitted. These reasons are provided in the relevant Cover page.

- TTY and VRS logs ("TTYVRS") logging all TTY and/or VRS usage at the facility;

- Unscheduled Inspection Reports ("DOC0481") which include the inspection of whether televisions had closed captioning;[11]

- Individual Hearing Screening reports ("ADARpt") which includes individuals in custody who requested a Hearing Screening, whether they received the requested Hearing Screening, and why any individuals in custody did not receive the requested Hearing Screening. It also contains information reflecting the identification of each individual in custody who, based on a Hearing Screening after the date of this Agreement, was found to require an Audiological Evaluation (and any subsequent steps to provide this evaluation);

- Accommodations ("Accom") such as watches, headphones, hearing aids, etc. provided to individuals in custody in the reporting month. This report may take the form of pdfs of property receipts or lists of accommodations provided. Additionally, some facilities simply report this information within the ADA Report in the preceding section;[12]

- 5% of documents for the Intake screenings ("Intake") at the reception and classification centers; and

- MMCall ("MMCall") printouts of the pages sent during the month.[13]

Exhibit B contains a listing of all individuals in custody identified as Deaf or Hard of Hearing and the location where each individual in custody is housed.

Exhibit C contains a list of ADA coordinators at each facility.

---

[11] A concern was raised by operations staff regarding production of information contained in the inspection reports that, if released, could pose safety and security concerns. As this information is irrelevant to this litigation and often also contains privileged or protected information, non-*Holmes* related information has been redacted. If a facility did not provide a report, they did not complete Unscheduled Inspections in the reporting month.

[12] If a facility does not have an Accommodations report or list accommodation provisions in their ADA Report, they reported having none in the reporting month.

[13] Crossroads ATC, Elgin, Fox Valley ATC, Kewanee, North Lawndale ATC, Peoria ATC, Stateville NRC, and Vandalia report they did not have pages in certain months of the reporting period because they do not have individuals who use the system – either due to refusals or not having hard of hearing individuals who reside there.

Exhibit D contains a list of individuals in custody who have completed virtual assessments with CHS.

Exhibit E contains the audiology wait times information as of April 20, 2022.

Dated: April 22, 2022

Respectfully submitted,

KWAME RAOUL
Illinois Attorney General

/s Michael D. Arnold
Michael D. Arnold
Assistant Attorney General
100 West Randolph Street, 13th Floor
Chicago, Illinois 60601
(312) 814-3720
Michael.Arnold@ilag.gov

*Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the foregoing **DEFENDANT'S STATUS REPORT TO THE COURT** was served on all counsel of record on April 22, 2022, by filing a copy of the same through the Court's CM/ECF filing system.


/s/ *Michael D. Arnold*