**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **RALPH HOLMES, *et al.,* on behalf of themselves and all others similarly situated,** | ) ) ) | **No. 11 CV 2961** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Young B. Kim** |
| | ) | |
| **ROB JEFFREYS, Acting Director of Illinois Department of Corrections,** | ) ) | |
| | ) | **August 3, 2022** |
| **Defendant.** | ) | |

**MEMORANDUM OPINION and ORDER**

Before the court is Plaintiffs' motion for a finding that the Illinois Department of Corrections ("IDOC") violated the parties' settlement agreement ("Settlement") by failing to use its best efforts to ensure that qualifying inmates are timely seen by audiologists for the agreed upon evaluations. For the following reasons, the motion is granted:

**Background**[1]

This case involves a class of "Illinois prison inmates with hearing problems." *Holmes v. Godinez*, 991 F.3d 775, 779 (7th Cir. 2021). The details of the underlying allegations are "largely irrelevant for present purposes," *Rasho v. Jeffreys*, 22 F.4th

---

[1] The court's June 2020 opinion provides a more complete description of the allegations underlying this action. (See R. 573.)

703, 706 (7th Cir. 2022), because the parties agreed to the Settlement,[2] (R. 446-2, Settlement). As such, whether IDOC owes constitutional or statutory duties to Plaintiffs is "irrelevant to the contractual issue" before the court. *Holmes*, 991 F.3d at 784 (internal quotations and citation omitted). The Settlement "serves as the source of the court's authority to enter any judgment" pursuant to the current motion. *Id.*

As part of the Settlement, and central to the motion, Plaintiffs bargained for—and IDOC agreed to adopt within 90 days of the effective date of the Settlement:[3]

> a policy and procedure pursuant to which inmates whose Hearing Screenings determine that they may be Deaf or Hard of Hearing must be referred to an audiologist for an Audiological Evaluation at the earlier of: (a) [30] days after arrival to their home facility; or (b) 45 days after being admitted into IDOC custody.

(R. 446-2, Settlement ¶ 36 (referred to herein as "Referral Provision").) Plaintiffs previously moved to enforce the Referral Provision, and in June 2020 this court ruled that IDOC had violated the Settlement by failing to conduct Audiological Evaluations for qualifying inmates within a reasonable time after receipt of a referral. (R. 573.) In the absence of a specific term in the Settlement by which Audiological Evaluations had to be completed, the court implied a reasonable period of 90 days after a referral.

---

[2] The Settlement "is more accurately described as a consent decree rather than a private settlement," *Rasho*, 22 F.4th at 707 n.2, because this court retained jurisdiction to oversee, supervise, and enforce the terms of the agreement, *Holmes*, 991 F.3d at 784; (R. 446-2, Settlement). In any event, the court refers to the agreement as "Settlement" for consistency with the language used by the parties.

[3] The Settlement defines the effective date as the date on which the Settlement is "approved and entered" by the court. (R. 446-2, Settlement ¶ 23.) The court approved and entered the Settlement on July 26, 2018. (R. 454.)

(Id. at 11.)  The court also ordered "IDOC to pay Plaintiffs reasonable attorneys' fees and costs to investigate and litigate IDOC's violation" of the Settlement from July 2018 to July 2019 by using licensed hearing instrument dispensers ("LHIDs") to perform Audiological Evaluations because the Settlement permits only licensed audiologists to perform this service.  (Id. at 3, 13; see also R. 446-2, Settlement ¶ 14; R. 615 (granting Plaintiffs' petition for fees in the amount of $52,357.50 in fees and $1,741.35 in costs).)

IDOC appealed the court's decision and in March 2021 the Seventh Circuit affirmed the award of attorneys' fees to Plaintiffs based on IDOC's "substantial non-compliance" with the Settlement but reversed the 90-day deadline imposed by this court.  *Holmes*, 991 F.3d at 779, 783-85.  In so ruling, the Seventh Circuit found that because the Settlement's Referral Provision did not specify a period for completing Audiological Evaluations, "a set time-table" could not be implied.  *Id.*  At the same time, the Seventh Circuit found that "based on the meaning of the word 'refer,' IDOC has *some* obligation regarding the completion of the evaluations—it must use its best efforts to actually 'send' its inmates in need to an audiologist so that the evaluations can be performed."  *Id.* at 782.  The Seventh Circuit likened a "best efforts undertaking" to "the exercise of good faith implied in all contracts" under Illinois law, and that "IDOC can't sit on its hands."  *Id.*

After the Seventh Circuit issued its opinion, this court ordered the parties to confer on whether discovery was needed to investigate IDOC's efforts to "actually 'send' its inmates to an audiologist so that the evaluations can be performed."

3

(R. 651.)   After hearing from the parties, the court permitted Plaintiffs to serve written discovery requests on IDOC by April 2021.  (R. 653.)  Plaintiffs then served: document requests and interrogatories to IDOC; deposition notices to IDOC and Wexford Health Sources, Inc. ("Wexford")—IDOC's principal vendor for inmate healthcare; and a subpoena to Wexford for documents.  (R. 657; R. 671; R. 675; R. 688; R. 693; R. 694; R. 698.)   In turn IDOC and Wexford produced written discovery responses and witnesses for their depositions.  (R. 701, Pls.' Mot. at 5-8.)  Based on this discovery, Plaintiffs claim that IDOC failed to exercise best efforts to complete Audiological Evaluations.  (Id. at 8.)

On May 18, 2022, the court held an evidentiary hearing on the subject.  Katie Smith—a former Wexford contracting specialist who was the sole individual tasked with searching for and identifying audiologists to whom IDOC can send inmates for Audiological Evaluations—was the first to testify.  (Id. at 6-7 & Ex. F3, Ohleger Dep. at 62, 127-28, Ex. F5, Smith Dep. at 22-27, 37-39, 195; R. 776, May 18, 2022 Hr'g Tr. at 3, 13-14, 16-17, 52, 174, 243-44).)   Testifying second was Kathy Ohleger—Smith's former supervisor and Wexford's Director of Provider Network Development, Claims, and Credentialing.[4]  (R. 701, Pls.' Mot. at 6 & Ex. F3, Ohleger Dep. at 23-26; R. 776, May 18, 2022 Hr'g Tr. at 7-8, 10, 196).)  Ohleger was responsible for overseeing the process for hiring outside healthcare professionals as independent contractors to provide services to about 30 correctional facilities in Illinois and other

---

[4] The court sought testimony from Smith and Ohleger because the parties' briefing showed they contested aspects of each other's deposition testimony.  (R. 726.)

prison operations in several other states.  (R. 701, Pls.' Mot. Ex. F3, Ohleger Dep. at 23, 29-37; R. 776, May 18, 2022 Hr'g Tr. at 12-13, 17, 237-38.)  Before the hearing, the parties submitted stipulations concerning IDOC's direct efforts to comply with the Referral Provision to streamline the issues the court must address.  (R. 751, Stipulations.)

## Analysis

Plaintiffs now ask the court to find that IDOC violated the Settlement by failing to use best efforts to "actually 'send' its inmates in need to an audiologist" for evaluations.  *Holmes*, 991 F.3d at 782; (R. 701, Pls.' Mot.; R. 703, Pls.' Mem.).  For support they point to evidence showing: (1) significant wait times—of more than a year or even two years for some inmates—for the performance of Audiological Evaluations by audiologists; (2) IDOC's lack of coordination with, or supervision over, its agent Wexford regarding compliance with Settlement obligations; and (3) a failure to cure the shortage of audiologists willing to evaluate qualifying inmates.  (R. 701, Pls.' Mot. at 7-10.)  Plaintiffs allege that IDOC's failure to use best efforts led to an excessive backlog of inmates requiring Audiological Evaluations, and that IDOC therefore deprived these inmates of the evaluations they bargained for in the Settlement.  (Id. at 8-10; R. 446-2, Settlement ¶ 36.)

IDOC responds that it in fact sent qualifying inmates to audiologists for evaluations and, as such, satisfied its best-efforts obligation—no matter when the actual appointments took place.  (R. 715, IDOC's Resp. at 5 (asserting that "IDOC would be 'sitting on its hands' only if it failed, on a systemic basis, to physically bring

individuals in custody to see audiologists").)  IDOC disagrees with Plaintiffs that the Settlement includes any timeliness component or that inmate wait times have any bearing on the best-efforts inquiry.  (Id. at 2.)  IDOC explains that it has "discretion" in "'sending' its inmates in need to an audiologist so that the evaluations can be performed," and that it must simply "use its best efforts to turn referrals into actual appointments," without regard to any "specific timeframe."  (Id. at 3-5.)  IDOC also contends that Plaintiffs cannot add terms to the Settlement by requiring it to "expand the list of outside audiologists" or hire in-house employee audiologists.  (Id. at 8, 10.)  Finally, IDOC asserts that it has already been sanctioned for Wexford's use of LHIDs during the first year of the monitoring period and that it cannot be penalized twice for the same failure.  (Id. at 25-28.)

## A.  **Applicable Law**

The Referral Provision requires that once an inmate fails a Hearing Screening, IDOC must "refer[]" the inmate "to an audiologist for an Audiological Evaluation" within 30 to 45 days after he or she arrives at his or her home facility or is taken into IDOC custody.  (R. 446-2, Settlement ¶ 36); *Holmes*, 991 F.3d at 782.  The Seventh Circuit has instructed that "refer" in this context means "send or direct for treatment."  *Holmes*, 991 F.3d at 782-83.  In terms of timing, a qualifying inmate must only be "referred" within the 30- or 45-day period, but no term sets a deadline for the completion of the actual Audiological Evaluation.  *Id.*  But given the definition of "refer," IDOC "has *some* obligation . . . [to] use its best efforts to actually 'send' its inmates in need to an audiologist so that the evaluations may be performed."  *Id.*

6

Indeed, its "obligation to refer inmates in need carries with it a correlating obligation to use its best efforts to see that the inmate is actually sent to an audiologist for an evaluation." *Id.* at 783.

In explaining IDOC's best-efforts obligation, the Seventh Circuit compared "best efforts" to the duty of "good faith implied in all contracts," *id.* at 782 (citing *Grant v. Bd. of Educ. of Chi.*, 282 Ill. App. 3d 1011, 1024 (1996)), which "requires one vested with contractual discretion to exercise it reasonably and not arbitrarily or capriciously" and "not to do anything which will destroy or injure the other party's right to receive the fruits of the contract," *Vincent v. Doebert*, 183 Ill. App. 3d 1081, 1090 (1989). Whether a party has used "best" or "reasonable" efforts is a factual question, *Wells v. State Farm Fire & Cas. Ins. Co.*, 2021 IL App (5th) 190460, ¶ 37 (quotations and citations omitted), which "can be satisfied by any of a wide range of possible levels and types of performance that comport with the exercise of 'good faith' by the obligor," *United States v. Bd. of Educ. of Chi.*, 799 F.2d 281, 292 & n.8 (7th Cir. 1986) (noting that "specific type and level of performance" cannot be read into a consent decree but "general guidelines" may be set). The best-efforts inquiry hinges on "the nature of the undertaking for which the 'best efforts' commitment has been made." *Grant*, 282 Ill. App. 3d at 1025; *see also Bd. of Educ.*, 799 F.2d at 292 ("The nature and circumstances of the underlying obligation help to determine what constitutes good faith."). Here, best efforts are defined with regard to IDOC's treatment of qualifying inmates in the referral process, and specifically with regard

to actually transporting them to audiologists for evaluations. *See Holmes*, 991 F.3d at 783.

## B. Evidence Presented

In considering the evidence, IDOC asks the court to "ignore" what it refers to as Smith's "unsupported and refuted testimony . . . regarding her former boss," Ohleger. (R. 715, IDOC's Resp. at 21-25.) IDOC characterizes Smith as a "disgruntled former Wexford employee" who had a "personnel dispute" with Ohleger. (Id. at 21.) The court acknowledges that Smith testified that Ohleger overworked her, retaliated against her for complaining to Human Resources, engaged in improper conduct, and not only was ambivalent about securing additional audiologists to treat IDOC inmates but also sabotaged Smith's efforts to do so. (Id.; R. 776, May 18, 2022 Hr'g Tr. at 28-36, 40-47.) Smith also testified that Wexford did not place a high or even medium priority on finding and retaining audiologists, let alone use best or even reasonable efforts to do so. (R. 701, Pls.' Mot. at 7 & Ex. F5 at 185, 236, 248; R. 776, May 18, 2022 Hr'g Tr. at 40-47, 167.)

Although both Smith and Ohleger may be biased witnesses in this particular setting,[5] the court finds them to be generally credible and their testimony to be largely aligned—at least when discussing facts related to IDOC's or Wexford's efforts to send qualifying inmates for Audiological Evaluations. The court therefore

---

[5] When Smith left Wexford, she complained of retaliation for raising concerns about events that allegedly took place at work. (R. 701, Pls.' Mot. Ex. F5 at 37-47, 55, 62-63, 182-85.) For its part, Wexford accused Smith of providing false information. (R. 716, IDOC's Ex. Q at 11 (sealed); R. 776, May 16, 2022 Hr'g Tr. at 232.) Because this dispute has no bearing on the subject inquiry, the court need not resolve it here.

considers Smith's and Ohleger's testimony to the extent their statements relate to the best-efforts inquiry and are factual in nature—not legal conclusions based on those facts—and disregards any allegations of sabotage or misconduct as biased. The court also finds that neither Smith nor Plaintiffs offered sufficient evidence to support their accusation that Ohleger sabotaged Smith's efforts to identify additional audiologists and finds that Ohleger credibly explained the comments and actions that Smith considered as disparaging the inmate population or attempting to sabotage the search process.

In discussing the relevant evidence, and as IDOC suggests, the court breaks the Settlement monitoring period into three phases: (1) July 2018 through July 2019 ("Year One"); (2) August 2019 through August 2020 ("Year Two"); and (3) September 2020 through present ("Years Three and Four"). (R. 715, IDOC's Resp. at 9.) The court finds that IDOC failed to use best efforts during Years One and Two.

### 1.    Year One

IDOC argues that qualifying inmates were sent for Audiological Evaluations during Year One. (R. 715, IDOC's Resp. at 10-11.) During this period, IDOC says Wexford employed a process for referring qualifying inmates for Audiological Evaluations. (R. 751, Stipulations at 8.) That process included, upon receipt of "positive" Hearing Screenings, the following: conveying those results in batches to licensed doctors or nurse practitioners within one to two days; generating referral forms for Audiological Evaluations and providing those forms to IDOC/Wexford employees within one to two days; transmitting forms electronically to "WexCare,"

Wexford's central database for appointments, within one to two days; assigning tracking numbers to referrals within one to two days; receiving notice of referrals by schedulers within one to two days; and contacting audiologists to schedule appointments within one to two days. (Id.) IDOC acknowledges, however, that this process did not include measures to ensure patients would be scheduled for Audiological Evaluations, or that such evaluations would be completed within a specific time period. (See id. ("The time it takes to actually schedule and conduct an appointment with an audiologist varies and depends on the availability of audiologists for that facility.").)

IDOC also points to "ongoing improvement efforts" it says it and Wexford took to "lower[] wait times" for inmates to receive Audiological Evaluations. (R. 715, IDOC's Resp. at 4.) These efforts included identifying additional audiologists to provide services to qualifying inmates. (Id. at 8-9.) Before the effective date of the Settlement, Wexford had nine audiology groups on retainer, but they were not enough to satisfy the increased demand for audiology services for qualifying inmates. (Id. at 10 (citing R. 548-1, Stock-Jones Decl. ¶¶ 7-11); R. 776, May 18, 2022 Hr'g Tr. at 184; see also R. 701, Pls.' Mot. Exs. B, G2A.) Shortly after the Settlement took effect, Wexford identified two more audiology groups to evaluate qualifying inmates. (R. 701, Pls.' Mot. Exs. B, G2A (noting contracting start dates of August 27, 2018, and September 28, 2018, for Sarah Bush Lincoln Health Center and Carle Physicians Group, respectively).) To retain these two groups, Smith—the sole Wexford employee tasked with identifying contract providers—began contacting audiology groups in the

fall of 2018 to assess interest in providing services for inmates. (Id. at 6 & Ex. F3 at 61-66, 127-28; see also R. 548-1, Stock-Jones Decl. ¶¶ 7-8.)

By early 2019 IDOC says it and Wexford communicated regarding "expanding the ranks of audiologists beyond the two new additions." (R. 715, IDOC's Resp. at 11.) On behalf of Wexford, Smith emailed Ohleger in February 2019 conveying that there was an "increase in volume" of inmates needing Audiological Evaluations. (Id. at 11 & Ex. F.) Ohleger responded that Wexford was "doing the best that [it could] to identify providers that [we]re willing to see these inmates," and that providers had limited appointments. (Id.) For IDOC's part, in January 2019 its medical director began investigating "what audiologists were being used" by different IDOC facilities because of a greater need for audiological services. (R. 751, Stipulations at 3 (citing R. 701, Pls.' Mot. Ex. F1 at 196-97).) That same month, IDOC's health care unit administrator at a southern Illinois facility sent a memorandum regarding the Settlement, indicating that it had identified an audiology group (albeit only LHIDs) to provide services to qualifying inmates. (Id.) The following month, IDOC's ADA coordinator stated that a downstate audiologist who had been treating IDOC inmates once weekly would now limit services to one inmate monthly and asked internally, "[I]s there anything else we can do to try to get these guys scheduled?" (Id. (citing R. 715, IDOC's Resp. Ex. G).) Nevertheless, IDOC did not submit evidence showing that it or Wexford retained additional audiologists to meet the increased need. (R. 701, Pls.' Mot. Ex. F at 196-97.) IDOC asserts, however, that it was not required to do so under the Settlement and points to Exhibit A to Plaintiffs' motion to show that

inmates waited on average only about four and a half months for Audiological Evaluations during Year One.[6]  (R. 715, IDOC's Resp. at 10-11 (citing R. 701, Pls.' Mot. Ex. A).)

Plaintiffs respond that during Year One Wexford secured only "two additional audiologist groups" to perform Audiological Evaluations, and one of those groups treated "only 13 IDOC inmates in the first two years of the Settlement monitoring period." (R. 701, Pls.' Mot. at 9 & Exs. B, B1.)  Plaintiffs further note that throughout Year One Wexford widely used LHIDs to perform Audiological Evaluations, (R. 751, Stipulations at 7), even though the Settlement permits only audiologists to be used, (R. 446-2, Settlement ¶ 14).  IDOC admits that "LHIDs . . . conduct[ed] Audiological Evaluations on approximately 700 individuals" during Year One.  (R. 751, Stipulations at 7); *Holmes*, 991 F.3d at 779.  And internal IDOC documents reflect its understanding that Audiological Evaluations had to be performed by audiologists. (R. 701, Pls.' Mot. Exs. F1, F4, G4-G8, G11-15; R. 751, Stipulations at 7.)  Yet IDOC did not implement guidelines to ensure audiologists were used for the evaluations until mid-2019, when Plaintiffs learned that LHIDs were performing them.  (R. 701, Pls.' Mot. at 7-8 & Exs. F1-F2, F4.)  At that time—nearly a year after the effective

---

[6]  Plaintiffs used data provided by IDOC to create Exhibit A to their motion. (R. 701, Pls.' Mot. at 3-5 & n.1.)  They represent that Exhibit A underestimates inmate wait times because when IDOC schedules an Audiological Evaluation, some IDOC facilities report the date when the scheduling took place, rather than the date of the Audiological Evaluation, which occurs much later. (Id.)  For purposes of this motion, "IDOC does not contest the accuracy or completeness of Plaintiffs' Exhibits A and D in summarizing the [Audiological Evaluation] Wait-time data that IDOC has reported."  (R. 751, Stipulations at 2.)

date of the Settlement, Wexford "put on hold" the use of LHIDs given current "thinking that the hearing specialist has to be an audiologist." (Id., Ex. G17; see also id., Exs. G18 (July 22, 2019 email from Wexford confirming "all referrals will need to be scheduled with a licensed audiologist"), G24 (Aug. 5, 2019 email from IDOC giving Wexford "[d]irection" that offenders must be "assessed by an *Audiologist*") (emphasis in original)); R. 751, Stipulations at 8 (citing R. 701, Pls.' Mot. Ex. F1 at 147-52, 156-58).)

Plaintiffs also cite evidence showing that while IDOC relied on Wexford to schedule appointments for Audiological Evaluations, IDOC offered Wexford "no guidance, no supervision, [and] no monitoring" regarding its Settlement obligations during Year One. (R. 703, Pls.' Mem. at 10-15; R. 715, Pls.' Reply at 4-5.) And although Wexford's "upper management" received the Settlement during August or September 2018, neither IDOC nor Wexford informed Smith or Ohleger—the individuals tasked with retaining providers to perform audiological services for IDOC inmates—that "only licensed audiologists" could perform Audiological Evaluations until the end of Year One. (R. 751, Stipulations at 7-8; R. 776, May 18, 2022 Hr'g Tr. at 48-49, 214-15, 293.) During the evidentiary hearing, Smith confirmed that through the fall of 2018, she was not aware of the Settlement, and that through July 2019, she was not aware that only audiologists could perform Audiological Evaluations. (R. 776, May 18, 2022 Hr'g Tr. at 49, 56-57; see also id. at 214-15 (Ohleger testified that on July 24, 2019, she emailed Wexford regional managers and medical directors, informing them that LHIDs could no longer be used).) As a result,

13

during Year One Smith searched for and retained primarily LHIDs, rather than audiologists, to perform Audiological Evaluations. (Id.) By the end of Year One, there was a stronger need for audiologists to treat qualifying inmates because LHIDs could no longer be used, and the 700 inmates who saw LHIDs had to be sent for Audiological Evaluations. (Id. at 57-58, 215-16.) Even then, IDOC had no involvement in retaining audiologists to evaluate qualifying inmates and did not work with Wexford to alleviate the backlog. (R. 701, Pls.' Mot. Exs. F1 at 190-216, F2 at 74-75, 106-21, 170-207.)

### 2.    Year Two

IDOC cites evidence showing that in Year Two Wexford identified and retained three additional audiology groups to provide services to qualifying inmates. (R. 715, IDOC's Resp. at 12 (citing R. 701, Pls.' Mot. Ex. B (noting contracting start dates of Aug. 1, 2019, Jan. 1, 2020, and May 1, 2020, for Thomas H. Boyd Memorial Hospital, Advanced Hearing Systems LLC, and Richland Memorial Hospital Inc., respectively).) At the beginning of Year Two, Smith emailed IDOC facility staff, informing them she would contact audiologists across Illinois and wanted assistance. (Id. at 12 & Ex. H.) An IDOC facility staff member responded that she had reached out to five possible audiologists without success. (Id.) Smith similarly wrote in an email to a colleague that there were "no additional providers to add at this time, despite my numerous calls and inquiries." (Id. at 12 & Ex. I.) In August 2019 IDOC's medical director wrote that the need for more audiologists was "on the radar at the highest levels of IDOC." (Id. at 12 & Ex. J.) IDOC facility staff continued to send

possible provider recommendations to Wexford, but none panned out. (Id. at 13 & Exs. M, N.) In any event, IDOC asserts that qualifying inmates were sent for Audiological Evaluations during Year Two. (Id. at 13; see also R. 701, Pls.' Mot. Exs. A, D (pointing to Plaintiffs' inmate wait-time charts to assert it sent qualifying inmates for Audiological Evaluations in Years One and Two).)

IDOC also points to a series of internal emails it says shows it was trying to identify additional audiologists. IDOC cites for example a September 27, 2019 email from a Shawnee healthcare administrator notifying staff that about 40 inmates were waiting to see an audiologist, and that a facility in St. Louis had "penciled in" these inmates for appointments in January 2020. (R. 751, Stipulations at 4.) On December 20, 2019, an IDOC employee emailed a Wexford manager the name and contact information of another audiologist who possibly could treat these inmates, so that they would not need to be transported a farther distance to St. Louis. (Id. (citing R. 715, IDOC's Resp. Ex. M).) And on January 7, 2020, a Pinckneyville staff member emailed Wexford a list of 10 possible audiologist candidates, but not one was retained to provide services.[7] (Id. at 4-5 (citing R. 715, IDOC's Resp. Ex. N).)

Plaintiffs point out that during Year Two IDOC in fact secured only three audiology groups, and they lost one of the groups previously retained. (R. 701, Pls.'

---

[7] At the beginning of Year Three, an IDOC healthcare administrator emailed staff that seven inmates had been awaiting Audiological Evaluations since July 2019, but the local provider who previously had been used refused to treat them, in part because of Covid concerns. (R. 751, Stipulations at 5.) The administrator noted she made alternate arrangements for two of the inmates and "expressed an interest in developing further plans to avoid long wait-times in the future." (Id.)

15

Mot. at 9-10 & Exs. B, B1.)  The new groups treated "only 20 inmates total in [Years Two and Three] of the Settlement monitoring period."  (Id.)  And by late 2019 and 2020, IDOC officials held "internal discussions about the backlog of individuals in custody" needing Audiological Evaluations.  (R. 751, Stipulations at 4 (citing R. 701, Pls.' Mot. Ex. F1 at 82-87).)  Following these discussions, IDOC officials agreed that "certain facilities would have to expand the geographic scope of providers, reach out to any audiologist that might accept IDOC individuals in custody, and hire more audiologists, even if that meant individuals in custody would be sent two or three hours away for their appointments."  (Id.)

To demonstrate the extent of the backlog, Plaintiffs submitted charts they created showing long average inmate wait times between referral to an audiologist and performance of an Audiological Evaluation.  (R. 701, Pl.'s Mot. at 8-9 & Exs. A, D.)  Plaintiffs assert these charts show that, at least for Years One and Two, qualifying inmates were either not sent to Audiological Evaluations or they experienced significant delays in being sent for such evaluations.  In some IDOC facilities the average wait times ranged from seven to as many as sixteen months. (Id. (noting that Lawrence had wait times from 2019 to March 2020 of seven to thirteen months, Lincoln had wait times from November 2018 to March 2020 of ten to fourteen months, Menard had wait times from September 2019 to July 2020 of seven months to almost a year, and Pinckneyville had wait times from May 2019 to March 2020 of seven to sixteen months).)  And "across all IDOC facilities, about 259 inmates had to wait over a year, 86 inmates had to wait over 18 months, and 37

inmates had to wait over two years" for Audiological Evaluations. (Id.; see also R. 776, May 18, 2022 Hr'g Tr. at 173 (noting that at one point about 2,000 qualifying inmates were waiting for Audiological Evaluations).)

### 3. Years Three and Four

To reduce audiological treatment backlogs at IDOC facilities, in Year Three Wexford launched a comprehensive "Audiology Project." (R. 701, Pls.' Mot. at 7, 13; R. 751, Stipulations at 5-7.) Under this project, Wexford assigned four of its contracting specialists to work with Smith to locate audiologists to treat qualifying IDOC inmates, (R. 701, Pls.' Mot. at 7 & Exs. F3 at 126, F5 at 248-328; R. 776, May 18, 2022 Hr'g Tr. at 17-18), resulting in the identification of 902 audiologists registered and licensed in Illinois, including 765 with Illinois addresses, (R. 751, Stipulations at 6). Ohleger then divided the list of 765 audiologists and assigned portions to each of the five contracting specialists. (Id.) Next, the contracting specialists contacted the audiologists on their list to assess their interest in treating IDOC inmates, and recorded whether each audiologist was reached and, if so, whether he or she was interested in working with IDOC. (Id.; see also R. 701, Pls.' Mot. Exs. G9, G54, G82; R. 715, IDOC's Resp. Ex. C.) Finally, for the audiologists who indicated an interest in treating IDOC inmates, Smith tried to reach agreements to include them in Wexford's provider network for IDOC. (R. 751, Stipulations at 7.)

Ultimately, 176 individual audiologists expressed interest in working with IDOC, and in early 2021, Wexford retained 12 new audiology groups to provide services to qualifying inmates, including two groups of audiologists that treat inmates

on site at IDOC facilities. (R. 701, Pls.' Mot. at 14-15 & Ex. B.) As a result, between August and December 2021, IDOC "slashed the number of those waiting for audiology appointments from 312 individuals in custody to 205 individuals in custody." (R. 715, IDOC's Resp. at 7 & Ex. C.) And as of December 1, 2021, only 29 inmates had been waiting more than 90 days for Audiological Evaluations. (Id.; R. 701, Pls.' Mot. at 15 & Ex. F at 17-22.) Notably though, IDOC did not present any evidence to show any efforts made to send inmates to those areas where audiologists were ready and willing to treat inmates. Ohleger's testimony shows that Wexford had limitations on where it can send inmates for Audiological Evaluations.

## C. Factual Findings

Having reviewed the evidence and testimony presented, the court agrees with Plaintiffs that during Years One and Two IDOC failed to use best efforts to send qualifying inmates to audiologists for Audiological Evaluations. While the evidence shows that Wexford exercised good faith efforts to retain professionals to provide audiological services to qualifying IDOC inmates, IDOC did not adequately supervise Wexford to ensure compliance with the Settlement or support Wexford in any meaningful way to address the increased demand for audiological services. Furthermore, IDOC did not implement any new measures on its own to maintain adequate staffing of audiologists to allow qualifying inmates to receive Audiological Evaluations or arrange for the transportation of inmates to the facilities that had available audiological services. While this court cannot impose a "specific type" or "level of performance" required by the best-efforts obligation in the Settlement's

18

Referral Provision, *Bd. of Educ.*, 799 F.2d at 292 & n.8, here IDOC failed to abide by the parties' reasonable expectations that, during Years One and Two, qualifying inmates would actually be sent to audiologists for Audiological Evaluations as contractually agreed. As discussed further below, the result is clear: although some qualifying inmates received the benefits for which they bargained in the Settlement, many others did not. *See Vincent*, 183 Ill. App. 3d at 1090 (requiring contracting party to exercise discretion "reasonably and not arbitrarily or capriciously" and to ensure "the other party's right to receive the fruits of the contract").

### 1. Lack of Oversight

IDOC failed to take reasonable efforts to supervise Wexford's compliance with the Settlement. The Settlement does not preclude IDOC from relying on its agent Wexford to send qualifying inmates to audiologists for Audiological Evaluations. But the evidence is clear that IDOC delegated its contractual responsibilities to Wexford despite the fact that IDOC enjoys more discretionary authority than Wexford and IDOC, not Wexford, was required to comply with the Settlement's obligations. *Holmes*, 991 F.3d at 782-83. Here, IDOC dropped the ball by failing to inform Wexford of the Settlement when it became effective in July 2018. (R. 751, Stipulations at 7-8; R. 776, May 18, 2022 Hr'g Tr. at 48-49.) About a month or two later, IDOC communicated with Wexford's "upper management" about the Settlement but did not ensure that Wexford employees responsible for handling the IDOC contract understood the Settlement's obligations, particularly with respect to Audiological Evaluations. (R. 776, May 18, 2022 Hr'g Tr. at 49-51, 214-16.) Although

19

Wexford had specific procedures for referring qualifying inmates for Audiological Evaluations, those procedures did not include adequate measures to actually send qualifying inmates to audiologists for Audiological Evaluations. (R. 751, Stipulations at 8 (admitting that "[t]he time it takes to actually schedule and conduct an appointment with an audiologist varies and depends on the availability of audiologists for that facility").) And IDOC neither provided nor offered to provide any assistance or guidance to Wexford in this regard. As a result, efforts taken by Wexford did not translate into receipt of the fruits of the contract for many qualifying inmates. *Vincent*, 183 Ill. App. 3d at 1090. In other words, even if Wexford exercised best efforts, given its resources and limitations, its best efforts do not mean that IDOC exercised best efforts.

To be sure, IDOC delegated its responsibilities under the Settlement without instructing Wexford that *audiologists* had to perform Audiological Evaluations. Smith and Ohleger—the Wexford employees tasked with identifying and retaining audiology providers—testified that they were not informed that the Settlement required licensed audiologists to perform Audiological Evaluations. (R. 776, May 18, 2022 Hr'g Tr. at 49-50, 214-16.) Without oversight by IDOC, Wexford retained LHIDs to perform Audiological Evaluations throughout Year One. Consequently, while about 1,400 qualifying inmates received Audiological Evaluations during Year One, (R. 701, Pls.' Mot. Ex. A), only about half were performed by audiologists, necessitating reexaminations for the approximately 700 inmates whose evaluations were conducted by LHIDs, (R. 751, Stipulations at 7). IDOC's failure resulted in

significantly increased waiting times for those inmates and others.  (R. 701, Pls.' Mot. Ex. A (indicating, for example, inmate wait times of 152.46 days in Jan. 2019 and 232.50 days in Oct. 2019)).)  Had IDOC supervised Wexford to ensure compliance, qualifying inmates would not have experienced these additional delays.

### 2.  Shortage of Audiologists

Even after IDOC stopped using LHIDs, IDOC failed to retain enough audiologists to allow qualifying inmates to actually be sent for Audiological Evaluations.  After the Settlement went into effect, Wexford scheduled more appointments for Audiological Evaluations, resulting in a greater need for audiologists.  (R. 776, May 18, 2022 Hr'g Tr. at 50, 169, 253.)  Yet from August 2018 to July 2019, Wexford secured only "two additional audiologist groups" to perform Audiological Evaluations, and one of those groups treated "only 13 IDOC inmates in the first two years of the Settlement monitoring period."  (R. 701, Pls.' Mot. at 9-10 & Exs. B, B1.)  The following year, from August 2019 to July 2020, Wexford secured three audiologist groups, but it lost one of the groups previously retained.  (Id.)  And two of the new groups treated "only 20 inmates total in years 2 and 3 of the Settlement monitoring period."  (Id.)  Wexford's efforts to retain audiologists simply were not sufficient to meet the growing need for audiologists to provide services to IDOC inmates locally, and IDOC took no actions to resolve or mitigate this problem despite having knowledge of it.

Wexford faced two key issues in trying to find additional audiologists.  First, in Years One and Two, Wexford lacked sufficient resources to conduct an adequate

search. As noted, Smith was the sole Wexford employee tasked with searching for and contacting audiologists to provide services to qualifying inmates.[8] (Id. at 52-53, 174, 243-44.) And while she testified that since starting as a contract specialist at Wexford in about 2016, through about early 2021, she made at least 50 to 100 calls to potential audiology providers to assess their interest in working with IDOC inmates, (id. at 136-37, 144, 267 & Ex. B), her efforts produced few results, and did not resolve the increasing need for audiologists to perform the required evaluations. Smith said that one tool she was lacking, which would have been useful, was a list of licensed audiologists in Illinois, but in Years One and Two Wexford failed to secure this list. (R. 776, May 18, 2022 Hr'g Tr. at 181.) Thus, Wexford's efforts to retain audiologists—no matter how well-intentioned—barely scratched the surface in terms of meeting the evaluation needs of qualifying inmates.

Second, Wexford limited its scope of potential audiologists based on its perceptions of what IDOC wardens would allow. Smith and Ohleger testified, for example, that when identifying providers, Wexford tried to stay within a certain distance (generally 100 miles) of an IDOC facility housing qualifying inmates because it assumed IDOC wardens would object to allocating officers to transport inmates

---

[8] Smith testified that in addition to trying to identify audiologists interested in treating IDOC inmates, she also searched for providers in other areas, such as cardiology, pulmonology, and oncology, to treat IDOC inmates. (R. 776, May 18, 2022 Hr'g Tr. at 14-15, 19, 248.) And in addition to performing contracting specialist duties for the IDOC contract, Smith assisted with claims processing and credentialing work for Wexford. (Id. at 23-26.) Ohleger testified that Smith might have worked about 10 to 15 percent of the time on projects unrelated to Wexford's contract with IDOC. (Id. at 209-10.)

farther than that.[9]  (Id. at 125-26, 200-01, 217, 289 (Ohleger testified that "if [Wexford] contract[s] with audiologists that are too far from a facility and the scheduler schedules there, [IDOC] may not transport [inmates to their appointments]").)  Ohleger also testified that Wexford tried to avoid scheduling appointments in Cook County, where IDOC did not have facilities, to avoid friction with IDOC wardens concerned about "transport[ing inmates] to Cook County from a distance."  (Id. at 226-27 ("[I]f we would have identified providers in Cook County, which it ended up we did not, the problem becomes convincing the facilities to transport that far for services.").)  Because it took Wexford a significant amount of time to identify and contract with audiologists, Ohleger said she worried that identifying audiologists too far from IDOC facilities would result in wasted resources. (Id. at 289-90.)  As a result, Wexford limited its searches for available audiologists without guidance from IDOC officials charged with ensuring compliance with the Settlement.  (See id. at 125-26.)

IDOC failed to guide or assist Wexford in dealing with these problems, or in taking actions on its own initiative to deal with the backlog.  IDOC is correct that the Settlement contains no provisions explicitly requiring it to hire a certain number of audiologists or to cure the apparent shortage of audiologists willing to evaluate qualifying inmates in IDOC custody.  But as part of its best-efforts obligation, IDOC

---

[9] This assumption was borne out by an August 2019 email in which a Vienna facility staff member noted that a St. Louis treatment center had agreed to treat qualifying inmates, but IDOC's medical director felt that the volume of inmates needing treatment and two-hour distance to the facility would "create many issues."  (R. 751, Stipulations at 9; R. 715, IDOC's Resp. Ex. J.)

was required to take some steps to send qualifying inmates to audiologists for Audiological Evaluations. *Holmes*, 991 F.3d at 782. Where, as here, there were not enough audiologists to evaluate qualifying inmates, and that shortage prevented inmates from receiving their bargained-for services, IDOC was required to undertake some effort to cure the shortage, such as by: adding more resources to search for and retain additional audiologists; offering audiologists incentives, such as travel stipends or bonuses, to treat inmates away from their home area; partnering with local university health systems; hiring permanent or contract audiologists; or making the necessary arrangements to send inmates outside the typical traveling area for medical appointments. (R. 751, Stipulations at 5.) IDOC did not submit evidence showing that it did so during Years One or Two.[10]

Midway through Year One and well into Year Two, IDOC and Wexford were aware of an increased need for qualifying inmates to be sent for Audiological Evaluations. (Id. at 3-5.) By early 2019, IDOC's medical director clearly was concerned about the need for audiologists because he began investigating which providers IDOC facilities were using. (Id. at 3 (citing R. 701, Pls.' Mot. Ex. F1 at 196-97).) Other IDOC employees also tried to identify audiologists who could treat qualifying inmates. (See, e.g., id.) Even IDOC's ADA coordinator questioned, "[I]s there anything else we can do to try to get these guys scheduled"? (Id. (citing R. 715,

---

[10] Ohleger testified at the hearing that when retaining audiologists, Wexford initially offered Medicare reimbursement rates but would negotiate higher rates of billed charges if requested. (R. 776, May 18, 2022 Hr'g Tr. at 303-04.) But IDOC did not submit evidence showing the extent to which it agreed to pay higher rates to retain audiologists during Years One or Two.

IDOC's Resp. Ex. G).) Yet, the evidence does not show that IDOC did anything to address the situation.

By late 2019, IDOC officials recognized that the need for audiologists was even greater. Indeed, IDOC held "internal discussions about the backlog of individuals in custody," and finally agreed that additional measures needed to be taken. (Id. at 4 (citing R. 701, Pls.' Mot. Ex. F1 at 82-87).) For example, IDOC employees suggested that "certain facilities would have to expand the geographic scope of providers, reach out to any audiologist that might accept IDOC individuals in custody, and hire more audiologists, even if that meant individuals in custody would be sent two or three hours away for their appointments." (Id.) IDOC does not explain, however, how these discussions led to the adoption of any policies or action items to clear the backlog—or the extent to which, if at all, it coordinated with Wexford to retain additional audiologists, at least during Years One and Two. (See id. at 4-5.)

The record therefore shows that IDOC was aware of the problem, knew Wexford was struggling to find additional audiologists, and imposed often-unspoken geographic constraints on Wexford that made retaining audiologists more difficult. The record also shows that IDOC brainstormed solutions to the specific difficulties Wexford faced such as by proposing an expansion of the geographic range of providers and expanding outreach to more audiologists. That IDOC failed to act on this knowledge or these recommendations in any meaningful way is indicative of IDOC's failure to exercise best efforts to comply with the Settlement during Years One and Two.

### 3. Insufficiency of Efforts

Regardless, IDOC argues its efforts were sufficient because some inmates were actually sent to audiologists for Audiological Evaluations during Years One and Two. (R. 715, IDOC's Resp. at 6 (citing R. 701, Pls.' Mot. Ex. A).) However, IDOC's efforts were sporadic at best—and the court wonders whether its efforts were in response to the monitoring process and Plaintiffs' repeated complaints or its contractual obligations under the Settlement. For example, in September 2019 an IDOC health care administrator at the Shawnee facility notified staff that 40 inmates were waiting to see an audiologist, and that a facility in St. Louis had "penciled in" these inmates for appointments in January 2020. (R. 751, Stipulations at 4.) On a few occasions, IDOC employees provided Wexford with names and contact information for potential audiologists to treat qualifying inmates. (Id. (citing R. 715, IDOC's Resp. Exs. M, N).) And others within IDOC expressed interest in identifying which audiologists were being used and ways to reduce inmate wait times. (Id.) Rather than showing the sufficiency of IDOC's efforts, however, this evidence demonstrates the lack of a coordinated effort by IDOC to ensure qualifying inmates at nearly 30 IDOC facilities were actually being sent to audiologists for Audiological Evaluations.

Moreover, Plaintiffs' wait-time charts show that at least during Years One and Two, qualifying inmates waited significant amounts of time between the referral and the actual evaluation. (R. 701, Pls.' Mot. 8-9 & Exs. A, D.) In some IDOC facilities the average wait times for evaluations ranged from seven to as many as sixteen months. (Id.) And "across all IDOC facilities, about 259 inmates had to wait over a

year, 86 inmates had to wait over 18 months, and 37 inmates had to wait over two years" for Audiological Evaluations. (Id.) While the Settlement includes no set timetable for completion of Audiological Evaluations, IDOC was still required to exercise good faith in sending qualifying inmates to audiologists for such evaluations. *Holmes*, 991 F.3d at 782-83. In carrying out its Settlement obligations, IDOC therefore had to act "in a manner consistent with the reasonable expectations of the parties" and ensure qualifying inmates received Audiological Evaluations in a timely manner. *Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1445 (7th Cir. 1992).

In stark contrast to efforts taken during the first two years of the Settlement monitoring period, in Year Three IDOC coordinated with Wexford to develop a plan—the Audiology Project—to cure the shortage of audiologists available to provide Audiological Evaluations to qualifying inmates. These efforts finally produced tangible results. Whereas in Years One and Two, Wexford's Smith identified only a handful of audiology groups that were interested in providing services to IDOC inmates, in Year Three Wexford's expanded team of five contracting specialists (including Smith) identified nearly 100 interested audiologists who were not yet treating IDOC patients. (R. 776, May 18, 2022 Hr'g Tr. at 91-92, 96, 280.) This led Wexford to contract with 12 new audiology groups that year. (Id.) While the Settlement does not specify the steps IDOC must take to ensure qualifying inmates are sent to audiologists for Audiological Evaluations, there is no dispute that the measures taken by IDOC and Wexford in Year Three satisfy the best-efforts obligation.

To be sure, through the Audiology Project initiative, Wexford engaged a team of five contracting specialists to identify audiologists registered and licensed in Illinois, and their efforts resulted in the identification of 902 audiologists. (R. 751, Stipulations at 6.) The contracting specialists then contacted the 765 audiologists who had Illinois addresses to assess their interest in treating IDOC inmates and recorded the audiologists' responses in spreadsheets. (Id.; see also R. 701, Pls.' Mot. Exs. G9, G54, G82; R. 715, IDOC's Resp. Ex. C.) Finally, Smith tried to reach agreements with interested audiologists to include them in Wexford's provider network. (R. 751, Stipulations at 7.) These measures yielded some measure of relief. As mentioned, in early 2021 IDOC retained 12 new audiology groups to provide services to qualifying inmates, including two groups that work on site at IDOC facilities, and by the end of 2021, the backlog of inmates needing audiological services decreased significantly. (R. 701, Pls.' Mot. at 14-15 & Exs. B, F.)

Plaintiffs argue that the Audiology Project should have been started at the beginning of the Settlement monitoring period, not two years later. (Id. at 13-15.) IDOC responds that the Settlement "contains no terms about immediate efforts to increase the supply of outside audiologists," and therefore its efforts at least during Year One "do not require much attention." (R. 715, IDOC's Resp. at 9.) By its reasoning, the efforts IDOC took during Year Three are sufficient to satisfy its best-efforts undertaking. But IDOC points to no language in the Settlement—or the Seventh Circuit's decision—limiting the best-efforts obligation to only a portion of the Settlement's effective period. And while the court cannot add terms to the Settlement

dictating which measures IDOC had to take to fulfill its obligations, the Seventh Circuit made clear that IDOC could not "sit on its hands," and was required to take actions that comport with the exercise of good faith. *Holmes*, 991 F.3d at 782-83; *see also Bd. of Educ.*, 799 F.2d at 292. The court therefore declines to gloss over the efforts—or lack thereof—taken by IDOC in Years One or Two.

IDOC also argues that it has paid the price for violating the Settlement by improperly using LHIDs during Year One. (R. 715, IDOC's Resp. at 25-28.) IDOC points out that the court previously ordered it to pay $52,357.50 in attorneys' fees and $1,741.35 in costs for its substantial non-compliance with the Settlement's obligation to use licensed audiologists for Audiological Evaluations.[11] (R. 573 at 3, 14; R. 615; see also R. 446-2, Settlement ¶ 14.) But the improper use of LHIDs was only part of IDOC's continued violation of the Settlement. As set forth above, during Years One and Two IDOC did not use best efforts to monitor or oversee Wexford's actions, retain additional audiologists, or ensure compliance with the Settlement. Besides, a payment of fees and costs for Plaintiffs' attorneys to investigate non-compliance does nothing to address the inmates' failure to receive the benefits for which they bargained. Therefore, IDOC violated the Settlement during that period. While the court agrees that IDOC cannot be penalized twice for the same action of improperly using LHIDs, relief still may be assessed based upon a continued violation that occurred in Year Two, as well as the fact that IDOC's failure to use its best efforts

---

[11] Plaintiffs reported in May 2022 that IDOC has not paid the attorneys' fees or costs previously ordered by the court. (See R. 573 at 3, 14; R. 615.)

adversely impacted services for qualifying inmates during Years Three and Four. There must be a cost for IDOC's noncompliance. To address the relief to which Plaintiffs are entitled, the court will require the parties to first confer on this issue and if they cannot reach an agreement, they will then brief the issue.

### Conclusion

For the foregoing reasons, Plaintiffs' motion to find IDOC in violation of the Settlement is granted.

ENTER:

Young B. Kim
United States Magistrate Judge

30